FILED
IN CLERKS OFFICE
2004 JUN 16 A 10: 31
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
ex rel. JOHN M. GREABE,
PLAINTIFFS

v.

BLUE CROSS BLUE SHIELD ASSOCIATION
225 North Michigan Avenue
Chicago, IL 60601;

ANTHEM, INC.
120 Monument Circle
Indianapolis, IN 56204

and

BLUE CROSS BLUE SHIELD ASSOCIATION
OF NEW HAMPSHIRE
3000 Goffs Falls Road
Manchester, NH 03111-0001

DEFENDANTS.

CIV. ACTION NO.

04 CV 11355 MEL

COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT (Title 31, U.S.C. §3729)

~~FILED IN CAMERA AND UNDER SEAL~~

JURY TRIAL DEMANDED

Plaintiff John M. Greabe files this Complaint against Defendants BLUE CROSS BLUE SHIELD ASSOCIATION, ANTHEM, INC., and BLUE CROSS BLUE SHIELD ASSOCIATION OF NEW HAMPSHIRE and alleges as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made or caused to be made by the defendants to the United States in violation of the False

Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (the "FCA"). The false claims and statements at issue involve claims for payments billed under the Federal Employees Health Benefit Act, Medicare, Medicaid, Tricare and other federal health care programs.

2. The FCA was originally enacted in 1863 during the Civil War. In 1986, finding that fraud in federal programs was pervasive and that the FCA was in need of modernization, Congress substantially revised the FCA by passing the False Claims Amendments Act. Characterizing the FCA as a primary tool for combating government fraud, Congress used the 1986 amendments to enhance the government's ability to recover losses sustained as a result of fraud against the United States. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction.

3. The FCA provides that any person who knowingly submits a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The Complaint must be filed under seal for 60 days (without service to the defendants during that time to allow the government time to conduct its own investigation and to determine whether to join the action.

4. Pursuant to the Act, plaintiff seeks to recover damages and civil penalties arising from false and improper denials of claims for payment which were submitted, or caused to be submitted to Defendants by beneficiaries of Federal Employees Health Benefit Plans ("FEHBP") and, on information and belief, as well as Medicare, Medicaid, Tricare and other federal health insurance programs.

## II. SUMMARY OF THE CASE

5. Defendants have systematically defrauded enrollees of FEHBP, Medicare, Medicaid, Tricare and other federal health insurance programs by improperly denying reimbursement for claims by beneficiaries of these healthcare programs for medically necessary treatments for mental disorders.

6. Annually, the federal Office of Personnel Management ("OPM") has purchased from the Blue Cross and Blue Shield Association ("BCBSA") on behalf of federal employees who wish to enroll, a fee-for-service health insurance plan known as the Service Benefit Plan. The Service Benefit Plan provides claims coverage for, *inter alia*, all "medically necessary" speech, occupational and physical therapy.

7. RELATOR has learned that, in administering the Service Benefit Plan and in overseeing the administration of all Blue Cross Blue Shield plans, the BCBSA has been denying a broad class of claims for speech, occupational and physical therapy, even through the claims are for services that are "medically

necessary." The BCBSA denies claims for speech, occupational and physical therapy when those claims are submitted in connection with a "mental disorder" diagnosis. The BCBSA computer system automatically denies claims for speech, occupational and physical therapy submitted in connection with a "mental disorder" diagnosis, while knowing that speech, occupational and physical therapy can properly be "medically necessary" treatments for "mental disorders." The BCBSA's behavior is knowing, willful, unlawfully discriminatory, and fraudulent.

8. The government is harmed by the BCBSA's fraudulent conduct in three ways. First, the designated beneficiaries of the Service Benefit Plan, federal employees and family members who are enrolled in the Plan, must either forego health insurance benefits to which they are entitled or undertake the burden of appealing the improper denials to OPM. Second, BCBSA is providing reimbursement and claims administration services under the Service Benefit Plan that are inferior to, and thus worth less than, the services for which the government has bargained and to which it is contractually entitled. Third, government-funded programs such as Medicare and Tricare, which sometimes serve as "secondary payers" to persons enrolled in Blue Cross Blue Shield policies as their primary health insurance, are wrongfully being asked to provide reimbursement for services that should be covered, but are not being covered, under the Blue Cross Blue Shield policies. Fourth, enrollees are wrongly referred to local social service agencies and school districts to provide the therapies which the Defendants have contracted to provide..

