# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                   )

UNITED STATES OF AMERICA, ex rel.   )
JOHN M. GREABE,                      )
                                   )
           Plaintiffs,           )
                                   )
      v.                        )    Civil Action No. 04-11355-MEL
                                   )
BLUE CROSS BLUE SHIELD ASSOCIATION  )
and                                  )
ANTHEM BLUE CROSS BLUE SHIELD    )
OF NEW HAMPSHIRE,             )
                                   )
          Defendants.       )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## JOINT MOTION TO DISMISS AMENDED COMPLAINT

Defendants Blue Cross Blue Shield Association ("BCBSA") and Anthem Blue Cross Blue Shield of New Hampshire ("ANH") (collectively, "Defendants") respectfully submit this Memorandum in support of their Motion, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), to dismiss the Amended Complaint filed by relator John M. Greabe ("the Relator"). Defendants move on two independent grounds:  (1) that the False Claims Act violations alleged in the Amended Complaint are precluded by the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901-8914, and the United States Office of Personnel Management's exclusive control over benefits paid and carriers' conduct under FEHBA, and (2) that the Amended Complaint fails to plead any False Claims Act violation with the particularity required by Rule 9(b).

## INTRODUCTION AND SUMMARY

The Relator filed his original *qui tam* complaint on June 16, 2004, alleging violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").  On August 17, 2005, the United States filed its Notice of Election to Decline Intervention (Doc. No. 12), and the case was unsealed on August 25, 2005 (Doc. No. 13).  On December 16, 2005, the Relator filed an Amended Complaint (Doc. No. 15).

The Relator is a federal employee enrolled in the Service Benefit Plan – an insurance plan sponsored and paid for by the United States Office of Personnel Management ("OPM") pursuant to FEHBA.  OPM contracts with BCBSA to administer the Service Benefit Plan, with BCBSA signing on behalf of local Blue Cross and Blue Shield entities who administer the Service Benefit Plan in their individual localities.  ANH is the local Blue Cross and Blue Shield company administering the Service Benefit Plan in New Hampshire.

As alleged in the Amended Complaint, the Relator was unhappy with the denial of payment for speech therapy that the Relator's son received.  The Relator pursued an appeal before OPM – the exclusive mechanism for reviewing benefit denials under FEHBA – and was successful in obtaining the benefits he was seeking.  That should have ended this dispute.  Instead, the Relator brought this suit, alleging that by systematically denying benefits for certain types of speech therapy, Defendants have committed a fraud against the United States in violation of the FCA.  Under one of the Relator's theories, the false claims are BCBSA's claims for payment of administrative expenses and profits under the Service Benefit Plan.  Under another of the Relator's theories, the false claims are claims under two other federally sponsored health programs – Medicare and Tricare.  These claims are false,

says the Relator, if Medicare and Tricare subscribers seek payment for speech therapy services the Relator believes should have been paid for under the Service Benefit Plan.

The Relator's allegations are fatally flawed for two separate reasons. First, under FEHBA, OPM has exclusive authority over how the Service Benefit Plan is administered and whether particular benefits should be paid. This exclusive authority is appropriate because OPM ultimately controls the funds used to pay benefits under the Plan. Indeed, if the Relator's novel False Claims theory succeeded, the allegedly victimized agency – OPM – would be forced to pay out *more money*. In analogous situations – where Congress has placed oversight authority exclusively in the hands of a federal agency – courts have repeatedly held that a False Claims Act suit will not lay. *See infra*, at 10-15.

Second, the Relator's Amended Complaint fails to comply with Rule 9(b)'s requirement that fraud be pleaded with particularity. While the Relator pleads in much detail the facts surrounding his particular benefits dispute, he says nothing about the false claims he alleges were submitted to the United States Government. He does not say when, by whom, or for how much they were submitted, or what false or fraudulent representations they contained. This cannot suffice under Rule 9(b). *See infra*, at 15-24.

### <u>REGULATORY BACKGROUND</u>

1. <u>The Service Benefit Plan</u>. Congress enacted FEHBA in 1959 to provide health benefits for federal employees. Instead of selecting one insurer for this purpose, it vested a government agency (now OPM) with broad discretion to establish insurance plans with many different insurers, which are known under the FEHBA program as "carriers." *See* 5 U.S.C. §§ 8901(7), 8902-8903, 8913.

One such plan is the Service Benefit Plan. *See* 5 U.S.C. § 8903(1). The Service Benefit Plan is formed by a federal government contract between OPM and BCBSA. Am. Compl. ¶¶ 14, 24. BCBSA, in turn, acts on behalf of local Blue Cross and Blue Shield companies nationwide that administer the Plan in their individual localities. *Id*. ANH administers the Service Benefit Plan in New Hampshire. *Id*. ¶ 16.

Federal employees do not contract directly with BCBSA or any local Blue Cross and Blue Shield company for health benefits. Instead, they enroll in the Service Benefit Plan through OPM. *See* 5 U.S.C. § 8905(a); 5 C.F.R. §§ 890.101(a), 890.102-104, 890.301(d) and subparts C, D, and K; *see also Caudill v. Blue Cross Blue Shield of N.C., Inc.*, 999 F.2d 74, 76-77 (4th Cir. 1993); Am. Compl. ¶ 24. After federal employees enroll in the Service Benefit Plan, they receive benefits in accordance with the terms of the contract between OPM and BCBSA. The benefits OPM has selected and the limitations thereon are described in a "Statement of Benefits" that is incorporated into the contract between OPM and BCBSA. 5 U.S.C. §§ 8902(d), 8907. The government pays the majority of the premium cost for each enrollee. *Id*. §§ 8906, 8909(a); Am. Compl. ¶ 26.

