UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. JOHN M. GREABE, | ) | CIV. ACTION NO. |
| c/o WILSON, DAWSON & BRETT | ) | 04-11355-MEL |
| 21 Custom House Street | ) | |
| Boston, MA  02110 | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | SECOND |
| | ) | AMENDED |
| BLUE CROSS BLUE SHIELD | ) | COMPLAINT |
| ASSOCIATION | ) | FOR |
| 225 North Michigan Avenue | ) | VIOLATION OF |
| Chicago, IL  60601; | ) | FEDERAL FALSE |
| | ) | CLAIMS ACT |
| and | ) | (Title 31, U.S.C. §§3729 et |
| | ) | seq.) |
| | ) | |
| ANTHEM BLUE CROSS BLUE SHIELD | ) | |
| OF NEW HAMPSHIRE | ) | |
| 3000 Goffs Falls Road | ) | JURY TRIAL |
| Manchester, NH  03111-0001 | ) | DEMANDED |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

Plaintiff John M. Greabe, on behalf of the United States, files this Second

Amended Complaint against Defendants BLUE CROSS BLUE SHIELD

ASSOCIATION ("ASSOCIATION"), and ANTHEM BLUE CROSS BLUE SHIELD

ASSOCIATION OF NEW HAMPSHIRE ("ANTHEM NEW HAMPSHIRE") and alleges

as follows:

## I. **INTRODUCTION**

1.  This is an action to recover treble damages and civil penalties on behalf of the United States of America arising from false statements and claims made or caused to be made by the Association, in conspiracy with Anthem New Hampshire and others, to the United States in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.*, as amended (the "FCA"). The false claims and statements at issue involve claims for payments made by the Association to the United States under a contract ("Contract CS 1039" or "Contract") between the Office of Personnel Management ("OPM") and the Association, which has been in effect since January 1, 1960 and is attached as Exhibits A and B, )Parts 1, 2, & 3) to this pleading.

2.  The FCA provides that any person who knowingly submits a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The Complaint must be filed under seal for 60 days (without service to the defendants) during that time to allow the government time to conduct its own investigation and to determine whether to join the action.

3.  Pursuant to the Act, plaintiff seeks to recover damages and civil penalties arising from false and improper claims for payment submitted by the Association, or caused to be submitted by the Association, to the government under Contract CS 1039, which was entered into pursuant to the Federal Employees Health Benefits Act

("FEHBA"), 5 U.S.C. §§ 8901 et seq.

## II.  THE PARTIES

### A.  The Relator

4. The RELATOR, JOHN M. GREABE, is a career employee of the federal judiciary. .

5. RELATOR is married and has three children.  The federal government offers RELATOR a choice of health insurance plans.  Since 1990, RELATOR and his family have subscribed to the Blue Cross and Blue Shield's Service Benefit Plan's "Standard Option - Self and Family" ("Service Benefit Plan").  Subscribers are required to submit claims for reimbursement on a "Health Benefits Claim Form."

### B.  The Defendants

**i.  Blue Cross and Blue Shield Association
    225 North Michigan Avenue
    Chicago, IL 60601**

6. The Association is a Chicago-based membership organization of locally operated companies referred to as "Member Plans," "Local Plans," or "Blue Plans." These Local Plans are located in every state, the District of Columbia and Puerto Rico. They offer health insurance products to individuals, small businesses, seniors and large employer groups.

7. Since January 1, 1960, the Association has contracted with OPM to administer the federal Blue Cross Blue Shield Service Benefits Plan under Contract CS 1039.  The Service Benefit Plan is administered locally by participating Blue Cross and Blue Shield

3

Local Plans on behalf of the Association, the carrier.

**ii. Anthem Blue Cross and Blue Shield of New Hampshire**
   **3000 Goffs Falls Road**
   **Manchester, NH 03111-0001**
   **Phone: (603) 695-7000**

8. Anthem, Inc. ("ANTHEM"), 120 Monument Circle, Indianapolis, IN, is a health benefits company operating in the United States. ANTHEM serves more than 11.9 million members (customers), primarily in Indiana, Kentucky, Ohio, Connecticut, New Hampshire, Maine, Colorado, Nevada and Virginia, excluding the immediate suburbs of Washington, D.C. The Company owns the exclusive right to market its products and services using the Blue Cross and Blue Shield (BCBS) names and marks in all nine states under license agreements with the Association. ANTHEM's products include managed care products, such as preferred provider organizations (PPOs), health maintenance organizations (HMOs) and point-of-service (POS) plans, as well as traditional indemnity products. The Company also offers a range of administrative and managed care services and partially insured products for employer self-funded plans. One of its subsidiaries, DEFENDANT ANTHEM NEW HAMPSHIRE, is the Local Plan for the residents of New Hampshire.

