## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

**UNITED STATES OF AMERICA, ex rel.**
**JOHN M. GREABE,**

          **Plaintiffs**

     **v.**                                **Civil Action No. 04-11355-MEL**

**BLUE CROSS BLUE SHIELD ASSOCIATION**
**and ANTHEM BLUE CROSS BLUE SHIELD**
**OF NEW HAMPSHIRE**

          **Defendants**
_____

### Memorandum of Law in Opposition to Joint Motion to Dismiss
### Amended Complaint and in Support of Motion to File Second Amended Complaint

      Relator John M. Greabe, on behalf of the United States, respectfully submits this

Memorandum in Opposition to Defendants' Joint Motion to Dismiss the Amended Complaint

and in Support of Motion to File Second Amended Complaint.

### I.  Introduction

      Defendants Blue Cross Blue Shield Association (Association) and Anthem Blue Cross

Blue Shield of New Hampshire (Anthem) have moved to dismiss relator's amended complaint on

two grounds.  Miscasting this case as an action seeking improperly denied health benefits owed

to federal employees, defendants first argue that the only statutory and regulatory authority the

government may invoke to remedy the pleaded false claims are those provisions of the Federal

Employees Health Benefits Act (FEHBA), 5 U.S.C. § 8901 et seq., and its implementing

regulations, which accord the federal Office of Personnel Management  (OPM) limited powers to

regulate and debar insurance carriers administering federal health plans. Alternatively, defendants contend that relator has failed to plead its fraud theory with the particularity required by Fed. R. Civ. P. 9(b).

The court should reject these arguments and deny defendants' joint motion. This lawsuit does not seek improperly denied health insurance benefits on behalf of any federal employee. Rather, it seeks on behalf of the United States damages and penalties the government is entitled to collect under the False Claims Act (FCA), 31 U.S.C. § 3729 et seq., because the Association, in conspiracy with Anthem and others, has on numerous occasions presented the government with claims for payment for services the Association did not actually perform. The government's power to seek such damages and penalties under the FCA is not limited, or even affected by, the OPM's separate and unrelated power to regulate and debar insurance carriers under the FEHBA. And because relator has specified (1) the time, place, and content of the Association's false claims for payment, and (2) the sources of the information and the reasons for relator's belief that the claims are false, relator has satisfied the requirements of Rule 9(b).[1]

## II. The Nature of Defendants' Fraud: Claiming Payment for Services That Never Were Performed

Since January 1, 1960, the OPM has contracted with the Association for the Association to adjudicate claims and provide other administrative services to the federal Blue Cross Blue Shield Service Benefits Plan – a health insurance plan offered to federal employees as part of the Federal Employees Health Benefits Program. <u>See</u> OPM-Association Contract CS 1039 (attached

---

[1]As explained below, <u>see</u> <u>infra</u> at 10-11, relator is contemporaneously moving to file a second amended complaint under Fed. R. Civ. P. 15(a) because he now has a copy of the entire Contract CS 1039 and related accounting statements. All references in this memorandum will be to the second amended complaint, which is attached to relator's motion to amend.

as Exhibits A and B, (Parts 1, 2 & 3) to the second amended complaint) at ii.[2]  The cover page of

the contract is explicit in stating that the Association is to be paid a negotiated profit in the form

of an annual service charge in exchange for "*all*" the adjudicative and other administrative

services required by the contract.  See Exhibit A at ii. (emphasis supplied); see also id. § 3.7 &

Exhibit B.

The Service Benefits Plan is "experience rated," so the Association is entitled to (and

does) withdraw from a special reserve in the letter of credit account it manages in administering

the Plan a portion of its negotiated annual service charge on the last day of each month.  See

Exhibit A at §§ 1.1, 3.3(a) & 3.7.  Then, by March 31 of the following year, the Association

submits to OPM an audited accounting statement, which the parties use to "true up" the final

annual amounts due and owing under the contract.  See id. at § 3.2(a) & (b).  This accounting

statement is accompanied by a certification, signed by the Association's chief executive and

financial officers and/or responsible corporate official, which avers, inter alia, that (1) only

income, rebates, allowances, refunds, and other credits owed in accordance with the contract

terms have been included in the accounting statement, id. at § 3.2(c)(3); and (2) the letter of

credit account was managed in accordance with the federal acquisition regulations, found at 48