## III. THE PARTIES

### A. The Relator

9. The RELATOR, JOHN M. GREABE, is a career employee of the federal judiciary. RELATOR is a graduate of the Harvard Law School and is admitted to the practice of law. He has been a visiting assistant professor of law at Vermont Law School and an adjunct professor of law at Franklin Pierce Law Center.

10. RELATOR is married and has three children. The federal government offers RELATOR a choice of health insurance plans which it purchases from carriers under contract with the federal government. For many years, RELATOR and his family have subscribed to the Blue Cross and Blue Shield's Service Benefit Plan's "Standard Option – Self and Family" ("Service Benefit Plan"). Subscribers are required to submit claims on a "Health Benefits Claim Form".

11. On April 12, 2000, RELATOR's middle child was diagnosed by a speech and language pathologist, as having a phonological process disorder and a neurologically based oral dyspraxia.

12. On November 23, 1999, and May 29, 2000, the child's pediatrician prescribed speech and occupational therapies for the child.

**B. The Defendants**

**i. Blue Cross and Blue Shield Association**
**225 North Michigan Avenue**
**Chicago, IL 60601**

13. The Blue Cross and Blue Shield Association ("BCBSA") is a Chicago-based membership organization of locally operated companies referred to as "Member Plans," "Local Plans," or "Blue Plans." These Local Plans are located in every state, the District of Columbia and Puerto Rico. They offer health insurance products to individuals, small businesses, seniors and large employer groups.

14. BCBSA enters into an annual contract for health insurance for federal employees with the Office of Management and Budget ("OPM"). The resulting contract is the Service Benefit Plan, *supra*. The Service Benefit Plan is underwritten by participating Blue Cross and Blue Shield Local Plans, which administer it on behalf of the BCBSA, the carrier.

**ii. Anthem Inc.**
**120 Monument Circle**
**Indianapolis, IN 56204**
**Phone: (317) 488-6000**

15. Anthem, Inc. ("ANTHEM") is a health benefits company operating in the United States. ANTHEM serves more than 11.9 million members (customers), primarily in Indiana, Kentucky, Ohio, Connecticut, New Hampshire, Maine, Colorado, Nevada and Virginia, excluding the immediate suburbs of

Washington, D.C. The Company owns the exclusive right to market its products and services using the Blue Cross and Blue Shield (BCBS) names and marks in all nine states under license agreements with the BCBSA. ANTHEM's products include managed care products, such as preferred provider organizations (PPOs), health maintenance organizations (HMOs) and point-of-service (POS) plans, as well as traditional indemnity products. The Company also offers a range of administrative and managed care services and partially insured products for employer self-funded plans. One of its subsidiaries, ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHIRE, is the Local Plan for the residents of New Hampshire.

**iii. Anthem Blue Cross and Blue Shield of New Hampshire**
**3000 Goffs Falls Road**
**Manchester, NH 03111-0001**
**Phone: (603) 695-7000**

16. ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHIRE ("ANH") is the Local Plan, owned by ANTHEM. It is ANTHEM's representative to federal Service Benefit Plan enrollees in New Hampshire.

## IV. JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

18. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, at least one of the Defendants can be found in, resides or transacts or has transacted business in the District of Massachusetts.

19. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least one Defendant can be found in, resides or transacts or has transacted business in the District of Massachusetts.

## V. BACKGROUND

20. Although RELATOR is informed upon information and belief that the Defendants employ the false claims practice described herein in all health insurance programs operated by the federal government in which Defendants are participants, RELATOR has direct knowledge and evidence of the claims fraudulently denied by Defendants involving the FEHBA. Allegations relating to other federal or state health insurance programs are made upon information and belief.

### A. The Service Benefit Plan

21. The Service Benefit Plan offers comprehensive medical coverage, including "medically necessary" speech, occupational and physical therapy.

22. The Service Benefit Plans is a fee-for-service health insurance plan, purchased by the United States Office of Personnel Management ("OPM") from

the Blue Cross Blue Shield Association (the "carrier"), on behalf of its Local Blue Cross Plans. The Service Benefit Plan is then offered to federal employees under the Federal Employee Heath Benefit Act ("FEHBA"), Title 5 U.S.C. § 8901 *et seq.*, and its implementing regulations, 5 C.F.R. Part 890, *et seq.*

23. The United States Treasury funds 72% f the Service Benefit Plan's annual premium, the federal employees pay the remaining 28%. The contract between OPM and BCBSA grants the Local Plans a line of credit, drawn on the U.S. Treasury, to cover their expenses and to collect their profits under the BCBSA's annual contract with OPM.