2. <u>OPM Authority over Carriers</u>. Congress delegated to OPM the sole authority to police the conduct and health care policies and practices of FEHBA carriers, and OPM has promulgated extensive regulations on the topic. *See* 5 U.S.C. §§ 8902(e), 8910, 8913(a); 48 C.F.R. Chapter 16; *see also Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 42-43 (D.D.C. 1996); *Kight v. Kaiser Found. Health Plans of Mid-Atlantic States, Inc.*, 34 F. Supp. 2d 334, 342 (E.D. Va. 1999). OPM has the authority to penalize a carrier and to order appropriate corrective action any time the carrier displays a "pattern of poor conduct or

evidence of misconduct," such as "[u]sing fraudulent or unethical business or health care practices or otherwise displaying a lack of business integrity or honesty" or "[f]ail[ing] to assure that the plan provides properly paid or denied claims." 48 C.F.R. § 1609.7001(c)-(d).

3.  <u>OPM's Exclusive Jurisdiction Over Benefits Disputes</u>.  FEHBA also provides a comprehensive scheme for enrollees to enforce their rights under the statute and the contracts that OPM enters pursuant to it.  Under FEHBA, each contract that OPM enters must require the carrier "to pay for or provide a health service or supply in an individual case if [OPM] finds that the employee . . . is entitled thereto under the terms of the contract."  5 U.S.C. § 8902(j).  Thus, Congress has determined that OPM is the ultimate authority on whether benefits should be paid, subject only to normal Administrative Procedure Act review.  OPM has implemented this provision by establishing a comprehensive administrative remedy for any individual who believes the carrier has incorrectly denied a benefit.  5 C.F.R. § 890.105. This remedy is mandatory and must be exhausted before the filing of any lawsuit relating to benefits.  5 C.F.R. §§ 890.105(a); 890.107(d)(1); *see also Kobleur v. Group Hosp. & Med. Servs., Inc.*, 954 F.2d 705, 708-11 (11th Cir. 1992).

Under the FEHBA remedy, any enrollee denied benefits by a FEHBA carrier may "make a request to OPM to review the carrier's decision."  5 C.F.R. § 890.105(e)(1); *see also* 5 C.F.R. § 890.105(a); Am. Compl. ¶ 87.  If OPM affirms the carrier's denial of benefits, the enrollee "may seek judicial review of OPM's final action."  5 C.F.R. § 890.107(c); Am. Compl. ¶ 87.  "A legal action to review final action by OPM . . . must be brought against OPM and not against the carrier or the carrier's subcontractors."  5 C.F.R. § 890.107(c). Such lawsuits against OPM are narrow in scope.  A court must limit its review to the

administrative record compiled by the agency and can overturn OPM's determination of the

issues only if the agency was arbitrary and capricious.  5 U.S.C. § 706; 5 C.F.R.

§ 890.107(d)(3); *Nesseim v. Mail Handlers Benefit Plan*, 995 F.2d 804, 807 (8th Cir. 1993);

*Doe v. Devine*, 703 F.2d 1319, 1325-26 & n.31 (D.C. Cir. 1983).  The recovery is limited to

the "amount of benefits in dispute."  5 C.F.R. 890.107(c).

      4.  <u>Service Benefit Plan Funding</u>.  By statute, the government and the enrollees share

responsibility for premiums payable to the Service Benefit Plan, with the government

contributing the majority of the premium.  *See* 5 U.S.C. § 8906(b)(1), (b)(2), (f); Am. Compl.

¶¶ 26, 29.  Premiums are deposited into a special Treasury fund called the Federal Employees

Health Benefits Fund.  5 U.S.C. § 8909(a).  ANH and the other Blue Cross and Blue Shield

entities administering the Service Benefit Plan draw directly from the Federal Employees

Health Benefits Fund to pay benefits and the costs of administering the Plan.  5 U.S.C.

§ 8909(a); 48 C.F.R. § 1632.170(b); Am. Compl. ¶ 27.

      It is important to recognize that the Service Benefit Plan is funded differently than a

traditional insurance plan.  In a traditional insurance plan, the insurer would keep as profit

the difference between the premiums collected and the amount paid out in claims and other

expenses.  The Service Benefit Plan, however, works in a fundamentally different way.  The

collected premiums are held not by BCBSA, but rather by the United States in the Federal

Employees Health Benefits Fund.  More importantly, any Service Benefit Plan surplus

remaining in the Fund at the end of the year remains the property of the United States, and is

placed in the Service Benefit Plan's contingency reserves, which may be used, at OPM's –

and only OPM's – discretion, to defray future rates, reduce future government and employee

contributions, increase plan benefits, or refund monies to the government and plan enrollees. *See* 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503(c)(2); Am. Compl. ¶ 27.  In other words, any premiums not used to pay claims or administrative expenses remain the property of the United States, not BCBSA.  BCBSA's profit, if any, comes only from a negotiated service charge.  *See Nat'l Ass'n of Postal Supervisors v. United States*, 21 Cl. Ct. 310, 315 (1990) ("The service charge is the only profit element of FEHBA. . . . [The] carrier may not make a profit on the premium charges themselves."), *aff'd mem.*, 944 F.2d 859 (Fed. Cir. 1991); *see also* 48 C.F.R. § 1615.902.