9. ANTHEM NEW HAMPSHIRE is ANTHEM's representative to federal Service Benefit Plan enrollees in New Hampshire.

## III. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

11.  This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, at least one of the Defendants can be found in, resides or transacts or has transacted business in the District of Massachusetts.

12.  Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least one Defendant can be found in, resides or transacts or has transacted business in the District of Massachusetts.

13.  RELATOR acts on behalf of the United States pursuant to Title 31, U.S.C. § 3730(b)(1).   Prior to filing suit, he provided to the government written disclosure of all material evidence and information in RELATOR's possession regarding the allegations. RELATOR has direct and independent knowledge of the allegations, Title 31 U.S.C. § 3730(e)(4)(B).

14.  After the investigation required by Title 31 U.S.C. § 3730(b)(2), the Government notified the Court that it declined to intervene.  On August 25, 2005, the case was ordered unsealed.

**IV. <u>BACKGROUND</u>**

15.  Although RELATOR is informed upon information and belief that the Defendants employ the false claims practice described herein in all health insurance programs in which Defendants are participants, RELATOR has direct knowledge and evidence of the claims fraudulently denied by Defendants involving the FEHBA.

**A.  The Contract between the Association and OPM**

16.  Since January 1, 1960, the Association has provided services to the United States (specifically to OPM) under Contract CS 1039 (attached hereto as "Exhibits A and B, (Parts 1, 2, &3").

17.  The Contract is an agreement under which the Association provides services to OPM in exchange for a fee paid to the Association by OPM.  Specifically Contract CS 1039 states that, in consideration of payment by OPM of what are called "subscription charges," the Association agrees to perform "all" of the services set forth in the Contract.

18.  The Contract obligates the Association to provide OPM with adjudicative and other services that are necessary for the proper distribution insurance health benefits. The Contract provides that these benefits, in the form of payments to service providers and reimbursement for amounts spent for medical services by subscribing government employees ("enrollees"), are to be distributed to service providers and enrollees by the Association according to the Service Benefit Plan, which is attached as Exhibit B to the Contract, and according to the Contract itself.

19.  The Service Benefit Plan is, correspondingly, the fee-for-service health insurance plan offered to federal employees under the Federal Employee Heath Benefit Act ("FEHBA"), Title 5 U.S.C. §§ 8901 et seq., and its implementing regulations, 5 C.F.R. Part 890, et seq.

20. The Service Benefit Plan, the administration of which is a contractual obligation of the Association to OPM, offers to enrollees comprehensive medical coverage, including coverage for "medically necessary" speech, occupational, and physical therapy. <u>See</u> Exhibit B, pp. 37, 62, and 98.  Claims must be filed with the carrier

6

of the covered individual's health benefit plan. See 5 C.F.R. Part 890 Section 105.

21.  The FEHBA is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22.

22.  During the relevant time period (1999 to present), OPM contracted with the Association to administer the FEHBA insurance program under the Contract and pursuant to 5 U.S.C. §§ 8901 et seq. .

23.  Monies for the FEHBA are maintained in the Employees Health Benefits Fund ("Health Fund"), 5 U.S.C. § 8909.  Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums, 5 U.S.C. § 8906.  The monies from the Health Fund are then used to reimburse the carriers for claims they pay on behalf of FEHBA beneficiaries.

24.  With some limitations, 5 U.S.C. § 8906 sets the government's share of contributions to the Health Fund at between 72 and 75 percent of the weighted average of subscription charges for all health plans, as determined by OPM. 5 U.S.C. § 8906(a), (b). These contributions, combined with the employee's share, are used to pay for healthcare for the government's employees.  The government funds 72% of the Service Benefit Plan's annual premium as an employment benefit to federal employees; the federal employees pay the remaining 28%.

25.  The Health Fund is split into three parts: (1) a letter of credit ("LOC") account, (2) a contingency reserve for each carrier, and (3) an account to cover administrative expenses. 5 U.S.C. § 8909(a), (b).  The LOC account is to pay carriers for their claims, their profit and administrative expenses.  48 C.F.R. § 1602.170-10.  The

contingency reserve account is not immediately accessible by the carriers.  It is to this account that the Government claims the carriers must deposit any contractual penalties that they receive.  If there is money remaining in the LOC account at the year's end, it is used to pay future claims.  If money remains in the contingency reserve account at year's end, it is used to "defray increases in future rates, or may be applied to reduce the contributions of enrollees and the Government to, or increase the benefits provided by, the plan form which the reserves are derived . . . ." 5 U.S.C. § 8909(b).

26.  OPM generally employs two types of contracts to govern its relationship with carriers: experience-rated and community-rated.  48 C.F.R. § 1616.7001, 1616.7002.  OPM's contract with the Association is experience-rated.  Experience-rated contracts pay carriers on a cost-incurred basis, while community-rated contracts pay carriers a fixed monthly rate, regardless of the actual costs the carrier incurs in the operation of its program.