C.F.R. chapter 16,  id.  These referenced federal acquisition regulations are incorporated into

Contract CS 1039, id. at § 1.4(a), and require, inter alia, "compliance with the terms of the . . .

contract," 48 C.F.R. subpart 1609.7001(b)(3) (2005), and the "accurate adjudication of claims"

---

[2]Because Contract CS 1039 and the related accounting statements are  referenced within and central to relator's
second amended complaint, the court may consider them in ruling on defendants' motion to dismiss.  See, e.g.,
Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002).

presented to the Association and its agents under the contract, 48 C.F.R. subpart 1609.7001(b)(4)

(2005).[3]

Relator alleges that, during each contract year from no later than 2000 to the present, a

portion of the annual service charge that the Association collected and certified as due and owing

(and thereby induced the OPM to approve) was in fact *not* due and owing because of the

Association's willful and knowing failure to perform certain services it was obliged to perform

under the contract.  Relator premises this charge on a foundational allegation that, while

collecting its service charge and certifying entitlement to its monthly claims and satisfaction of

contractual conditions precedent, but see supra note 3, the Association, in conspiracy with

Anthem and others, has engaged in a scheme not to adjudicate, but systematically to deny

without adjudication, claims for reimbursement for medically necessary speech, occupational,

and physical therapy submitted in connection with "mental disorder" diagnosis codes despite

knowing that the claims are covered by the Plan and that OPM regards the claims as covered.

See Second Amended Complaint Parts IV & V (detailing the scheme).  In other words, the

Association has (1) withdrawn its service charge, payment of which is conditioned on the

Association's performance of "*all*" the services required by the contract, see Exhibit A at ii, and

(2) certified entitlement to the service charge and satisfaction of explicit contractual conditions

---

[3]Oddly, the language of the certifications does not track exactly the specific certification language *required* by §
3.2(c) of the contract, which specifies that "[t]he certificate required *shall* be in the following form," id. at §
3.2(c)(3) (emphasis supplied), and requires certification that "the letter of credit account was managed in accordance
with *5 C.F.R. part 890, 48 C.F.R. chapter 16*, and OPM guidelines." (emphasis supplied).  Instead, the certifications
merely state that "[t]he letter of credit account was managed in accordance with OPM guidelines"; no mention is
made of 5 CFR part 890 or 48 CFR chapter 16.  Compare Exhibit A at § 3.2(c)) with Exhibit C (fourth
certification).  In any event, relator construes the submitted certifications to encompass the material contractual
compliance and accurate adjudication of claims certifications required by the contract (through its reference to 48
C.F.R. chapter 16, which contains 48 C.F.R. subparts 1609.7001(b)(3) & (4)) – at least insofar as is relevant to the
allegations of the second amended complaint.

precedent (thereby inducing the OPM to approve payment of the service charge), see  id. at §

3.2(c)(3), despite knowingly failing to provide some of the services it was obliged to perform in

order to earn the service charge – i.e., profit – withdrawn.[4]

### III.  The Relator Has Pleaded Viable Claims Under the FCA

The FCA

> imposes liability upon persons who 1) present or cause to be presented to the
> United States government, a claim for approval or payment, where 2) that claim is
> false or fraudulent, and 3) the action was undertaken "knowingly," in other
> words, with actual knowledge of the falsity of the information contained in the
> claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that
> information.

United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)

(citing 31 U.S.C. § 3729(a)(1), (b)).  Relator has pleaded viable FCA claims under each of his

two alternative theories.

First, relator has alleged that, dating back to at least January 2000, when his first batch of

claims for reimbursement for medically necessary speech therapy were not adjudicated (or,

alternatively, were not adjudicated in good faith), see Second Amended Complaint ¶¶ 31-75, the

Association, in conspiracy with Anthem and others, has submitted 73 monthly "claims" for its

negotiated service charge, see Exhibit A at § 4.4 (stating that a "claim includes, in the case of the

carrier, a charge against the contract"), for approval or payment.  See Second Amended

Complaint at pp 27-30 & 93-94.