24. Claims must be filed with the carrier of the covered individual's health benefit plan (5 C.F.R. Part 890 Section 105).

**B. Relator's Direct and Independent Knowledge of the FCA Violations**

25. In late summer 1999, RELATOR, his wife, and their family physician became concerned about the speech development of one of RELATOR's children, who was then two years old.

26. RELATOR and his wife contacted a local Early Intervention social services agency, which conducted an assessment of their son's speech development.

27. The assessment team concluded that RELATOR's son's articulation development was "significantly delayed" and that he was eligible to receive, on a

weekly basis, publicly funded speech therapy from a licensed speech therapist until the age of three.

28. Pursuant to this assessment, RELATOR's son received weekly speech therapy services from a licensed speech therapist until his third birthday, at which point Early Intervention services were no longer available.

29. For children age 3 and up, the local public school district becomes responsible for any publicly funded speech and occupational therapy to which a child is entitled.

30. Prior to RELATOR's son's third birthday, RELATOR and his wife contacted the Concord, New Hampshire School District's speech and language director to request that the district continue to provide RELATOR's son with necessary therapies beyond his third birthday.

31. RELATOR and his wife were told that their son's entitlement to services had to be assessed under the district's education-based criteria, and that the assessment would be conducted over the course of the second semester of the 1999-2000 school year in the district's speech and language preschool program.

32. To ensure continuity in their son's therapy after he turned three, RELATOR and his wife contracted to continue weekly speech therapy after the boy's third birthday until the start of the district's second semester in December 1999. The sessions ran from November 11, 1999 – December 1, 1999, for a total cost of $280.00.

33. Because RELATOR's 1999 Service Benefit Plan covered "medically necessary" speech therapy conducted by licensed speech therapists, RELATOR's wife called ANH, and requested a "prior authorization" of the contemplated speech therapy sessions. A customer service representative told RELATOR's wife that prior authorization was not required because the 1999 Service Benefit Plan covered the sessions, if the services were "medically necessary."

34. In or about December 1999 and January 2000, RELATOR twice sent ANH's agent claims for reimbursement for the speech therapy sessions, along with supporting documentation establishing that the speech therapy was medically necessary.

35. RELATOR and his wife received no response and were told, during follow-up telephone conversations, that their claims and documentation had been lost and would have to be resubmitted.

36. In or about February 2000, RELATOR's family physician also submitted his written opinion to ANH that it was medically necessary that RELATOR's son receive speech therapy. The physician requested that such speech therapy be covered under RELATOR's health insurance plan. He received no response. His assistant was told, in a follow-up conversation, that his request and documentation had been lost.

37. Counting the physician's experience, there were three unexplained losses of claims for reimbursement and supporting documentation submitted by RELATOR, or on his behalf, between December 1999 and March 2000.

38. In or about early March 2000, during a follow-up telephone call inquiring about the status of RELATOR's third written claim for reimbursement for the speech therapy sessions (which was submitted on February 22, 2000), RELATOR's wife was told by a customer service representative that the claim had been denied because RELATOR's son had been treated in RELATOR's home. According to the representative, the Service Benefit Plan only covered speech therapy services delivered in a speech therapist's office.

39. RELATOR subsequently called ANH and objected that no such limitation or exclusion was in the 1999 Service Benefit Plan brochure or had been mentioned when RELATOR'S wife called to request prior authorization of the speech therapy sessions. Despite the fact that agent could point to no contractual provision requiring that speech therapy be provided in the therapist's office, the agent stated that the patient must go to the provider's office unless the patient had some physical impairment making travel dangerous and thus making it "medically necessary" that the services be provided in the home.

40. Meanwhile, during the spring of 2000, the Speech and Evaluation Team of the Developmental Preschool of the Concord School District completed its assessment of RELATOR's son. The Team concluded that, although RELATOR's son suffered from speech problems, he was not "educationally handicapped" within the district guidelines because his articulation delay was not handicapping his educational development. He was not eligible for therapy as a student with a disability.

41. As a result, RELATOR and his wife decided to retain another private speech therapist, to assess their son's medical needs and recommend a course of action.