## THE RELATOR'S ALLEGATIONS

The Relator sets forth detailed allegations of his experiences trying to obtain coverage for his son's speech therapy treatments under the Service Benefit Plan.  Am. Compl. ¶¶ 31-75.  After payment for these claims was denied, the Relator appealed to OPM.  *Id*. ¶ 60.  OPM ultimately reversed the denial as to some of these benefits.  *Id*. ¶ 61.  After further discussions with the Relator and with BCBSA, ANH also approved payment for other similar services not specifically addressed by OPM's decision.  *Id*. ¶¶ 67, 73.  Thus, there can be no doubt that the Relator has received payment for all services to which he believes he is entitled.  The Relator nonetheless alleges that Defendants violated the FCA in several ways.

The gravamen of all of the Relator's FCA allegations is that BCBSA has programmed its computer system to automatically deny payment for "speech, occupational, and physical therapy" associated with a "mental disorder" (as opposed to a medical disease), even though all medically necessary speech, occupational, and physical therapy is eligible for limited reimbursement under the Service Benefit Plan.  Am. Compl. ¶¶ 85, 86; *see also id*. at ¶¶ 70-

72.  By doing this, the Relator claims, BCBSA causes its local plans to deny claims for medically necessary speech, occupational, and physical therapy associated with a "mental disorder." *Id.* ¶ 86.  The Relator asserts that both Defendants "act with actual knowledge of their fraudulent denial" of such claims.  *Id.* ¶ 89.  He also alleges that this causes some Service Benefit Plan enrollees to receive less benefits "than that to which they were entitled." *Id.* ¶ 90.[1]

In his original complaint filed in 2004, the Relator claimed that "at its most basic level" this conduct resulted in BCBSA wrongfully concealing, avoiding, or decreasing an obligation to pay money to the Government in violation of 31 U.S.C. § 3729(a)(7) of the FCA.  Compl. ¶¶ 89-92.  The "reverse false claims" theory was that BCBSA's failure to pay out claims owed to beneficiaries resulted in its wrongfully retaining money that belonged to the Government.  As the Relator now appears to appreciate, this theory is meritless because any alleged failure to pay claims under the Service Benefit Plan would result in the U.S. Government – not BCBSA or ANH – keeping the money the Relator believes should have been paid out in benefits.  Thus, if anything, the actions against which the Relator complained resulted in a savings to the Government, not a fraud upon it.  The Relator has dropped this allegation from his recently filed Amended Complaint.

However, the Relator continues to press three additional and increasingly tangential

---

[1] Although the Relator alleges in various places in the Amended Complaint that BCBSA's actions harm other Service Benefit Plan enrollees (*e.g.*, Am. Compl. ¶¶ 8, 90), he never asserts that such harm constitutes the basis of a False Claims Act violation.  The Relator correctly recognizes that only fraud against the Government itself – and not Service Benefit Plan beneficiaries – can constitute a breach of the FCA.  *See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993) (under the FCA, the Government must have suffered an injury in fact).

claims.  First, in Count One, the Relator claims both Defendants violated § 3729(a)(1) of the

FCA, which prohibits the submission of false or fraudulent claims.  Am. Compl. ¶¶ 94-97,

104-106.  Defendants allegedly did this when they received payments from the Government

for administrative expenses and profits under the Service Benefit Plan.  Am. Compl. ¶ 95.

These payments were allegedly fraudulent because BCBSA failed to provide limited

reimbursement for all medically necessary speech, occupational, and physical therapy, and

thus it was not providing all of the administrative services for which OPM contracted.  *Id.*

¶ 96; *see also id.* at ¶ 8 (BCBSA failed to provide "services for which the Government has

bargained and to which it is contractually entitled").  Second, in Count Two the Relator

alleges these same actions might have violated § 3729(a)(2) of the FCA (which prohibits the

use of a false record to get a false claim paid) by harming two other federally-sponsored

health programs – Medicare and Tricare.  Am. Compl. ¶¶ 99-103, 107-109.  The Relator

hypothesizes that Service Benefit Plan enrollees (or enrollees in other BCBSA programs)

who are denied benefits for speech, occupational, and physical therapy might also be covered

by Medicare or Tricare, which might then pay for those benefits as a secondary payor.  *Id.*

¶¶ 100-102.  Third, in Count Three the Relator adds on a claim that these same actions

constitute a conspiracy to defraud the Government by submitting and receiving payment for

false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(3).  Am. Compl. ¶¶ 110-112.

## ARGUMENT

In deciding a motion under Rule 12(b)(6), the Court accepts the Relator's well-

pleaded facts as true and draws all reasonable inferences in favor of him.  *United States ex*

*rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1st Cir. 2004).  However, the

Court may reject "'bald assertions'" and "'unsupportable conclusions.'"  *Id*. (quoting *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18 (1st Cir. 2002)).