27.  The contract between OPM and the Association grants the Association and the Local Plans access to the line of credit account to cover their expenses and to collect their profits under Contract CS 1039.

28.  In exchange for the services to be provided to OPM over the course of a year, the Association has contracted to receive an annual service charge.

29.  Under the Contract, the Association is entitled to pre-pay itself this annual service charge by withdrawing from the LOC account it manages in administering the Plan a portion of its negotiated annual service charge on the last day of each month.  Then, by March 31 of the following year, the Association submits to OPM an audited

accounting statement, which the parties use to "true up" the final annual amounts due and owing under the contract.

30.  The Contract obligates the Association to accompany this accounting statement with a certification, signed by the Association's chief executive and financial officers and/or responsible corporate official, which avers, inter alia, that (1) only income, rebates, allowances, refunds, and other credits owed in accordance with the contract terms have been included in the accounting statement, id. at § 3.2(c)(3); and (2) the letter of credit account was managed in accordance with the federal acquisition regulations, found at 48 C.F.R. chapter 16, id. at § 3.2(c)(4).  These referenced federal acquisition regulations are incorporated into Contract CS 1039, id. at § 1.4(a), and require, inter alia, "compliance with the terms of the . . . contract," 48 C.F.R. subpart 1609.7001(b)(3) (2005), and the "accurate adjudication of claims" presented to the Association and its agents under the contract, 48 C.F.R. subpart 1609.7001(b)(4) (2005).

**B.  Relator's Direct and Independent Knowledge of the FCA Violations**

31.  In late summer 1999, RELATOR, his wife, and their family physician became concerned about the speech development of one of RELATOR's children, who was then two years old.

32.  RELATOR and his wife contacted a local Early Intervention social services agency, which conducted an assessment of their son's speech development.

33.  The assessment team concluded that RELATOR's son's articulation development was "significantly delayed" and that he was eligible to receive, on a weekly basis, publicly funded speech therapy from a licensed speech therapist until the age of

three.

34.  Pursuant to this assessment, RELATOR's son received weekly speech therapy services from a licensed speech therapist until his third birthday, at which point Early Intervention services were no longer available.

35.  For children age 3 and up, the local public school district becomes responsible for any publicly funded speech and occupational therapy to which a child is entitled.

36.  Prior to RELATOR's son's third birthday, RELATOR and his wife contacted the Concord, New Hampshire School District's speech and language director to request that the district continue to provide RELATOR's son with necessary therapies beyond his third birthday.

37.  RELATOR and his wife were told that their son's entitlement to services had to be assessed under the district's education-based criteria, and that the assessment would be conducted over the course of the second semester of the 1999-2000 school year in the district's speech and language preschool program.

38.  To ensure continuity in their son's therapy after he turned three, RELATOR and his wife contracted to continue weekly speech therapy after the boy's third birthday until the start of the district's second semester in December 1999.  The sessions ran from November 11, 1999 - December 1, 1999, for a total cost of $280.00.

39.  Because RELATOR's 1999 Service Benefit Plan covered "medically necessary" speech therapy conducted by licensed speech therapists, RELATOR's wife

called Anthem New Hampshire, and requested a "prior authorization" of the contemplated speech therapy sessions.  A customer service representative told RELATOR's wife that prior authorization was not required because the 1999 Service Benefit Plan covered the sessions if the services were "medically necessary."

40.  In or about December 1999 and January 2000, RELATOR twice sent Anthem New Hampshire, the Association's agent, claims for reimbursement for the speech therapy sessions, along with supporting documentation establishing that the speech therapy was medically necessary.

41.  RELATOR and his wife received no response and were told, during follow-up telephone conversations, that their claims and documentation had been lost and would have to be resubmitted.

42.  In or about February 2000, RELATOR's family physician also submitted his written opinion to Anthem New Hampshire, the Association's agent, that it was medically necessary that RELATOR's son receive speech therapy.  The physician requested that such speech therapy be covered under RELATOR's health insurance plan.  He received no response.  His assistant was told, in a follow-up conversation, that his request and documentation had been lost.

43.  Counting the physician's experience, there were three unexplained losses of claims for reimbursement and supporting documentation submitted by RELATOR, or on his behalf, between December 1999 and March 2000.

44.  In or about early March 2000, during a follow-up telephone call inquiring about the status of RELATOR's third written claim for reimbursement for the speech

11

therapy sessions (which was submitted on February 22, 2000), RELATOR's wife was told by a customer service representative that the claim had been denied because RELATOR's son had been treated in RELATOR's home.  According to the representative, the Service Benefit Plan only covered speech therapy services delivered in a speech therapist's office.