Second, relator has alleged that these claims are "false or fraudulent" under two

---

[4]To the extent that relator's amended complaint stated theories other than these central allegations – that the
Association is liable to the government under 31 U.S.C. § 3729(a)(1) for a multiple of the value of the services that
were contracted for but that it knowingly did not deliver (plus statutory penalties), and that the Association and
Anthem are liable to the government under 31 U.S.C. § 3729(a)(3) as coconspirators in the scheme – relator is
content to simplify the case and hereby withdraws them.  See Second Amended Complaint.

alternative theories:  (1) the claims are false or fraudulent because the Association, in conspiracy

with Anthem and others, has claimed entitlement to the entirety of the service charge withdrawn

despite knowing that the entirety of the service charge has not been earned, see <u>United States ex</u>

<u>rel. Mikes</u> v. <u>Straus</u>, 274 F.3d 687, 696-97 (2d Cir. 2001) (describing "factually false"

certifications and differentiating them from "legally false" certifications), and, alternatively, (2)

the claims are false or fraudulent because the Association, in conspiracy with Anthem and

others, has certified satisfaction of certain express conditions precedent to final approval of the

claims -- i.e., that the Association has materially complied with the contract and accurately

adjudicated claims made pursuant to the contract -- despite knowing that those express

conditions precedent have not been satisfied,  <u>see</u>  <u>id.</u> at 697-98 (discussing "express false

certifications") .  <u>See</u>  <u>also</u> Second Amended Complaint at ¶¶ 94 - 96.

      Third, relator has alleged that the Association, in conspiracy with Anthem and others,

<u>see</u> Second Amended Complaint at ¶ 97, has acted while knowing (or at the very least being

deliberately ignorant of or recklessly disregarding the fact) that it is shunting aside, and not

"adjudicating," or at the very least not adjudicating accurately, claims for speech, occupational,

or physical therapy submitted in connection with mental disorder diagnosis codes (at least where

the claimant is not persistent in pursuing reimbursement).  <u>See id at</u>  ¶¶ 67,69-72 &n 97.

## IV.  Defendants' Principal Arguments

      As set forth above, defendants have moved to dismiss the amended complaint under Fed.

R. Civ. P. 12(b)(6) on two principal grounds.[5]  Seeming at times to understand this action as one

for health benefits owed to defrauded federal employees – which it clearly is not – defendants

---

[5]Defendants' joint motion also suggests several additional grounds for dismissal.  These additional arguments are set forth and rebutted <u>infra</u>.

first argue that the only statutory authority the government may invoke to remedy the alleged

false claims are those provisions of the FEHBA, 5 U.S.C. § 8901 et seq., and its implementing

regulations, which accord  the OPM limited powers to regulate and debar insurance carriers

administering federal health plans.  Alternatively, defendants contend that relator has failed to

plead its fraud theory with the particularity required by Fed. R. Civ. P. 9(b).

## A.  FEHBA Preclusion

Defendants' primary argument for dismissal of this lawsuit is that "the relator's False

Claims Act allegations are precluded by the exclusive remedies provided under the Federal

Employees Health Benefit Act."  Memorandum in Support of Defendants' Joint Motion to

Dismiss Amended Complaint (Defendants' Memorandum) at 10.  Defendants believe that the

"FEHBA's carefully crafted regulatory and contractual scheme provides specific and exclusive

mechanisms for OPM to deal with *benefits disputes* and *the policing of FEHBA carriers*."  Id.

(emphases supplied).  Indeed, defendants contend that the "OPM's authority and FEHBA's

purpose would be seriously undermined if the Relator's FCA claims were permitted to

proceed."[6]  Relator submits that, if defendants' argument were accepted, it is the government's

authority and Congress's purposes in passing the FCA that would be seriously undermined.