42. On April 12, 2000, she issued her diagnosis, and concluded that RELATOR's son suffered from a phonological process disorder and a neurologically based verbal dyspraxia, manifesting itself in, *inter alia*, a hand tremor. She recommended speech therapy and occupational therapy.

43. On May 29, 2000, RELATOR's family physician concurred with the new therapist's neurological diagnosis and reiterated his request that ANH reimburse the recommended speech and occupational therapies.

44. Meanwhile, after reviewing the new assessment, and receiving word that his son was not eligible for services from the Concord School District, RELATOR requested that ANH agree to reimburse RELATOR for speech therapy sessions to be conducted during the summer of 2000. RELATOR supported his requests with copies of the evaluation and the Concord School District assessment team's report.

45. On May 30, 2000, RICHARD P. LAFLEUR, M.D., Assistant Medical Director of ANH, denied RELATOR's request for pre-certification for the proposed summer therapy sessions. His letter stated, *inter alia*:

> "After review of the medical information provided, the request for Speech Therapy is denied as it does not meet ANTHEM Blue Cross and Blue Shield's criteria because it [sic] is developmental in nature and can be done in the school system. This decision is based on nationally recognized criteria including Optimed, Milliman &

> Robertson Health Management Guidelines, the Commonwealth of Massachusetts Department of Industrial Accidents and Guidelines for Chiropractic Quality Assurance and Practice Parameters, and ANTHEM BC/BS Medical Policy."

(Emphasis supplied). RELATOR's son has never been involved in an industrial accident or been in need of chiropractic care.

46. Also, at some point in May 2000, ANH denied coverage for the cost of the April 12, 2000 assessment.

47. RELATOR subsequently called ANH to protest LAFLEUR's denial of pre-certification coverage for the proposed summer 2000 speech therapy sessions, as well as its denials of coverage for the earlier sessions and the cost of the original assessment. The customer service representative promised to follow up on RELATOR's protest.

48. Despite the May 30th denial of pre-certification for coverage for the Summer 2000 proposed course of speech therapy, RELATOR retained the therapist to provide the speech therapy.

49. During the first week of July 2000, a customer service representative informed RELATOR that ANH was going to cover the cost of the April 12, 2000 assessment. During this conversation, the representative led RELATOR to believe that ANH's decisions on payment for the first and second sessions were being reassessed. She asked that RELATOR hold off on further action until a final decision was reached.

50. In September 2000, RELATOR (who had heard nothing in the interim) called ANH and was told that the November/December 1999 speech therapy sessions and the summer 2000 speech therapy sessions would not be covered.

51. On October 2, 2000, RELATOR appealed to ANH and asked it to reverse its denials of coverage for the November/December 1999 speech therapy sessions and the Summer 2000 speech therapy sessions. His appeal noted that LAFLEUR's "not medically necessary" conclusion regarding the second session was contrary to the determination of the licensed health professionals who, unlike LAFLEUR, had actually examined his son. RELATOR argued that LAFLEUR had wrongly concluded that the availability of a school district's education-related speech therapy services would relieve ANH of its contractual obligation to provide medically necessary speech therapy services. RELATOR also noted that, in any event, the Concord School District had determined that his son was ineligible for services (as RELATOR had documented to LAFLEUR). Finally, RELATOR questioned why LAFLEUR had referred in his denial letter to patently irrelevant criteria such as the Commonwealth of Massachusetts Department of Industrial Accidents and Guidelines for Chiropractic Quality Assurance and Practice Parameters.

52. On October 26, 2000, in a letter from ANH Senior Customer Service Representative KELLY FEENY, ANH affirmed its denials of

coverage for the two therapy sessions. ANH again asserted that RELATOR's son should seek speech therapy services from the school system, even though it twice had been provided with copies of the Concord School District assessment team's conclusion that RELATOR's son was not entitled to services from the district.

53. The decision also enigmatically stated that RELATOR's documentation did "report" a "medical condition" and that the assessment "did not conclude a medical based condition that constituted the medical need for continuation of benefits."

54. In January 2001, RELATOR appealed ANH's denial of coverage for both benefits to the OPM, which referred the matters for an independent medical review.

55. On a March 5, 2001, OPM reversed the denial of coverage for the November/December 1999 speech therapy sessions, ruling that "the speech therapy was medically necessary for your dependent's diagnosis" (Ex. 15). ANH's FEENY acknowledged the reversal on April 9, 2001.