## I.    THE RELATOR'S FALSE CLAIMS ACT ALLEGATIONS ARE PRECLUDED BY THE EXCLUSIVE REMEDIES PROVIDED UNDER THE FEDERAL EMPLOYEES HEALTH BENEFITS ACT

The Relator incorrectly believes he can employ the FCA to challenge the manner in which the Service Benefit Plan processes FEHBA claims.  Those types of decisions, however, are within the exclusive province of OPM.  After all, it is the United States' money that is at stake every time a FEHBA claim is processed.  Moreover, FEHBA's carefully crafted regulatory and contractual scheme provides specific and exclusive mechanisms for OPM to deal with benefits disputes and the policing of FEHBA carriers.  OPM's authority and FEHBA's purpose would be seriously undermined if the Relator's FCA claims were permitted to proceed.  Case law under both FEHBA and the FCA demonstrate that the Relator's claims must be dismissed.

The central feature of the FEHBA statutory regime is OPM's authority, which repeatedly has been described as "very broad."  *Tackitt v. Prudential Ins. Co. of Am.*, 758 F.2d 1572, 1575 (11th Cir. 1985); *accord Muratore v. United States OPM*, 222 F.3d 918, 923 (11th Cir. 2000).  As discussed *supra* at 5-6, "FEHBA established a comprehensive administrative enforcement mechanism for review of disputed claims."  *Bridges*, 935 F. Supp. at 42.  Under this administrative regime, litigation regarding disputed claims "must be brought against OPM and not against the carrier" and "[t]he recovery in such a lawsuit shall be limited to a court order directing OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).  There is no allowance for compensatory damages,

punitive damages, attorney fees, or any other additional forms of relief.  *See Williams v. Blue Cross & Blue Shield of Va.*, 827 F. Supp. 1228, 1229-30 (E.D. Va. 1993).  In addition, FEHBA grants OPM generalized enforcement power "to police those administering FEHBA plans."  *Carter v. Blue Cross & Blue Shield of Fla., Inc.*, 61 F. Supp. 2d 1241, 1243 (N.D. Fla. 1999).  *See supra* at 4-5.  OPM has "the power to penalize or debar carriers who violate the terms of their contracts with the OPM."  *Bridges*, 935 F. Supp. at 42.

Because the statute establishes this detailed enforcement regime, courts have held that FEHBA precludes broader remedies under other federal statutes.  *See*, *e.g.*, *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37 (D.D.C. 1996) (RICO remedies precluded by FEHBA).  In *Bridges*, the plaintiff asserted that those administering the Service Benefit Plan had committed mail fraud by failing to disclose discount arrangements with hospitals and by failing to share those discounts when computing coinsurance for enrollees.  In holding that FEHBA precludes suits under RICO, the *Bridges* court analogized to the situation where a plaintiff seeks to imply a private right of action from a federal statute.  The analogy was apt, the court ruled, because FEHBA provided only for an administrative remedy and for public enforcement through OPM's policing action; with RICO, the plaintiff instead was attempting to assert a judicial right of action and enforcement remedies that are not outlined in the statute.  *See Bridges*, 935 F. Supp. at 42.  The court concluded that "the broad enforcement and oversight powers of the OPM established in the statute indicate that the exclusive remedy for an action cognizable under the FEHBA lies under the FEHBA, not under another federal statute."  *Id*. at 41.  Similarly here, the Relator's FCA "claims must be dismissed because the detailed enforcement scheme of the FEHBA leaves no room for" an FCA action.  *Id*. at 43.

Case law under the FCA also supports this conclusion.  *See*, *e.g.*, *United States v. Southland Management*, 326 F.3d 669 (5th Cir. 2003) (*en banc*); *United States ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844, 851-852 (E.D. Va. 1995).  In *Southland Management*, the Fifth Circuit affirmed the grant of summary judgment for the defendants because the administrative and contractual scheme at issue granted the federal agency remedies meant to deal with the alleged fraud.  The case involved the National Housing Act of 1934, the purpose of which is to "encourage private industry to provide housing for low-income families."  326 F.3d at 671.  Under the Act, Section 8 "assistance payments" and loan guarantees are made by the Government to private property owners who enter into administrative agreements with the United States Department of Housing and Urban Development ("HUD"), which administers the program.  *Id*. at 671-72.  In return for these financial benefits, property owners are required to maintain their property in good condition.  *Id*. at 672.  The United States sought to impose FCA penalties on the owners of an apartment building who sought and received Section 8 payments while knowing they were in breach of their contractual obligations regarding the condition of their property.  The *en banc* court held that the United States could not state a claim under the FCA based on this breach, because the "Contract explicitly addresses a breach of this nature and provides a specific remedy" in HUD's favor.  *Id*. at 676.  Because a regulatory and contractual "mechanism is spelled out for controlling" this type of situation (*id*. at 675), no FCA violation could exist.[2]

---

[2]  It is also worth noting that the defendants in *Southland Management* explicitly certified that their apartment building was in good condition each time they requested assistance payments from HUD. 326 F.3d at 672.  In other words, the defendants' claims were literally false on their face.  As explained below at 21-24, the Relator makes no such allegation here.