45.  RELATOR subsequently called Anthem New Hampshire and objected that no such limitation or exclusion was in the 1999 Service Benefit Plan brochure or had been mentioned when RELATOR'S wife called to request prior authorization of the speech therapy sessions. Despite the fact that the customer service representative to which RELATOR spoke could point to no contractual provision requiring that speech therapy be provided in the therapist's office, the agent stated that the patient must go to the provider's office unless the patient had some physical impairment making travel dangerous and thus making it "medically necessary" that the services be provided in the home.

46.  Meanwhile, during the spring of 2000, the Speech and Evaluation Team of the Developmental Preschool of the Concord School District completed its assessment of RELATOR's son.  The Team concluded that, although RELATOR's son suffered from speech problems, he was not "educationally handicapped" within the district guidelines because his articulation delay was not handicapping his educational development.  He was not eligible for therapy as a student with a disability.

47.  As a result, RELATOR and his wife decided to retain another private speech therapist to assess their son's medical needs and recommend a course of action.

48.  On April 12, 2000, the therapist issued her diagnosis and concluded that RELATOR's son suffered from a phonological process disorder and a neurologically based verbal dyspraxia, manifesting itself in, *inter alia*, a hand tremor.  She recommended speech therapy and occupational therapy.

49.  On May 29, 2000, RELATOR's family physician concurred with the new therapist's neurological diagnosis and reiterated his request that Anthem New Hampshire, the Association's agent, reimburse the cost of the recommended speech and occupational therapies.

50.  Meanwhile, after reviewing the new assessment, and receiving word that his son was ineligible for services from the Concord School District, RELATOR requested that Anthem New Hampshire, the Association's agent, agree to reimburse RELATOR for speech therapy sessions to be conducted during the summer of 2000.  RELATOR supported his requests with copies of the evaluation and the Concord School District assessment team's report.

51.  On May 30, 2000, RICHARD P. LAFLEUR, M.D., Assistant Medical Director of Anthem New Hampshire, denied RELATOR's request for pre-certification for the proposed summer therapy sessions.  In relevant part, his letter stated:

> After review of the medical information provided, the request for Speech Therapy is denied as it does not meet ANTHEM Blue Cross and Blue Shield's criteria because it [sic] is developmental in nature and can be done in the school system. This decision is based on nationally recognized criteria including <u>Optimed, Milliman & Robertson Health Management Guidelines, the Commonwealth of Massachusetts Department of Industrial Accidents and Guidelines for Chiropractic Quality Assurance and Practice Parameters,</u> and ANTHEM BC/BS Medical Policy.

(emphases supplied).  RELATOR's son has never been involved in an industrial accident

13

or been in need of chiropractic care.

52. Also, at some point in May 2000, Anthem New Hampshire, the Association's agent, denied coverage for the cost of the April 12, 2000 assessment.

53. RELATOR subsequently called Anthem New Hampshire to protest LAFLEUR's denial of coverage for the proposed summer 2000 speech therapy sessions, as well as the denials of coverage for the earlier sessions and the cost of the original assessment. The customer service representative promised to follow up on RELATOR's protest.

54. Despite the May 30th denial of pre-certification for coverage for the Summer 2000 proposed course of speech therapy, RELATOR retained the therapist to provide the speech therapy.

55. During the first week of July 2000, a customer service representative informed RELATOR that Anthem New Hampshire, the Association's agent, was going to cover the cost of the April 12, 2000 assessment. During this conversation, the representative led RELATOR to believe that the decisions on payment for the November-December 1999 and summer 2000 sessions were being reassessed. She asked that RELATOR hold off on further action until a final decision was reached.

56. In September 2000, RELATOR (who had heard nothing in the interim) called Anthem New Hampshire, the Association's agent, and was told that the November/December 1999 speech therapy sessions and the summer 2000 speech therapy sessions would not be covered.

57. On October 2, 2000, RELATOR appealed to Anthem New Hampshire and

14

asked it to reverse its denials of coverage for the November/December 1999 speech

therapy sessions and the Summer 2000 speech therapy sessions.  His appeal noted that

LAFLEUR's "not medically necessary" conclusion was contrary to the determination of

the licensed health professionals who, unlike LAFLEUR, actually had examined his son.

RELATOR argued that LAFLEUR had wrongly concluded that the availability of a

school district's education-related speech therapy services would relieve Anthem New

Hampshire, the Association's agent, of its contractual obligation to provide medically

necessary speech therapy services.  RELATOR also noted that, in any event, the Concord

School District had determined that his son was ineligible for services -- a fact which

RELATOR had documented to LAFLEUR.  Finally, RELATOR questioned why

LAFLEUR had referred in his denial letter to patently irrelevant and bizarre criteria such

as the Commonwealth of Massachusetts Department of Industrial Accidents and

Guidelines for Chiropractic Quality Assurance and Practice Parameters.