The first italicized phrase in the preceding paragraph implies that defendants see this

action, at least in part, as one seeking health insurance benefits.  But it is not.  This is simply an

action alleging that a government contractor and its agent who have agreed to provide services to

---

[6]In so contending, defendants state as fact that "it is the United States' money that is at stake every time a FEHBA claim is processed."  Defendants' Memorandum at 10; see also id. at 14 ("Because it is the United States' money that is used to pay all claims . . .").  For the reasons set forth below, relator does not believe it relevant whether it is the United States' money that is at stake in benefits adjudications.  But in the event that the court deems it relevant, relator would point out that it is not  the United States' money, but rather a mixture of enrollees' direct contributions (in the form of withheld premium payments) and benefits payments (in the form of contributions made by the government) that is at stake.  In other words, it is the enrollees' money.

the government falsely claimed an entitlement to money from the government that was *not* due and owing because *all* the services required under the contract were not performed.  The service providers in this case happen to be insurance carriers, but it cannot be disputed that the carriers owed contractual services to the government -- and not to the contract's beneficiaries -- in exchange for a fee.  See Exhibit A at ii.  Therefore, the extent to which Congress intended that federal employees' *health benefits disputes* be resolved solely within the FEHBA framework is immaterial.[7]  And so too is the authority discussed in defendants' memorandum suggesting that "an action cognizable under the FEHBA lies under the FEHBA, not under another federal statute."  Bridges  v. Blue Cross & Blue Shield Ass'n, 935 F. Supp. 37, 41 (D.D.C. 1996) (prohibiting the use of RICO by a putative class of federal employees to obtain benefits they believed due them under the Service Benefit Plan). There is nothing in  theFEHBA or its implementing regulations, see 5 C.F.R. part 890, authorizing *the United States* to sue a carrier to recover its fraudulently induced payments to that carrier.  But the United States *is* authorized to sue a carrier, or any other service provider, under the FCA.

The question thus reduces to whether the court should infer from the limited police and debarment powers granted to the OPM in the FEHBA an intent on the part of Congress to

---

[7]In any event, defendants repeatedly overstate matters in referring to  the OPM's "exclusive" jurisdiction over benefits disputes, e.g., Defendants' Memorandum at 5, 10, and describing the OPM as the "ultimate authority on whether benefits should be paid," id. at 5.  As defendants recognize elsewhere in their memorandum, an enrollee in a federal health insurance plan is entitled to federal court review of a benefits denial.  See  5 C.F.R. § 890.107(c). The OPM is therefore no more the "exclusive" or "ultimate" arbiter of a benefits dispute than, say, Anthem or Liberty Mutual is the "exclusive" or "ultimate" arbiter of a private-plan benefits dispute involving Anthem or Liberty Mutual that makes its way into federal court under ERISA.  Thus, in saying that this case is "no different" than United States ex rel. Windsor v. DynCorp, Inc., 895 F. Supp. 844, 851 (E.D. Va. 1995) (barring an FCA claim which would require a court or jury to decide whether a government contractor misclassified an employee under the Davis-Bacon Act because "responsibility for resolving such disputes rests not with the courts, but with the Department of Labor"); see also id. at 852 n.12 (collecting cases holding or suggesting that court review of the Department of Labor's resolution of such disputes is not available), and in saying that benefit determinations are "not for the court," defendants are making an argument that is not only immaterial, but also factually incorrect. See  Defendants' Memorandum at 13.

prevent the government from pursuing the remedies granted it by federal statutes other than the FEHBA. Cf. Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1995) (noting that the determination whether a particular federal scheme is the exclusive mechanism by which relief is to be sought requires an inquiry into Congress's intent in establishing the scheme); Eastern Bridge LLC v. Chao, 320 F.3d 84, 88 (1st Cir. 2003) (similar) . The answer to this question clearly is no. Once again, the court need not look beyond the fact that there is nothing in the FEHBA or its implementing regulations authorizing *the United States* to sue a carrier to recover fraudulently induced payments made to the carrier. It cannot plausibly be maintained that, in the case of government contracts with health insurance carriers, Congress *intended* the government to be without a remedy by which it could be made whole, let alone without the tort remedies available to it in the case of false or fraudulent claims. Cf. Thunder Basin, 510 U.S. at 212-13 (making clear that the inquiry into congressional purpose turns in large measure on whether the relief sought also is available in the other federal scheme). Yet this is exactly where defendants FEHBA-preclusion argument would lead the court.