56. OPM did not address RELATOR's appeal of ANH's denial of coverage of the Summer 2000 speech therapy sessions.

57. After the OPM decision, RELATOR called an ANH representative and requested that it also provide reimbursement for the summer 2000 speech therapy sessions. RELATOR pointed out that these sessions were almost immediately followed by the medical diagnoses upon

which OPM relied when it overturned ANH's denial of coverage for the 1999 speech therapy sessions.

58. On June 27, 2001, ANH denied the claims pertaining to the summer 2000 sessions with a one-line written explanation: "Benefits are not paid for medical services which the local Blue Cross and Blue Shield Plan determines to be not medically necessary, or that does not provide the level of care required for your condition as explained in your . . . Plan brochure".

59. On June 27, 2001, RELATOR called ANH and spoke with customer service representative PAM LETIZI. LETIZI acknowledged that there are "structural problems here" and that "clearly our standards for 'medical necessity' and OPM's are not the same." RELATOR inquired why, despite the OPM reversal, ANH continued to deny these claims. LETIZI answered that employees of ANH "could lose their jobs" if a different determination was made. This was because New Hampshire personnel were applying standards and criteria that came from BCBSA; because "our system is programmed in such a way as to spit out your claims", and because, even after the successful appeal to OPM, "we had all sorts of trouble getting the system to take … [the ultimately successful claims for the speech therapy sessions] … for processing."

60. On July 2, 2001, RELATOR had two conversations with ANH Service Benefit Plan liaison LISA TWOHIG. In the first

conversation, TWOHIG expressed concern about how OPM might respond to yet another ANH denial of speech therapy reimbursement for RELATOR's son. TWOHIG informed RELATOR that she would contact an official who worked for BCBSA to see if anything could be done.

61. TWOHIG called back that same day to say that she had spoken to BARBARA HOLLEY in the Director's Office of BCBSA. HOLLEY had authorized ANH to pay the claims pertaining to the summer 2000 sessions. In the course of this conversation, TWOHIG informed RELATOR that ANH's denials of RELATOR's speech therapy claims were required under "Guidelines" BCBSA issued to all of the Local Plans. TWOHIG also stated that issues involving speech and occupational therapy for children were a "national problem" for BCBSA and were not "unique" to subscribers in New Hampshire. She stated that "most cases involving OPM reversals of Local Plan decisions are speech therapy cases." TWOHIG again mentioned her "concern about exposure to OPM." Finally, TWOHIG emphasized that the ANH's decision to cover speech therapy for RELATOR's son was not indefinite and could change.

62. On July 24, 2001, while reviewing the documents accumulated in the course of his dealings with BCBSA and ANH, RELATOR noticed that LAFLEUR's May 30, 2000 letter had stated that "[a] copy of the criteria used in … [denying RELATOR's Summer 2000 request for pre-certification] … may be obtained by calling 1-800-531-

4450." RELATOR called the number and asked for the criteria. The service representative said that she would have to call him back.

63. Later in the day, RELATOR received a call from ANH Senior Customer Service Representative KELLY FEENY, author of the October 26, 2000 decision denying RELATOR's initial appeal and the April 9, 2001 letter acknowledging OPM's reversal of ANH's denial of the November/December 199 claims. FEENY informed RELATOR that LAFLEUR's justification for the claim denial in his May 30, 2000 letter was "boilerplate language" that ANH had been sending out in its denials of coverage to customers that were not federal employees. FEENY stated that the denial decision was based upon guidelines, specifications, or and/or criteria dictated to ANH by BCBSA. When RELATOR asked FEENY for a copy of the written guidelines applicable to his son's situation, she refused, saying that BCBSA's guidelines were for "internal use only" and were regarded as "extremely private." FEENY also confirmed that denials by the Local Plans of claims for children's speech and occupational therapy were frequently reversed on appeal by OPM.

64. FEENY went on to state that BCBSA's national computer system, which is used by the Local Blue Plans when a claim is made by a beneficiary of the Service Benefit Plan, is programmed in such a way that all claims seeking coverage for speech therapy, occupational therapy, physical therapy and other "medical services" will be denied when they

bear "mental disorder" diagnosis codes. Although FEENY would not disclose the specific diagnosis codes that had been submitted in connection with the claims of RELATOR's son, she informed RELATOR that the codes corresponded to a "mental disorder" diagnosis. RELATOR subsequently learned that the diagnosis codes used in his son's submission were 315.4, 315.39 and 784-69. The meaning of these diagnosis codes is discussed *infra*.