The district court's holding in *DynCorp* is similar.  Under the Davis-Bacon Act, certain federal government contracts must contain provisions stating the minimum wages to be paid to various classes of laborers.  The classification of workers and the minimum wages are determined by the contracting agency based on wage rates set by the Secretary of Labor. *DynCorp*, 895 F. Supp. at 849.  The contracting agency's determinations are subject to administrative review and incorporated into the contract.  *Id*.  In *DynCorp*, the relator alleged that a government contractor falsely asserted it was paying wages in compliance with the Davis-Bacon Act, when, in fact, the contractor misclassified workers, resulting in the wages paid being deficiently.  In granting summary judgment to the contractor, the court held that it would be "impossible to determine whether DynCorp submitted a false claim to the government without first determining whether DynCorp actually misclassified an employee in a given instance.  And responsibility for resolving such disputes rests not with the courts, but with the Department of Labor." *Id*. at 851.  Thus, the court held that a worker classification dispute, by itself, is not an FCA claim.  *Id*.

The Relator's claims in this case are no different than in *Southland Management* and *DynCorp*.  The crux of the Relator's Amended Complaint is that BCBSA breached its contract with OPM by systematically denying claims for speech therapy associated with mental disorders.  However, as a threshold matter, it is impossible to determine whether the Relator's allegations have any merit without first determining whether the Relator is correct that all medically necessary claims for speech therapy associated with mental disorders are universally covered under the Service Benefit Plan.  But that determination is not for the court; instead, "th[at] dispute[] must be resolved by" OPM.  *DynCorp*, 895 F. Supp. at 851.

Equally important, even assuming that the Relator's allegations regarding what services are covered by the Service Benefit Plan are meritorious (and BCBSA denies that they are), the FEHBA regulations and governing contract "explicitly address[] a breach of this nature and provide[] a specific remedy." *Southland Management*, 326 F.3d at 676. Specifically, OPM has the authority – both on a case-by-case and a plan-wide basis – to mandate payments for such services. OPM is exclusively responsible both for making all benefit payment decisions contested by enrollees (5 C.F.R. §§ 890.105(a); 890.107(d)(1)) and for policing any carrier that engages in "fraudulent or unethical business or health care practices or otherwise display[s] a lack of business integrity or honesty." 48 C.F.R. § 1609.7001(c)(2). These police powers specifically include OPM's ability to withdraw approval for a carrier that does not make "[t]imely and accurate adjudication of claims." 48 C.F.R. § 1609.7001(b)(4). Because it is the United States' money that is used to pay all claims, OPM is the only one entitled to make such decisions. Unless OPM is to become powerless in deciding what benefits are to be paid under FEHBA and in policing FEHBA carriers, the Court must dismiss the Relator's FCA claims as precluded by FEHBA's specific remedies, lest the Relator be allowed to "bypass[] [FEHBA's] carefully crafted administrative scheme." *DynCorp*, 895 F. Supp. at 852.

*Southland Management* and *DynCorp* also reinforce the more general point that "alleged violations of federal regulations are insufficient to support a claim under the FCA." *Karvelas*, 360 F.3d at 234; *see also United States ex rel. Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001) ("the False Claims Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations"). In the end, even were the Relator's

allegations about what should be covered under the Service Benefit Plan to be true, this case amounts to nothing more than a contractual issue between BCBSA and OPM; under FEHBA that issue must be resolved by OPM, not by the Relator or a jury.

## II.     THE AMENDED COMPLAINT FAILS TO MEET THE REQUIREMENTS OF RULE 9(B) AND FAILS TO STATE A CLAIM

"Rule 9(b) requires that a plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representations." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 226 (1st Cir. 2004) (citing *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 18-19 (1st Cir. 2002)).  The Rule's purpose is to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits," and to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Id.* (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996)).  Case law uniformly establishes that Rule 9(b) applies to FCA cases and establish the framework within which to evaluate a FCA complaint's compliance with Rule 9(b).

### A.     The Amended Complaint Fails to Meet the Requirements of Rule 9(b) Because It Fails to Plead Any Facts Regarding the Submission of Allegedly False or Fraudulent Claims or the Use of False Records

The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Karvelas*, 360 F.3d at 225 (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).  "The submission of a claim is thus not a 'ministerial act,' but the sine qua non of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  "Therefore, a defendant violates the FCA only when he or she has presented to the

government a false or fraudulent claim." *Karvelas*, 360 F.3d at 225.  Because this is the crux of any FCA violation, "the details of the actual presentation of false or fraudulent claims to the government can and must be plead with particularity in order to meet the requirements of Rule 9(b)." *Id*. at 228.  That means the Relator must plead at least some of the following information with respect to at least some of the allegedly false claims:  "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." *Id*. at 233.  Notably, while the Relator pleads many details of his interactions with ANH in trying to obtain payment for his son's speech therapy (Am. Compl. ¶¶ 31-75), he fails to plead any of the required details about the false claims allegedly submitted by Defendants to the United States.

In Count One, the alleged false claims at issue are BCBSA's claims "to cover its expenses and to collect its profits for administering the Service Benefit Plan."  Am. Compl. ¶ 95.  The Relator provides no other details about these claims.  He does not allege the date, or even the year, any claim was allegedly submitted.  He does not identify a single person at BCBSA or ANH who submitted a claim, or who had any role in submitting one.  Nor does the Relator allege the amount of any claims.  The Relator cannot identify any document – even by generic name or form number – that constitutes a claim or was used to get a claim paid.  As was the case in *Karvelas*, the Relator's Amended Complaint here "does not specify the individuals who filed these claims, the dates on which any such claims were filed, the

nature and content of any documents submitted, or the amount claimed from the government."  360 F.3d at 234.