    58.  On October 26, 2000, in a letter from Anthem New Hampshire Senior

Customer Service Representative KELLY FEENY, Anthem New Hampshire, the

Association's agent, affirmed its denials of coverage for the therapy sessions.  Anthem

New Hampshire again asserted that RELATOR's son should seek speech therapy services

from the school system, even though it twice had been provided with copies of the

Concord School District assessment team's conclusion that RELATOR's son was not

entitled to services from the district.

    59.  The decision also enigmatically stated that RELATOR's documentation did

"report" a "medical condition" and that the assessment "did not conclude a medical based

condition that constituted the medical need for continuation of benefits."

60.  In January 2001, RELATOR appealed Anthem New Hampshire's denial of coverage for the November/December 1999 and summer 2000 speech therapy sessions to OPM, which referred the matters for an independent medical review.

61.  On a March 5, 2001, OPM reversed the denial of coverage for the November/December 1999 speech therapy sessions, ruling that "the speech therapy was medically necessary for your dependent's diagnosis."  Anthem New Hampshire's FEENY acknowledged the reversal on April 9, 2001.

62.  For reasons it did not explain, OPM did not address RELATOR's appeal of Anthem's denial of coverage for the summer 2000 speech therapy sessions.

63.  After the OPM decision, RELATOR called an Anthem New Hampshire representative and requested that it also provide reimbursement for the summer 2000 speech therapy sessions.  RELATOR pointed out that these sessions almost immediately followed the medical diagnoses upon which OPM had relied when it overturned Anthem New Hampshire's denial of coverage for the 1999 speech therapy sessions.

64.  On June 27, 2001, Anthem New Hampshire, the Association's agent, denied the claims pertaining to the summer 2000 sessions with a one-line written explanation: "Benefits are not paid for medical services which the local Blue Cross and Blue Shield Plan determines to be not medically necessary, or that does not provide the level of care required for your condition as explained in your . . . Plan brochure".

65. On June 27, 2001, RELATOR called Anthem New Hampshire and spoke with customer service representative PAM LETIZI.  LETIZI acknowledged that there are

"structural problems here" and that "clearly our standards for 'medical necessity' and OPM's are not the same."  RELATOR inquired why, despite the OPM reversal, Anthem New Hampshire, the Association's agent, continued to deny these claims.  LETIZI answered that employees of Anthem New Hampshire "could lose their jobs" if a different determination was made.  This was because Anthem New Hampshire personnel were applying standards and criteria that came from the Association; because "our system is programmed in such a way as to spit out your claims"; and because, even after the successful appeal to OPM, "we had all sorts of trouble getting the system to take … [the ultimately successful claims for the speech therapy sessions] … for processing."

66.  On July 2, 2001, RELATOR had two conversations with Anthem New Hampshire Service Benefit Plan liaison LISA TWOHIG.  In the first conversation, TWOHIG expressed concern about how OPM might respond to yet another denial of speech therapy reimbursement for RELATOR's son.  TWOHIG informed RELATOR that she would contact an official who worked for the Association to see if anything could be done.

67.  TWOHIG called back that same day to say that she had spoken to BARBARA HOLLEY in the Director's Office of the Association.  HOLLEY had authorized Anthem New Hampshire to pay the claims pertaining to the summer 2000 sessions.  In the course of this conversation, TWOHIG informed RELATOR that Anthem New Hampshire's denials of RELATOR's speech therapy claims were required under "Guidelines" the Association issued to all of the Local Plans.  TWOHIG also stated that issues involving speech and occupational therapy for children were a "national problem"

17

for the Association and were not "unique" to subscribers in New Hampshire. She stated

that "most cases involving OPM reversals of Local Plan decisions are speech therapy

cases." TWOHIG again mentioned her "concern about exposure to OPM." Finally,

TWOHIG emphasized that the Anthem New Hampshire's decision to cover speech

therapy for RELATOR's son was not indefinite and could change.

68. On July 24, 2001, while reviewing the documents accumulated in the course

of his dealings with Anthem New Hampshire and the Association, RELATOR noticed

that LAFLEUR's May 30, 2000 letter had stated that "[a] copy of the criteria used in …

[denying RELATOR's Summer 2000 request for pre-certification] … may be obtained by

calling 1-800-531-4450." RELATOR called the number and asked for the criteria. The

service representative said that she would have to call him back.

69. Later in the day, RELATOR received a call from Anthem New Hampshire

Senior Customer Service Representative KELLY FEENY, author of the October 26,

2000 decision denying RELATOR's initial appeal and the April 9, 2001 letter

acknowledging OPM's reversal of the denial of the November/December 1999 claims.

FEENY informed RELATOR that LAFLEUR's justification for the claim denial in his

May 30, 2000 letter was "boilerplate language" that Anthem New Hampshire had been

sending out in its letters denying coverage to customers who were not federal employees.