If more were needed, and relator submits that no more is needed, Contract CS 1039 -- the contract under which defendants provide services to the government -- *explicitly states* that contact disputes between the OPM and carriers are to be governed not by the FEHBA, but by the Contracts Dispute Act of 1978, 41 U.S.C. §§ 601-613, which is to be supreme to the additional contract dispute mechanisms spelled out in the contract. See Exhibit A at § 5.36(a) & (b). What is more, the historical and statutory notes to the provision of the Contracts Dispute Act governing fraudulent claims, 41 U.S.C. § 604, *explicitly state*: "This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the

False Claims Act . . . .  That is, [§ 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation."[8]

The court should reject defendants' FEHBA-preclusion argument.

## B.  Fed. R. Civ. P. 9(b)

Defendants also argue that relator has failed to plead the alleged scheme with the particularity required by Fed. R. Civ. P. 9(b).  At the time relator filed his amended complaint, he had been able to obtain from OPM only excerpts of Contract CS 1039.  He also was relying on verbal descriptions of how the contract operated, and how the Association obtained its negotiated service charge, provided by OPM personnel.  Relator now has obtained full copies of the contract, as in effect from contract year 2000 to the present, and copies of all the accounting statements and certifications required by § 3.2 of the contract that have been filed since 2000.[9] While these documents substantiate all of relator's allegations, relator may now also provide further specifics about the time, place and content of the false representations.  See Karvelas, 360 F.3d at 226 (summarizing the requirements of Rule 9(b) in an FCA claim).  Rather than wasting resources arguing about the sufficiency of the amended complaint, relator has filed contemporaneously with this opposition a Fed. R. Civ. P. 15(a) motion to file a second amended complaint.  Because defendants have not filed a responsive pleading, the spirit of Rule 15(a), if

---

[8]For this reason, Southland Management, 326 F.3d at 675-76 (granting contractors summary judgment on FCA claim where the government's payments clearly were owed under the contract in question), cited by defendants in support of their exclusivity argument, actually supports relator's position.  If the contract terms are to govern, the government unquestionably has the right to maintain an FCA claim against a health insurance carrier participating in the Federal Employees Health Benefits Program.

[9]Relator presents the court only with the contract's most recent iteration to avoid unnecessarily inundating the court with paper.  See Exhibits A and B,.  Relator represents, however, that each of the contractual obligations discussed in this opposition memorandum has been in effect since at least contract year 2000.

not its letter,[10] militates in favor of allowing relator's motion.  Cf. <u>Karvelas</u>, 360 F.3d at 241 &

n.29 (relator may amend as of right in the absence of a responsive pleading, and a Rule 12(b)(6)

motion to dismiss is not a responsive pleading); <u>see also</u> Rule 15(a) ("leave [to amend] shall be

freely given when justice so requires").[11]

    Because relator is not and never has been an Association or Anthem insider, but is rather

a person who was at first victimized by the alleged scheme and then was carelessly apprised of

the scheme by three different agents of defendants, relator pleads partially on the basis of

personal knowledge (his experiences as a victim of the scheme) and partially on the basis of

information and belief (what he was told about the scheme by three of defendants' agents and

what he learned about the operation of the contract from his subsequent investigation).  This is

perfectly permissible, so long as the scheme is set forth with particularity and so long as relator

sets forth the facts on which his beliefs are founded.  <u>See Karvelas</u>, 360 F.3d at 226 & n.8.

Moreover, the requirements of Rule 9(b) must be read in conjunction with Fed. R. Civ. P. 8(a),

which requires only a "a short and plain statement of the claim."  <u>See United States ex rel.

Franklin</u> v. <u>Parke-Davis, Division of Warner Lambert Co.</u>, 147 F. Supp. 2d 39, 46 (D. Mass.

2001).  This means that, while relator must allege the circumstances of the fraud, he is not

---

[10]Relator acknowledges that he already has amended his complaint once, and that Rule 15(a) permits a party to amend as of right only "once" as a matter of course.  But relator's first amended complaint is the only pleading with which defendants have been served, so allowing relator's second amended complaint will not put defendants in the position of having to file a *third* responsive pleading or Fed. R. Civ. P. 12 motion.