65. FEENY explained that the ICD-9 classifies certain conditions, common in young children, as "mental disorders." FEENY asserted that BCBSA had programmed its computers to regard speech therapy, occupational therapy and physical therapy as "medical services" to be covered <u>only</u> when the claim forms contain corresponding "medical disease" diagnosis codes. In other words, she said, BCBSA's computer system will automatically reject all claims for "medical services" on claim forms containing a "mental disorder" diagnosis code, even when those services actually are "medically necessary" to treat the mental disorder.

66. FEENY agreed with RELATOR that, as a result of the BCBSA's computer system, the only way a plan beneficiary can obtain BCBSA's approval for a "medical service" prescribed for a condition bearing an ICD-9 "mental disorder" diagnosis code is to appeal BCBSA's automatic denial to OPM. FEENY informed RELATOR that his son was particularly "lucky" because the BCBSA had mandated that, in the case of

claims involving "his son and his son alone," an ANH employee would be assigned responsibility for keying into the ANH computer system an "override" to the BCBSA's preprogrammed "denial." RELATOR replied, "Gee, that's nice for my son but not so nice for others with similar diagnoses." FEENY had no reply.

67. Until early 2002, RELATOR's son received private speech therapy from a third therapist. ANH provided reimbursement for these services pursuant to BCBSA's authorization to ANH to allow an "override".

68. On Tuesday, April 13, 2004, RELATOR left a message with ANH's customer service line, requesting a copy of the guidelines that would be used to evaluate any claim for speech, occupational and physical therapy services for his daughter, who also has some articulation issues but is not currently diagnosed with a particular condition.

69. On April 15, 2004, an ANH customer representative "Linda" ("LNU") returned RELATOR's call. LINDA would not provide RELATOR with her last name, stating that she was not allowed to do so by her office. Instead of responding to RELATOR's request for the guidelines, she described the benefits to which the RELATOR is entitled under his Service Benefit Plan. RELATOR told LINDA that he knew the Plan's coverage provisions and, after describing the history of his attempts to secure coverage for his son's speech therapy sessions, asked for a copy

of the internal guidelines that ANH had refused to provide to him in 2001. LINDA replied that the internal guidelines are "even more confidential now." When RELATOR described the computer system problem he had uncovered in connection with his son's claims, she told him that BCBSA's computer is still programmed to reject claims for speech, occupational and physical therapy when prescribed to treat a "mental disorder." LINDA stated that "the same thing will probably happen again." She also confirmed that RELATOR likely will need to go to OPM to get any potential coverage for his daughter because "nothing has changed" and because speech, occupational and physical therapies are still "problem areas with mental health diagnoses."

## VI. ALLEGATIONS OF FRAUD

### A. General Allegations

70. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA) and the National Center for Health Statistics (NCI), two departments within the Department of Health and Human Services (DHHS), have devised the International Classification of Diseases, Ninth Revision – Clinical Modification ("ICD-9-CM") to identify diagnosis codes for "medical disease" and "mental disorders" to be used in submissions for reimbursement, i.e., "claims," by health service providers.

71. The ICD-9, itself, generally describes medical diseases and mental disorders. In Chapter V, "Mental Disorders," the ICD-9 includes a glossary which defines the contents of each category. Chapter V's introduction indicates that the glossary is intended for psychiatrists and other mental health providers to make their diagnoses based on the descriptions provided, rather than from the category titles.

72. Chapter 5, "Mental Disorders," in ICD-9-CM uses the standard classification format with inclusion and exclusion terms, omitting the glossary as part of the main text. The mental disorders section of ICD-9-CM has been expanded to incorporate additional psychiatric disorders not listed in ICD-9. The glossary from ICD-9 does not contain all these terms. It now appears in Appendix B, which also contains descriptions and definitions for the terms added in ICD-9-CM. Some of these were provided by the American Psychiatric Association's Task Force on Nomenclature and Statistics, which is preparing the Diagnostic and Statistical Manual, Third Edition (DSM-III), and others from A Psychiatric Glossary.

73. Section 300, *et seq.* of Chapter 5 of the ICD-9-CM is entitled "Neurotic Disorders, Personality Disorders and Other Nonpsychotic Mental Disorders (300-316)".