Count Two fares even worse under Rule 9(b).  There the Relator alleges a violation of § 3729(a)(2) of the FCA, which prohibits any person from "knowingly mak[ing], us[ing, or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  In order to show a violation of this subsection, the Relator must prove, among other things, that (1) a claim was presented, or caused to be presented, to the Government by the defendant; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.  *United States ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 682 (10th Cir. 1998).  These are the same elements required to show a violation of § 3729(a)(1), which prohibits the knowing presentation of a false claim. Section § 3729(a)(2), however, also requires proof of a fourth element:  the making or use of a false record or statement to get the claim paid.  *Aakhus*, 136 F.3d at 682.  Thus, in order to show a violation of this subsection, the Relator must show both a false claim, and a false record used to get that claim paid.

Count Two alleges false claims for payment under Medicare and Tricare.  Am. Compl. ¶¶ 101-102.  The Relator's allegations about these claims suffer from the same lack of specificity as did the claims in Count One:  there are no allegations of who submitted any of these claims, when any of the claims were submitted, or the amount of any of the claims.

In addition, under the Relator's allegations, it is far from clear that any false claims were actually submitted in the manner he asserts in Count Two.  As alleged by the Relator, the claims at issue could only have been submitted by individuals who (1) are enrollees in the

Service Benefit Plan (or another BCBSA program); (2) are also enrollees under Medicare or Tricare; (3) received speech, occupational, and physical therapy in connection with a mental disorder; (4) had a claim for such therapy denied by the Service Benefit Plan; and (5) had that claim paid by Medicare or Tricare instead. Am. Compl. ¶¶ 100-102. The Relator has no idea, however, if any such person even exists. Presumably that is why the Relator makes these allegations "on information and belief." *Id*. ¶ 101. In *Karvelas*, the First Circuit held that allegations made on information and belief "remain subject to the particularity requirements of Rule 9(b)" and "are also subject to the additional requirement that 'the complaint set forth the facts on which the belief is founded.'" 360 F.3d at 226 (quoting *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)).[3] Here, the Relator has not alleged any facts supporting his "information and belief" that at least one person meets each of the five conditions necessary for a false claim to have been submitted in the manner he alleges in Count Two. Thus, in addition to failing to allege the particulars of

---

[3] Although the First Circuit's decision in *Karvelas* permits it under some circumstances, other courts have been less tolerant of fraud claims made on information and belief. *E.g.*, *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683-84 (7th Cir. 1992) (basing allegations of fraud "on information and belief" is "a clearly improper locution under the current federal rules, which impose (in the amended Rule 11) a duty of reasonable precomplaint inquiry not satisfied by rumor or hunch."); *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988); *SEC v. Physicians Guardian Unit Inv. Trust*, 72 F. Supp. 2d 1342, 1352 (M.D. Fla. 1999) ("Allegations of fraud based on information and belief do not usually satisfy the degree of particularity required under Rule 9(b)."); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield, Inc.*, 755 F. Supp. 1040, 1052 (S.D. Ga. 1990); *Hekker v. Ideon Group, Inc.*, 1996 U.S. Dist. LEXIS 21814 (M.D. Fla. Aug. 19, 1996), at *12; *Curran Co. v. Imedco GmbH*, 1992 U.S. Dist. LEXIS 18420 (N.D. Ill. Dec. 3, 1992), at *15 ("allegations of fraud based on 'information and belief' violate Rule 11 and thus must be disregarded"). Courts that do permit fraud claims made on information and belief "have also warned that this exception 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). That is exactly what the Relator has done here.

the claims as required by Rule 9(b), the Relator has not even alleged that there were any false claims. All he alleges is that there *might* have been. That is not sufficient to state a claim under Rule 12(b)(6), let alone fulfill Rule 9(b)'s requirements.

Even more telling, the Relator never bothers to allege what the false *records or statements* are in Count Two, let alone who created them, how they were used to get false claims paid, when they were created or used, or why they were false. Thus, the Relator's allegations in Count Two fail to properly plead either a false claim or a false record or statement used to get a false claim paid, both of which are required elements of a § 3729(a)(2) violation.

Because the Relator's Count Three is based on a conspiracy to submit the allegedly false claims that are the subject of Count One and Count Two, it fails for the same reasons. In addition, the Relator fails to plead any details of the purported conspiracy, including the individuals involved or the time period the conspiracy lasted. The Relator also fails to allege an agreement between the parties, even though FCA conspiracy claims "must be supported by an allegation of an agreement among the parties allegedly involved in the conspiracy. Absent such an allegation, a claim under 3729(a)(3) is due to be dismissed for failure to state a claim." *United States ex rel. Sanders v. East Alabama Healthcare Auth.*, 953 F. Supp. 1404, (M.D. Ala. 1996) (citation omitted).