FEENY stated that the denial decision was based upon guidelines, specifications, or

and/or criteria dictated to Anthem New Hampshire by the Association. When

RELATOR asked FEENY for a copy of the written guidelines applicable to his son's

situation, she refused, saying that the Association's guidelines were for "internal use

18

only" and were regarded as "extremely private."  FEENY also confirmed that denials by

the Local Plans of claims for children's speech and occupational therapy were frequently

reversed on appeal by OPM.

70.  FEENY went on to state that the Association's national computer system,

which is used by Local Plans when a claim is made by a beneficiary of the Service

Benefit Plan, is programmed in such a way that all claims seeking coverage for speech

therapy, occupational therapy, physical therapy and other "medical services" will be

denied when they bear "mental disorder" diagnosis codes.  Although FEENY would not

disclose the specific diagnosis codes that had been submitted in connection with the

claims of RELATOR's son, she informed RELATOR that the codes corresponded to a

"mental disorder" diagnosis.  RELATOR subsequently learned that the diagnosis codes

used in his son's submissions were 315.4, 315.39 and 784-69. The meaning of these

diagnosis codes is discussed infra.

71.  FEENY explained that the ICD-9, discussed infra, classifies certain

conditions, common in young children, as "mental disorders."  FEENY asserted that the

Association had programmed its computers to regard speech therapy, occupational

therapy and physical therapy as "medical services" to be covered only when the claim

forms contain corresponding "medical disease" diagnosis codes.  In other words, she

said, the Association's computer system will automatically reject all claims for "medical

services" on claim forms containing a "mental disorder" diagnosis code, even when those

services actually are "medically necessary" to treat the mental disorder.

72.  FEENY agreed with RELATOR that, as a result of the Association's

computer system, the only way a plan beneficiary can obtain approval for a "medical service" prescribed for a condition bearing an ICD-9 "mental disorder" diagnosis code is to appeal the Association's agent's automatic denial to OPM. FEENY informed RELATOR that his son was particularly "lucky" because the Association had mandated that, in the case of claims involving "his son and his son alone," an Anthem New Hampshire employee would be assigned responsibility for keying into the computer system an "override" to the Association's preprogrammed "denial." When RELATOR suggested that this was good for his son but not so good for others with similar diagnoses, FEENY had no reply.

73. Until early 2002, RELATOR's son received private speech therapy from a third therapist. Anthem New Hampshire provided reimbursement for these services pursuant to the Association's authorization to permit a system "override" applicable only to RELATOR's son.

74. On Tuesday, April 13, 2004, RELATOR left a message on an Anthem New Hampshire customer service line, requesting a copy of the guidelines that would be used to evaluate any claim for speech, occupational and physical therapy services for his daughter, who also has articulation issues but was not diagnosed with a particular condition.

75. On April 15, 2004, an Anthem New Hampshire customer representative named "Linda" returned RELATOR's call. LINDA would not provide RELATOR with her last name, stating that she was not allowed to do so by her office. Instead of responding to RELATOR's request for the guidelines, she described the benefits to which

the RELATOR is entitled under his Service Benefit Plan.  RELATOR told LINDA that

he knew the Plan's coverage provisions and, after describing the history of his attempts to

secure coverage for his son's speech therapy sessions, asked for a copy of the internal

guidelines that Anthem New Hampshire had refused to provide to him in 2001.  LINDA

replied that the internal guidelines are "even more confidential now."  When RELATOR

described the computer system problem he had uncovered in connection with his son's

claims, she told him that the Association's computer system is still programmed to reject

claims for speech, occupational and physical therapy when prescribed to treat a "mental

disorder." LINDA stated that "the same thing will probably happen again."  She also

confirmed that RELATOR likely will need to go to OPM to get any potential coverage

for his daughter because "nothing has changed" and because speech, occupational and

physical therapies are still "problem areas with mental disorder diagnoses."

## V. ALLEGATIONS OF FRAUD

### A. General Allegations

76.  The Centers for Medicare and Medicaid Services (CMS), and the National

Center for Health Statistics (NCI), two departments within the Department of Health and

Human Services (DHHS), have devised the International Classification of Diseases,

Ninth Revision - Clinical Modification ("ICD-9-CM") to identify diagnosis codes for to

be used in submissions for reimbursement, i.e., "claims," by health service providers.

77.  Section 315 (Specific Delays in Development) of Chapter 5 of the ICD-9-CM

deals specifically with learning delays.

78.  The ICD-9-CM, Section 315.4 (Coordination Disorder) classifies as "mental

disorders" certain coordination disorders, such as "Clumsiness Syndrome," "Dyspraxia Syndrome" and "Specific Motor Development Disorder."

79.  The ICD-9-CM, Section 315.39, classifies as a "mental disorder" a disorder known as "Developmental and Articulation Disorder."