[11]The First Circuit has stressed that a Fed. R. Civ. P. 15(a) motion to amend should not be denied "unless there appears to be an adequate reason for the denial (e.g., undue delay, bad faith, dilatory motive on the part of the movant, futility of the amendment) . . . ."  States Resources Corp. v. The Architectural Team, Inc., 433 F.3d 73, 83 (1st Cir. 2005) (citation and internal quotation marks omitted).  Certainly, defendants have no basis for claiming undue delay, bad faith, dilatory motive or other form of misconduct on the part of relator.  Defendants' refusal to assent to the Rule 15(a) motion at this early stage of the proceedings must therefore be grounded on a belief that the amendment would be futile, given defendants' arguments for dismissal.  Relator already has explained why defendants' primary argument in favor of dismissal should be rejected.  The balance of this memorandum explains why defendants' other arguments for dismissal also should be rejected and, concomitantly, why amendment would not be futile.

required to plead *all* of the evidence or facts supporting his allegations. See id. at 47 (citing 5

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298, at 625-26 (2d

ed.1990) (Rule 9(b) does not require plaintiff to resort to "fact pleading")).

Finally, while relator believes that he easily satisfies Rule 9(b)'s requirements in his

second amended complaint, two other background principles, well summarized by this court in

the Parke-Davis case, should inform the court's consideration of the outsider relator's pleading:

> [S]trict application of requirements of Rule 9(b) may be relaxed in certain
> circumstances. For instance, where facts underlying the fraud are "peculiarly
> within the defendants' control," a plaintiff may be excused from pleading the
> circumstances of the fraud with a high degree of precision. Boston & Me. Corp. v.
> Hampton, 987 F.2d 855, 866 (1st Cir.1993). See also Wilkins ex rel. United States
> v. Ohio, 885 F.Supp. 1055, 1061 (S.D.Ohio 1995) (allowing qui tam relator to
> plead certain facts on information and belief). In other instances, the alleged
> scheme of fraud may involve numerous transactions or transactions that occur
> over a long period of time, and pleading the specifics with regard to every
> instance of fraudulent conduct may be impractical. See Corley v. Rosewood Care
> Ctr., Inc., 142 F.3d 1041, 1050 (7th Cir.1998) (applying relaxed standard to
> allegations of fraud in plaintiff's racketeering complaint); see also United States
> ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 206-07 (E.D.Tex.1998)
> (collecting cases that apply relaxed standard).

147 F. Supp. 2d at 47; see also Karvelas, 360 F.3d at 229-31 & nn.10 & 14 (declining to relax

Rule 9(b)'s particularity requirements on the facts before it, but recognizing that courts have

applied these relaxation principles in appropriate cases).

There can be no doubt that the second amended complaint provides defendants with (1)

precise notice of relator's case theories by specifying the time, place, and content of the false

claims, and (2) the sources of the information and the reason for the belief that the claims are

false. See Karvelas, 360 F.3d at 226. As set forth above, relator alleges that the Association has

made at least 73 false claims, one on the last day of each month between January 2000 and the

present. The false claims are the *Association's* monthly electronic withdrawals of the relevant

portion of its negotiated service charge.  See Exhibit A at § 3.7(b) & (c)).  These claims were false at the time they were made because, as set forth above, OPM explicitly conditioned the Association's entitlement to the withdrawals on its receipt of "*all* of the services set forth in this contract, including [the plan brochure]," which requires the adjudication and payment of *all* claims for "medically necessary" speech, occupational, and physical therapy -- even those submitted in connection with "mental disorder" diagnosis codes.  Exhibit A at ii & Exhibit B, pp. 37, 62, and 98 (emphasis supplied).  Or, at the very least, these claims became false when, on May 4, 2001, August 21, 2002, April 22, 2003, April 29, 2004, and April 29, 2005, the Association's chief executive and financial officers and/or  responsible corporate officials certified the Association's entitlement to its monthly advances and satisfaction of contractual conditions precedent -- contractual compliance and accurate claims adjudication -- in the annual accounting statements by which the parties "true up" the final amounts due and owing under the contract, see Exhibit A at § 3.2(c); Exhibit C, attached to Second Amended Complaint; see also United States ex rel. Augustine v. Century Health Servs, Inc., 289 F.3d 409, 415 (6th Cir. 2002) (recognizing that subsequent events can make earlier claims "false"), and thereby caused these claims finally to be "approved," Karvelas, 360 F.3d at 225.