74. Section 315 (Specific Delays in Development) deals specifically with learning delays. The ICD-9-CM, Section 315.4 (Coordination Disorder) classifies as "mental disorders" certain coordination disorders, such as

"Clumsiness Syndrome," "Dyspraxia Syndrome" and "Specific Motor Development Disorder."

75. The ICD-9-CM, Section 315.39, classifies as a "mental disorder" a disorder known as "Developmental and Articulation Disorder."

76. The ICD-9-CM, Chapter 16 (Symptoms, Signs and Ill-Defined Conditions), Section 784-69 (Symptoms Involving Head And Neck), classifies as a "symptom, sign, or ill-defined condition" a condition known as "Apraxia," along with three others.

77. These disorders and conditions, common in young children, cause speech and fine motor functioning problems. Speech, occupational and physical therapies are medically necessary treatments for these disorders and conditions.

78. Similarly, speech, occupational and physical therapies are prescribed for patients diagnosed with, *inter alia*, depression, schizophrenia or dementia as medically necessary treatments for these mental disorders.

79. As set forth above, the BCBSA has programmed its computers to deny claims for speech, occupational, and physical therapy when the claim forms, by which reimbursement coverage is sought, contain corresponding "mental disorder" diagnosis codes.

80. The result of this computer system programming is that the BCBSA causes its Local Plans to deny fraudulently ***all*** claims for reimbursement for medically necessary speech, occupational and physical therapy which are

submitted on claim forms containing "mental disorder" diagnosis codes from the ICD-9-CM.

81. OPM, on behalf of subscribed federal employees, enters into an annual contract with BCBSA for insurance benefits described in the Service Benefit Plan. The OPM, as a party in interest, has the final "right of review" of the denial by the carrier [BCBSA] ... of a claim for reimbursement (Title 5, Part 890 C.F.R. Sec. 105 – Filing Claims for Payment or Service). The CFR also provides that OPM is the party in federal court to be sued by a subscriber if it denies coverage, not the BCBSA or Local Plan.

82. Among the contract's service benefits is limited reimbursement for "... other outpatient services [for] ... speech, occupational and physical therapy."

83. BCBSA, ANTHEM and ANH act with actual knowledge of their fraudulent denial of claims for reimbursement for speech, occupational and physical therapy in cases where the therapy is medically necessary for conditions classified in the ICD-9-CM as "mental disorders."

84. The BCBSA has, in each of its contracts with OPM, caused federal employees (who are third-party beneficiaries of OPM's contract with BCBSA, that is, the Service Benefit Plan) to receive less than that to which they were entitled. The bargained-for Service Benefit Plan provides limited reimbursement for ***all*** medically necessary speech, occupational, and physical therapy. In practice, however, the BCBSA reimburses only for medically necessary speech,

occupational, and physical therapy prescribed in connection with "medical disease" diagnosis codes.

85. The BCBSA has, in each of its contracts with OPM, caused the Government to receive less than that for which it has bargained. The bargained-for Service Benefit Plan provides reimbursement for ***all*** medically necessary speech, occupational, and physical therapy. In practice, however, the BCBSA reimburses only for medically necessary speech, occupational, and physical therapy prescribed in connection with "medical disease" diagnosis codes.

86. BCBSA, ANTHEM and ANH have discriminated against beneficiaries of the Service Benefit Plan who suffer from mental disorders for which speech, occupational, or physical therapy are medically necessary treatments.

87. On information and belief, the BCBSA fraudulently denies claims for speech, occupational and physical therapy, not merely to defraud the federal government and its beneficiaries, but also to defraud all holders of Blue Cross and Blue Shield policies nationwide. The fraud against the federal government is part of a larger effort to defraud ***all*** BCBSA policyholders.

88. OPM is unaware of the fraudulent and discriminatory practices of BCBSA, ANTHEM and ANH.

## B. Legal Theories

### 1. Violation of 31 U.S.C. § 3729(a)(7)

89. The fraud, at its most basic level, operates as a violation of Section 3729(a)(7) of the FCA, which proscribes the knowing concealment, decrease or avoidance of an obligation to pay or transmit money or property to the United States Government.

90. Through its pattern of its knowingly false and fraudulent denials of proper claims for reimbursement for speech, occupational and physical therapy when those claims are submitted in connection with "mental disorder" diagnosis codes, BCBSA and its agents ". . . conceal, avoid, or decrease . . ." their obligation to transmit money to the beneficiaries of the Government's contract in violation of FCA Section 3729(a)(7).