Even as the Relator's allegations against BCBSA are insufficient under Rule 9(b), the allegations against ANH are weaker still. As was the case with BCBSA, the Relator makes no specific identification of any false submission, record, or statement made by ANH. Notably, even the inadequate conclusory allegations the Relator makes against BCBSA – that

"BCBSA causes a false or fraudulent claim to be submitted" (Am. Compl. ¶ 95) and that

"BCBSA is knowingly and fraudulently failing to deliver the insurance plan that OPM has

bargained for" (*id*. ¶ 96) – are absent with respect to ANH.[4]  As to allegedly false claims

actually made or caused to be made by ANH, the Amended Complaint is essentially silent.

In sum, the Relator's allegations merely set forth the general manner in which

allegedly false claims might have been submitted by BCBSA.  "[S]uch pleadings invariably

are inadequate unless they are linked to allegations, stated with particularity, of the actual

false claims submitted to the government that constitute the essential element of an FCA qui

tam action."  *Karvelas*, 360 F.3d at 232.  Merely alleging the "methods by which [defendant]

is said to have inflated its bills to the government, without citing a single instance of a false

claim" will not suffice under Rule 9(b).[5]  *United States ex rel. Gublo v. Novacare, Inc.*, 62 F.

Supp. 2d 347, 354 (D. Mass. 1999); *see also United States ex rel. Walsh v. Eastman Kodak

Co.*, 98 F. Supp. 2d 141, 147 (D. Mass. 2000) ("Without citing a single false claim arising

from an allegedly false invoice, Relator has not met even a bare-bones Rule 9(b) test.").

As demonstrated above, the Relator's allegations against BCBSA failed to identify

the details of any allegedly false claims or false records and hence must be dismissed under

---

[4]  The Relator's conclusory allegation that BCBSA is "acting through the agency of its Local Plans" (Am. Comp. ¶ 95), is insufficient to remedy his failure to allege that ANH engaged in any conduct that causes a false or fraudulent claim to be submitted.

[5]  With respect to ANH, the Relator's "general method" allegations are deficient for the additional reason that they have nothing to do with ANH.  For example, the Relator alleges that ANH is "applying standards and criteria *that came from BCBSA*," (Am. Comp., ¶ 65), that the claims denials at issue here "*were required under 'Guidelines' BCBSA issued* to all for the Local Plans," (*id*. ¶ 67), and were "*dictated to ANH by BCBSA*." (*id*. ¶ 69).  (Emphases added.)  The Relator also alleges that *BCBSA has programmed its* "national computer system" to automatically deny the claims at issue" *Id*. ¶ 70; *see also id*. ¶¶ 72, 75, 85.  As alleged, "[t]he result of this computer system programming *is that the BCBSA causes its Local Plans* initially not to pay claims."  *Id*. ¶ 86 (emphasis added).

Rule 9(b). Given the paucity of any particular allegations concerning ANH's submission of false claims or use of false statement or records, the Amended Complaint must *a fortiori* be dismissed against ANH as well.

> **B.** **The Amended Complaint Fails to Meet the Requirements of Rule 9(b) Because It Fails To Allege Basic Elements of a False Claims Act Violation**

In addition to lacking the basic "who, what, where, when" allegations about the allegedly false claims and records, the Relator's Amended Complaint also fails to plead at least two basic requirements for all FCA claims – that a claim was false or fraudulent, and that the allegedly false or fraudulent representations were material in the Government's decision to pay.

As discussed above, the central tenet of any FCA violation is the submission of a false or fraudulent claim. The Amended Complaint, however, lacks any factual allegations supporting the proposition that any claims were false or fraudulent. Instead, it merely alleges that to be the case in conclusory fashion. Am. Compl. ¶ 96. That is insufficient. Under Rule 9(b), the Relator must plead the "content of the alleged false or fraudulent representations." *Karvelas*, 360 F.3d at 226; *see also id*. at 224 ("we reject claims that are made in the complaint if they are 'bald assertions' or 'unsupportable conclusions'"). With respect to Count One, the Relator has not alleged what was false or fraudulent about BCBSA's claims for payment for administrative expenses and profit. The same applies to the Relator's Count Two: the Relator has failed to allege specifically what was false or fraudulent about the Medicare and Tricare claims or the unidentified records allegedly used to get those claims paid.

Similarly, the Relator does not allege facts sufficient to conclude that the allegedly false claims and records were material to the Government's decision to pay out any money. "[T]here should no longer be any doubt that materiality is an element of a civil False Claims Act case. . . . [E]very circuit that has addressed the issue ha[s] so concluded." *United States v. Southland Management Corp.*, 326 F.3d 669, 679 (5th Cir. 2003) (Jones, J., specially concurring).[6] That includes the First Circuit in *United States v. Data Translation, Inc.*, 984 F.2d 1256, 1267 (1st Cir. 1992), which affirmed judgment for a FCA defendant on the grounds that the "alleged nondisclosure could not have been material to the price negotiated."

"Whether a false statement is material depends on whether it 'has the natural tendency to influence agency action or is capable of influencing agency action.'" *United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 182 (D. Mass. 2004) (*quoting United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003)). In other words, the false statement or misconduct at issue must have an effect on the Government's decision to pay the claim. Despite this requirement, the Relator's Amended Complaint is totally devoid of any factual allegations that even remotely suggest the Government was influenced to pay out any money based on false or fraudulent representations by either Defendant.