80.  The ICD-9-CM, Chapter 16 (Symptoms, Signs and Ill-Defined Conditions), Section 784-69 (Symptoms Involving Head And Neck), classifies as a "symptom, sign, or ill-defined condition" a condition known as "Apraxia," along with three others.

81.  These disorders and conditions, common in young children, cause speech and fine motor functioning problems. Speech, occupational and physical therapies are medically necessary treatments for these disorders and conditions.

82.  As set forth above, the Association has determined, and actually has programmed its computers, to shunt aside, and not to adjudicate, claims for speech, occupational, and physical therapy when the claim forms by which reimbursement coverage is sought contain corresponding "mental disorder" diagnosis codes.

83.  The result is that the Association causes its Local Plans not to pay claims for reimbursement for medically necessary speech, occupational and physical therapy which are submitted on claim forms containing "mental disorder" diagnosis codes from the ICD-9-CM -- at least in situations where claimants are not unusually persistent.

84.  OPM contracts with the Association for the adjudicative and other administrative services required in the administration of the Service Benefit Plan.  The OPM, as a party in interest, has the final "right of review" of the denial by the carrier [the

Association] … of a claim for reimbursement (Title 5, Part 890 C.F.R. Sec. 105 - Filing Claims for Payment or Service).

85. The C.F.R. also provides that OPM is the party in federal court to be sued by a subscriber if it denies coverage, not the Association or Local Plan.

86. Among the contract's service benefits is limited reimbursement for "… other outpatient services [for] … speech, occupational and physical therapy."

87. The Association and Anthem New Hampshire act with actual knowledge of their fraudulent denial of claims for reimbursement for speech, occupational and physical therapy in cases where the therapy is medically necessary for conditions classified in the ICD-9-CM as "mental disorders," as such denials are frequently reversed by OPM.

88. The Association and its agents have caused the Government to receive less than that for which it has bargained. Contract CS 1039 requires the Association and its agents to adjudicate and reimburse claims for <u>all</u> medically necessary speech, occupational, and physical therapy. In practice, however, the Association and its agents adjudicate and reimburse only claims for medically necessary speech, occupational, and physical therapy prescribed in connection with "medical disease" diagnosis codes.

89. The Association and its agents have discriminated against beneficiaries of the Service Benefit Plan who suffer from mental disorders for which speech, occupational, or physical therapy are medically necessary treatments.

90. On information and belief, the Association and its agents fraudulently deny these claims for speech, occupational and physical therapy not merely to defraud the federal government and its beneficiaries, but also to defraud all holders of Blue Cross and

Blue Shield policies nationwide. The fraud against the federal government is part of a larger effort to defraud all Association policyholders. In fact, on information and belief, the scheme is motivated by the profits it generates for the Association and its agents in connection with their private plans.

**B. Legal Theories and False Claims Allegations**

**1. Violation of 31 U.S.C. § 3729(a)(1)**

91. The Association has been engaged in an ongoing violation of 31 U.S.C. § 3729(a)(1) of the FCA, which proscribes the knowing presentation to the United States Government of a false or fraudulent claim for payment or approval.

92. The Service Benefits Plan is "experience rated," so the Association and its agents are entitled to withdraw from a special reserve in the letter of credit account it manages in administering the Plan a portion of its negotiated annual service charge on the last day of each month. See Exhibit A at §§ 1.1, 3.3(a), and 3.7.

93. Since at least January 31, 2000 (when RELATOR's first batch of claims for reimbursement for medically necessary speech therapy were not adjudicated (or, alternatively, were not adjudicated accurately and in good faith)), and on the last day of each month since January 2000, the Association, in conspiracy with Anthem and others, has submitted at least 73 consecutive monthly "claims" for its negotiated service charge, see id. at § 4.4 (stating that a "claim includes, in the case of the carrier, a charge against the contract") for approval or payment. See id. at §§ 1.1, 3.3(a) & 3.7.

94. Each such claim is false or fraudulent in violation of FCA § 3729(a)(1) for at least two reasons. First, the claims are factually false or fraudulent because OPM pays