The second amended complaint easily satisfies the requirements of Fed. R. Civ. P. 9(b).

## V.  Defendants' Other Arguments

## A.  Defendants' Suggestion That An FCA Claim Will Not Lie Where a Government Contractor Merely Has Failed to Comply With Underlying Regulatory Requirements

Near the end of the section of defendants' memorandum which sets forth the FEHBA-preclusion argument, defendants briefly hint at an additional one:  that an FCA claim will not lie simply because a government contractor has failed to comply with underlying regulatory

requirements.  Defendants' Memorandum at 14-15 (citing <u>Karvelas</u>, 360 F.3d at 234; <u>Southland Management</u>, 326 F.3d at 675-76;  <u>Mikes,</u> 274 F.3d at, 699 ; and <u>DynCorp</u>, 895 F. Supp. at 852). Defendants' assertion is true as far as it goes, but it is both beside the point and not a complete statement of the law.

The statement is beside the point because, in this case, relator is not *primarily* alleging that the Association's violation of underlying regulations with which it certified compliance caused  the OPM to pay the Association monies that it otherwise would not have paid.  As set forth above, <u>see</u> <u>supra</u> at 2-4, relator *primarily* is alleging that the government is entitled to recover (in addition to the penalties provided by statute) a multiple of the consideration paid to the Association for services the government did not receive.  This is a heartland FCA claim. <u>See</u>, <u>e.g.</u>, <u>Mikes</u>, 275 F.3d at 696-97; <u>In re Cardiac Devices Qui Tam Litig.</u>, 221 F.R.D. 318, 334-36 (D. Conn. 2004).

The statement is not a complete statement of the law because a failure to comply with underlying regulatory requirements frequently *will* make a claim premised on the non-compliant conduct false or fraudulent.  As pointed out by Judge Jones in her special concurrence in <u>Southland Management</u>:  "[M]any certifications made in order to receive government payments may be material to the government's decision to pay . . . ."  326 F.3d 679-80 (Jones, J, specially concurring) (joined by JJ. Smith, Hawkins, Barksdale, DeMoss & Clement) (citing <u>Kungys</u>  v. <u>United States</u>, 485 U.S. 759, 770 (1988)). Such certifications therefore would form the basis for viable FCA claims.  <u>See</u>  <u>id.</u>; <u>see</u> <u>also</u>  <u>Mikes</u>, 274 F.3d at 696-700.  Relator alleges that defendants' certifications were material to OPM's decision to approve the Association's claims. <u>See</u> Second Amended Complaint at ¶ 94.

**B.  Defendants' Suggestion That Their False Certifications Were Immaterial as a Matter of**

**Law**

Within their Fed. R. Civ. P. 9(b) argument, defendants imply that any false certifications they have made are immaterial as a matter of law. As an initial matter, whether and to what extent a government contractor's certifications are material are context-specific inquiries which depend on the government's goals in requiring them. See Southland Management, 326 F.3d at 679 (Jones, J., specially concurring). Such fact-dependent inquiries are entirely unsuited to resolution under Fed. R. Civ. P. 12(b)(6), which obliges the court to take the well pleaded facts and all reasonable inferences from those facts in favor of relator. See, e.g., Karvelas, 360 F. 3d at 224.