91. Each such denial violates FCA Section 3729(a)(7) because the BCBSA and its agents fraudulently deny the claims of beneficiaries of the Government's contract (or their designee service providers).

92. The Government is entitled to recover damages for the fraudulently denied claims on behalf of its beneficiaries.

**2. Violation of 31 U.S.C. § 3729(a)(1)**

93. In addition to the "(a)(7)" violations, the parties also violate Section 3729(a)(1) of the False Claims Act ("FCA"), which proscribes the knowing presentation to the United States Government of a false or fraudulent claim for payment or approval.

94. Each time BCBSA, acting through the agency of its Local Plans, draws on the Treasury line of credit to cover its expenses and to collect its profits

for administering the Service Benefit Plan, BCBSA causes a false or fraudulent claim to be submitted for payment or approval in violation of FCA Section 3729(a)(1).

95. Each such claim is false or fraudulent in violation of FCA Section 3729(a)(1) because the BCBSA is knowingly and fraudulently failing to deliver the insurance plan that OPM has bargained for and bought in each annual contract: a Service Benefit Plan that provides limited reimbursement for ***all*** medically necessary speech, occupational, and physical therapy (and not simply medically necessary speech, occupational, and physical therapy prescribed in connection with "medical disease" diagnosis codes).

96. The government is entitled to recover damages for the inferior plan BCBSA provided.

**3. Medicare and Tricare Fraud (31 U.S.C. § 3729(a)(2))**

97. Section 3729(a)(2) of the FCA proscribes the knowing use of a false record or statement to get a false or fraudulent claim paid by the Government.

98. On information and belief, BCBSA programs its computers as detailed above "across the board" to all beneficiaries of its policies.

99. Some of these beneficiaries will also be covered by Medicare or Tricare (as either a "primary payer" or "secondary payer") under the automatic "coordination of benefits" provisions of these policies.

100. On information and belief, Medicare and Tricare (the military health insurance plan) are also victims of BCBSA's fraudulent denials of medically

necessary speech, occupational and physical therapy claims when those claims are submitted in connection with "mental disorder" diagnosis codes by beneficiaries of BCBSA policies who also have coverage under Medicare or Tricare.

101. These denials violate FCA Section 3729(a)(2) because they fraudulently shift the reimbursement obligation to Medicare or Tricare and thus cause a false or fraudulent claim to be paid or approved by the Government.

102. The Government is entitled to recover damages to Medicare and Tricare caused by the BCBSA's fraudulently denied claims.

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(7)

**(Knowingly Makes, Uses, or Causes to be Made or Used, a False Record or Statement to Conceal, Avoid or Decrease an Obligation to Pay or Transmit Money or Property to the Government)**

103. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 102.

104. Defendants knowingly made, use or cause to be made or used, false records and statements, e.g., written denials of legitimate claims for reimbursement by Service Benefit Plan enrollees for medically necessary treatment for mental disorders, to conceal, avoid and decrease its obligation to pay money under the Defendants' contract with OPM.

**COUNT TWO**

**False Claims Act, 31 U.S.C. § 3729(a)(1)**

**(Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)**

105. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 102.

106. Defendants knowingly presented, or cause to be presented, to officers, employees or agents of the United States Government false or fraudulent claims for payment or approval.

107. By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

**COUNT THREE**

**False Claims Act, 31 U.S.C. § 3729(a)(2)**

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

108. Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 102.

109. Defendants knowingly made, used, or cause to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

110. By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

**COUNT FOUR**

**False Claims Act, 31 U.S.C. § 3729(a)(3)**

**(Conspiring to Defraud the Government Through False or Fraudulent Claims)**

111. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 102.

112. Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit.

113. By virtue of the Defendants' conspiracy to defraud the Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

WHEREFORE, the Plaintiff demands and prays that judgment be entered in favor of the United States and against each Defendant as follows:

**A.** On Counts One, Two, Three and Four under the False Claims Act, as amended, for multiple of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper.

**B.** That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

**C.** That Plaintiff be awarded all costs of this action, including attorneys fees and costs; and

**D.** That Plaintiff recover such other relief as the Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

By: [signature]

William J. Hardy
B.B.O. #221460
William J. Hardy Law Offices
1140 Nineteenth Street, N.W.
Suite 900
Washington, DC 20036
(202) 223-5120
ATTORNEY FOR QUI TAM PLAINTIFF
JOHN M. GREABE