In Count One, the Relator pleads no facts suggesting that OPM would have refused to

---

[6] *See also United States ex rel. Berge v. Board of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir. 1997); *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 732-33 (7th Cir. 1999) (relator must show "the omitted facts were material to the listener's decision" and were "material to the United States' buying decision"); *Harrison ex rel. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999) ("liability under each of the provisions of the False Claims Act is subject to the further, judicially imposed requirement that the false statement or claim be material").

pay BCBSA's claims for profit and administrative expenses had OPM known how BCBSA was processing speech therapy claims associated with mental disorders. For starters, processing such claims is obviously only a tiny portion of the work BCBSA performs under its contract with OPM. It is likely that BCBSA's performance on this one minute aspect of the contract was totally irrelevant to OPM's decision to pay BCBSA's claims for profit and administrative expenses. In addition, the Relator does not distinguish between claims for profit and administrative expenses that are related to BCBSA's processing of speech therapy claims associated with mental disorders, and claims for profit and administrative expenses that are unrelated to that activity. Instead, the Relator alleges that *all* of BCBSA's claims for profit and administrative expenses were false, even if they had nothing to do with the processing of claims for speech therapy associated with mental disorders. Am. Compl. ¶ 95.

There are any number of other possible scenarios in which BCBSA's processing of these claims was immaterial to the Government's decision to pay. One likely possibility is that OPM knew how BCBSA was processing claims for speech therapy associated with mental disorders, and was still willing to pay all of BCBSA's claims for profit and administrative expenses.[7] Under these and various other possible scenarios, the allegedly false or fraudulent representations (whatever those might be) were not material to the Government's decision to pay out any money. In short, the Relator did not plead facts sufficient to show the materiality of the alleged false claims for profit and administrative

---

[7] The only relevant facts pleaded by the Relator suggest that this is the case. OPM reviews each and every benefit denial challenged by a Service Benefit Plan enrollee. *See supra*, at 5-6. According to the Relator, "claims for children's speech and occupational therapy [are] frequently reversed on appeal by OPM." Am. Compl. ¶ 69. The logical consequence of this is that OPM knows about the alleged pattern of claims denial.

expenses.

        In Count Two the Relator fails to allege facts sufficient to infer that BCBSA's actions

were material to the Government's decision to pay extra money on Medicare and Tricare

claims.  The Relator does not even explain how BCBSA's actions could affect Medicare and

Tricare claims through the "coordination of benefits" provisions.  Am. Compl. ¶ 100.  Once

again, the Relator impermissibly relies on conclusory allegation made on "information and

belief" to make that connection.  Am. Compl. ¶ 101.

        In sum, the Relator has failed to plead the specifics about the presentation of any

allegedly false claims or the use of any alleged false records, has failed to plead what

specifically was false or fraudulent about any claims or records, and has failed to plead that

any allegedly false claims or records were material to the Government's decision to pay.

Any one of these failures is fatal to the Relator's allegations.  Because the Relator's

Amended Complaint does not come close to meeting the requirements of Rule 9(b), it must

be dismissed.[8]

### CONCLUSION

        For the foregoing reasons, the Court should grant the Defendants' Motion to Dismiss

the Relator's Amended Complaint and should dismiss the Amended Complaint with

prejudice.

---

[8] "[T]he government's decision not to intervene in the action also suggested that [the Relator's] pleadings of fraud were potentially inadequate."  *Karvelas*, 360 F.3d at 242.

Dated:  February 28, 2006

Respectfully submitted,

/s/      Nicholas J. Nesgos
Nicholas J. Nesgos, BBO No. 553177
nnesgos@pbl.com
Jennifer Finger, BBO No. 641830
jfinger@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-8004
Telephone:  (617) 973-6100
Fax:  (617) 367-2315

Anthony F. Shelley
ashelley@milchev.com
Adam P. Feinberg
afeinberg@milchev.com
Miller & Chevalier Chartered
655 15th St., NW
Suite 900
Washington, DC  20005
Telephone:  (202) 626-6800
Fax:  (202) 628-0858

*Counsel for Defendant Blue Cross Blue Shield Association*

/s/      Lawrence M. Kraus
Michael J. Tuteur, BBO No. 543780
mtuteur@foley.com
Lawrence M. Kraus, BBO No. 564561
lkraus@foley.com
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199
Telephone:  617-342-4000
Fax:  617-342-4001

*Counsel for Defendant Anthem Blue Cross Blue Shield of New Hampshire*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused the foregoing Memorandum in Support of Defendants' Joint Motion to Dismiss Amended Complaint to be served electronically on the following on this 28th day of February, 2006:

James A. Brett, Esquire
Wilson, Dawson & Brett
21 Customs House Street
Boston, Massachusetts  02110

William J. Hardy, Esquire
William J. Hardy Law Offices
1140 Nineteenth Street, N.W.
Washington, D.C.  20036

Patricia M. Connolly, Esquire
Assistant United States Attorney
1 Courthouse Way
Suite 9200
Boston, Massachusetts  02210

Michael F. Hertz, Esquire
Joyce R. Branda, Esquire
Tracy L. Hilmer, Esquire
U.S. Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC  20044

/s/_____Nicholas J. Nesgos_____
Nicholas J. Nesgos