the Association its service charge in consideration for "all the services set forth in [Contract CS 1039]." See id. at ii.  And yet, as set forth above, the Association and its agents do not provide OPM with all the services for which it has contracted, which include adjudicating and paying claims for medically necessary speech, occupational, and physical therapy sought in connection with diagnosed mental disorders.  Second, the claims are legally false or fraudulent because, in accordance with the annual "truing up" process required by § 3.2 of Contract CS 1039, the Association and its agents have in each contract year since 2000 certified the satisfaction of material conditions to payment of their service charge: (1) that only income, rebates, allowances, refunds, and other credits owed in accordance with the contract terms have been included in the accounting statement, see id. at § 3.2(c)(3); and (2) that the letter of credit account was managed in accordance with the federal acquisition regulations found at 48 C.F.R. chapter 16, which are part of the contract, see Contract CS 1039 at § 1.4(a), and require, inter alia, "compliance with the terms of the . . . contract," 48 C.F.R. subpart 1609.7001(b)(3) (2005), and the "accurate adjudication of claims" presented to the Association and its agents under the contract, 48 C.F.R. subpart 1609.7001(b)(4) (2005). See Exhibit C (2000-2004 Annual Accounting Statements, signed and certified by Chief Executive Officer Scott P. Serota, Financial Officer Ralph D. Rambach, Executive Director of Finance Michelle Helfand, and Senior Vice President Kathryn Sullivan, and dated, respectively, May 4, 2001, August 21, 2002, April 22, 2003, April 29, 2004, and April 29, 2005). (N.B. The Association has not yet submitted the 2005 Annual Accounting Statement).

95.  As set forth above, the Association and its agents are neither materially complying with the terms of the contract nor accurately adjudicating the claims which are the subject of this lawsuit

96.  The Association's presentation of these false claims for approval has been "knowing" or, at the very least, deliberately ignorant or recklessly in disregard of the truth. As set forth above, the Association's agents are well aware that OPM regards speech, occupational, and physical therapy to be medically necessary treatments for certain mental disorders.  And yet, knowing that its non-adjudications and denials are frequently reversed by OPM, the Association and its agents knowingly maintain the non-compliant (with Contract CS 1039) computer system and adjudicative process in connection with claims of this sort, making exceptions only for persistent enrollees who do not accede to their initial decisions.

**2. Violation of 31 U.S.C. § 3729(a)(3)**

97.  The Association and Anthem New Hampshire (and others) have been engaged in an ongoing violation of 31 U.S.C. § 3729(a)(3) by conspiring to defraud the government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit.  The Association and Anthem New Hampshire have engaged in a number of overt acts to further the conspiracy, including the setting up and maintenance of a non-compliant (with Contract CS 1039) adjudicative system and the repeated failure to adjudicate, or to adjudicate accurately and fairly, claims for reimbursement for medically necessary speech, occupational, and physical therapy submitted in connection with mental disorder diagnoses.

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1)

**(Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)**

98.  RELATOR realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 97.

99.  The Association, through its agents, has knowingly presented, or cause to be presented, to officers, employees or agents of the United States Government false or fraudulent claims for payment or approval.

100.  By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by the Association or its agents.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(3)

**(Conspiring to Defraud the Government Through False or Fraudulent Claims)**

101.  Plaintiff realleges and incorporates herein by reference paragraphs 1 through 100.

102.  The Association, Anthem New Hampshire, and others have conspired to defraud the government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit.

27

103. By virtue of this conspiracy to defraud the government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by the Association and its agents.

WHEREFORE, the RELATOR demands and prays that judgment be entered in favor of the United States and against each Defendant as follows:

**A.** On Counts One and Two under the False Claims Act, as amended, for multiples of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper.

**B.** That RELATOR be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

**C.** That RELATOR be awarded all costs of this action, including attorneys fees and costs; and

**D.** That RELATOR recover such other relief as the Court deems just and proper.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

By:

_/s/ James A. Brett_____
James A. Brett, Esquire
B.B.O. # 056300
Wilson, Dawson & Brett

21 Custom House Street
Boston, MA   02110
Tel. 617-646-4111
Fax:  617-646-4413


   /s/ William J. Hardy
William J. Hardy, Esquire
B.B.O. #221460
William J. Hardy Law Offices
1140 Nineteenth Street, N.W.
Suite 900
Washington, DC   20036
Tel:  202-223-5120
Fax:  202-223-5619

ATTORNEYS FOR JOHN M. GREABE


<u>CERTIFICATE OF SERVICE</u>

I, James A. Brett, Esquire, hereby certify that on this 31st day of March, 2006, the foregoing document has been filed by electronic means through the ECF System.  Any persons not receiving notification through ECF as noted on the Notification of Electronic Filing will be conventionally served via first class mail, postage prepaid:

Nicholas J. Nesgos
Jennifer Finger
Posternak Blankstein & Lund LLP
800 Boylston Street, Prudential Tower
Boston, MA  02199-8004

Anthony F. Shelley
Adam P. Feinberg
Miller & Chevalier Chartered
655 15th St., NW, Suite 900
Washington, DC  20005

Michael J. Tuteur
Lawrence M. Kraus
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA  02199

Patricia M. Connolly

Assistant United States Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210

Michael F. Hertz, Esquire
Joyce R. Branda, Esquire
Tracy L. Hilmer, Esquire
U.S. Department of Justice
Civil Division
PO Box 261, Ben Franklin Station
Washington, D.C.  20044

   /s/ James A. Brett
James A. Brett, Esquire