More generally, consider the full implications of defendants' materiality argument. Defendants posit that the undelivered services of which relator complains constitute only "one minute aspect" of the contract, and ask the court to conclude from this fact alone that OPM "likely" would deem their failure to perform these services "totally irrelevant to [its] decision to pay . . . ." Defendants' Memorandum at 23. But why, especially on a Fed. R. Civ. P. 12(b)(6) motion, should the court conclude that OPM would pay *full* price even though some required services were not performed? Simply because the services were only some fraction of the services required under the contract? Suppose, for example, that a government contractor is engaged by the Department of Defense to clean and service 1000 aircraft engines for one million dollars. Suppose further that, after some period of time, the contractor certifies that it has cleaned and serviced all 1000 engines, when it knows that it actually has cleaned all 1000 but serviced only 950. Would that contractor be entitled to dismissal of an FCA action premised on his false certification because it did most of the work? Such a ruling would be an open invitation

to fraud.

In the end, defendants' materiality argument asks the court to make a false all-or-nothing choice: that OPM was obliged to pay either the *entire* service charge or nothing at all. <u>See</u> Defendants' Memorandum at 21-24. The court should decline the invitation. Defendants suggest that there is something legally wrong with asserting that *all* of the pleaded claims were false despite the fact that *many* of the services required by the contract actually were performed. But the assertion is entirely coherent and faithful to the text of the contract. Relator is alleging in this case that, had OPM known of the pleaded scheme, it would or should have withheld at least some portion of the negotiated service charge. This allegation cannot be rejected on the pleadings.

## VI. Conclusion

Defendants state in their memorandum that this case should have ended when, after relator's successful appeal to the OPM, he was told that he had succeeded in having an "override" programmed into the Association's computer system so that claims submitted on behalf of his "lucky" son would be paid. <u>See</u> Second Amended Complaint at ¶ 72. With respect, this case *began* at that moment. Relator seeks in this case to recover on behalf of the government the money and penalties defendants owe for their failure to provide *all* the services they have been paid to provide, and to have defendants honor the terms of the Association's contract with the government.[12]  Nothing more, but nothing less.

---

[12]Defendants suggest that they have no motive to act as relator has alleged because any Service Benefit Plan surplus not paid over to plan enrollees is placed in the Service Benefit Plan's contingency reserve, and is not kept by the Association. <u>See</u> Defendants' Memorandum at 6-7. This suggestion overlooks the fact that the system the Association has created cannot treat speech, occupational, and physical therapy as medically necessary treatments for certain medical disorders under its federal plan while at the same treating these therapies as *not* medically necessary. under its private plans. And, as defendants recognize, the Association and its affiliates keep as profit under the private plans "the difference between the premiums collected and the amount paid out in claims and other expenses." <u>Id.</u> at 6.

16

For the foregoing reasons, the court should **deny** defendants' motion to dismiss

Respectively submitted,

_____/s/  James A. Brett_____
James A. Brett, Esquire
B.B.O. # 056300
Wilson, Dawson & Brett
21 Custom House Street
Boston, MA   02110
Tel. 617-646-4111
Fax:  617-646-4413


_____/s/ William J. Hardy, Esquire_____
William J. Hardy, Esquire
B.B.O. #221460
William J. Hardy Law Offices
1140 Nineteenth Street, N.W.
Suite 900
Washington, DC   20036
Tel:  202-223-5120
Fax:  202-223-5619


CERTIFICATE OF SERVICE

I, James A. Brett, Esquire, hereby certify that on this 31st day of March, 2006, the foregoing has been filed by electronic means through the ECF System.  Any  persons not receiving notification through ECF as noted on the Notification of Electronic Filing will be conventionally served via first class mail, postage prepaid:

Nicholas J. Nesgos
Jennifer Finger
Posternak Blankstein & Lund LLP
800 Boylston Street, Prudential Tower
Boston, MA  02199-8004

Anthony F. Shelley
Adam P. Feinberg
Miller & Chevalier Chartered
655 15th St., NW, Suite 900

Washington, DC  20005

Michael J. Tuteur
Lawrence M. Kraus
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA  02199

Patricia M. Connolly
Assistant United States Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210

Michael F. Hertz, Esquire
Joyce R. Branda, Esquire
Tracy L. Hilmer, Esquire
U.S. Department of Justice
Civil Division
PO Box 261, Ben Franklin Station
Washington, D.C.  20044

                                          /s/ James A. Brett
                                          James A. Brett, Esquire