UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
UNITED STATES OF AMERICA,          )
ex rel. JOHN M. GREABE,            )
                                   )
            Plaintiff,             )   C.A. No. 04-11355-MEL
                                   )
            v.                     )
                                   )
BLUE CROSS BLUE SHIELD ASSOCIATION,)
ANTHEM, INC. and BLUE CROSS        )
BLUE SHIELD ASSOCIATION OF         )
NEW HAMPSHIRE,                     )
            Defendants.            )
_____)

## UNITED STATES' STATEMENT OF INTEREST
## ON DEFENDANTS' JOINT MOTION TO DISMISS

The United States of America, the real party in interest in this *qui tam* action[1], submits this Statement of Interest on the joint motion to dismiss Relator's Amended Complaint filed on February 28, 2006 by Defendants Blue Cross Blue Shield Association and Anthem Blue Cross Blue Shield of New Hampshire. Defendants administer a plan within the Federal Employees Healthcare Benefits Program (FEHBP) under contract with the United States Office of Personnel Management (OPM). Defendants receive a fee for their administrative services. In the Amended Complaint, Relator John M. Greabe alleges that Defendants violated the civil False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, by implementing a system to automatically decline

---

[1] The United States remains the real party in interest in a declined *qui tam* action. *See, e.g., United States ex rel. Rodgers v. Arkansas*, 154 F.3d 865 (8th Cir. 1998); *United States ex rel. Hall v. Tribal Development Corp.*, 49 F.3d 1208, 1212-13 (7th Cir. 1995); *see also* 31 U.S.C. § 3730(d) (providing that the largest portion of any recovery under the FCA is to be paid to the government, even if the government declined to intervene in the *qui tam* action).

reimbursement for certain healthcare expenses covered by the FEHBP plan.  Relator contends that Defendants therefore submitted false invoices to OPM for payment of administrative fees, knowing that they were not in fact providing "all services" as required by their FEHBP contract.

In their motion, Defendants seek dismissal of the Amended Complaint for Relator's failure to satisfy the requirements of Fed. R. Civ. P. 9(b) by failing to demonstrate that either Defendant actually submitted, or caused to be submitted, a false claim for payment to the United States.  The United States takes no position on whether Relator has adequately alleged the submission of a false claim.  However, Defendants also assert that Relator's Amended Complaint should be dismissed because of an alleged failure to exhaust administrative remedies and because administrators of FEHBP plans are allegedly exempt, as a matter of law, from FCA liability.  These assertions are incorrect statements of the law.  Accordingly, the United States submits this Statement of Interest solely in order to address these two arguments.

**Background**

Relator filed his initial Complaint on or about June 16, 2004.  Relator, a career employee of the federal judiciary, alleged that he and his family subscribed to the Blue Cross Blue Shield Service Benefit Plan's "Standard Option – Self and Family" (the Service Benefit Plan), one of the plans offered through FEHBP.  Defendant Anthem Blue Cross Blue Shield of New Hampshire (Anthem) is the local administrator of the Service Benefit Plan in New Hampshire, where Relator resides.  Defendant Blue Cross Blue Shield Association (BCBSA) is the national administrator for the Service Benefit Plan under contract with OPM.

Relator alleges that beginning in late 1999, he sought reimbursement from Anthem under the Service Benefit Plan for speech therapy services provided to his child that the child's pediatrician had determined to be medically necessary.  According to the Amended Complaint,

in April of 2000, Relator's child was diagnosed with a phonological process disorder and a neurologically based verbal dyspraxia.  Relator alleges that these diagnoses were identified for health care insurance billing and reimbursement purposes by one or more International Classification of Diseases 9th Revision ("ICD-9") codes indicating services related to a "mental disorder."  Relator further alleges that his claims for speech therapy for the child were rejected by Anthem, and later by BCBSA, because they carried these particular ICD-9 codes.  Relator successfully appealed the administrators' denial to OPM and received coverage for the speech therapy sessions.  Relator contends that his family was required to do battle with Anthem and BCBSA again in order to obtain reimbursement for services to another of his children.

On August 17, 2005, the United States notified the Court that it declined to intervene in this action.  On August 25, 2005, the Court lifted the seal upon the Complaint and the Government's notice of declination and directed Relator to serve the Complaint upon the Defendants.

Relator filed his Amended Complaint on or about December 16, 2005, asserting claims against Defendants under 31 U.S.C. §§ 3729(a)(1), (a)(2) and (a)(3).  On March 31, 2006, Relator filed a motion to further amend his complaint.  In the proposed Second Amended Complaint, Relator contends that Defendants have "discriminated against beneficiaries of the Service Benefit Plan who suffer from mental disorders for which speech, occupational or physical therapy are medically necessary treatments."  Second Amended Complaint ¶ 92.  According to Relator, this alleged discrimination renders the Plan inferior to that for which OPM bargained.  From this theory, Relator draws the conclusion that Defendants violated the FCA by submitting claims for payment of their fees and expenses in administering the Service Benefit Plan when they had not in fact provided "all services" required by their contract with OPM.

The Amended Complaint contains the additional allegation – on information and belief – that Defendants' practice has caused the Medicare and Tricare programs, in their capacities as secondary payors, to reimburse beneficiaries for the cost of such treatments. Second Amended Complaint ¶¶ 100-102. Relator, however, does not identify any instance in which such a claim for payment was made to either the Medicare or Tricare program.

## Argument

Defendants have filed a joint motion to dismiss the Amended Complaint. The United States takes no position on the question whether Relator has satisfied the particularity requirements of Rule 9(b). If the Court resolves the Defendants' motion on Rule 9(b) grounds, there would be no need for it to reach the issues addressed below.

### I. THERE IS NO ADMINISTRATIVE EXHAUSTION REQUIREMENT FOR FCA ACTIONS.

Defendants assert that Relator's FCA action should be dismissed because there exists an administrative avenue for addressing complaints about denials of benefits under the Service Benefit Plan. To be sure, the FEHBA does require plans participating in the FEHB program to agree that OPM shall have the final authority to determine whether a claim for coverage or reimbursement is valid. 5 U.S.C. § 8902(j). And OPM has promulgated regulations setting forth an administrative procedure to allow beneficiaries to appeal denials of claims for coverage and reimbursement under the various Service Benefit Plans. *See* 5 C.F.R. § 890.105. Relator himself successfully exercised his administrative appeal rights. But Relator does not purport to seek benefits under the plan; rather, he alleges that Defendants have filed false claims for payment by federal healthcare programs.

Under 28 U.S.C. § 1331, the federal district courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." The FCA is, obviously, a law of the United States, and the federal district courts therefore have original jurisdiction over civil actions brought under the FCA. *See* 31 U.S.C. § 3730 (b) (1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government."). Defendants appear to argue that the FEHBA somehow dispossessed the district courts of their jurisdiction over FCA suits that involve the FEHB program. "When there are statutes clearly defining the jurisdiction of the courts, the force and effect of such provisions should not be disturbed by a mere implication flowing from subsequent legislation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976) (internal citations omitted). Certainly, nothing in the FEHBA or OPM's regulations purports to oust the district courts of their original jurisdiction over FCA matters. While the question whether a plan improperly denied benefits could be an issue in an FCA action, the potential availability of an administrative avenue of relief could not by itself deprive the federal courts of their original jurisdiction to decide suits brought under the FCA. Nor does the fact that OPM may possess additional remedies for fraud under the FEHBA, the regulations and/or its contract with an administrator affect the district court's jurisdiction to hear and fully adjudicate an FCA claim and, if the claim is meritorious, to award FCA damages and penalties against the contract administrator.

Defendants cite no authority holding that potential administrative remedies must be exhausted before an FCA action may be filed in district court, and there is none. Indeed, the Court of Appeals for the First Circuit recently observed, in rejecting a defendant's exhaustion argument in the Medicare context, that "[t]o its credit, [defendant] correctly concedes that if the

-5-

statute sued on were the False Claims Act . . . rather than [28 U.S.C.] § 1345, the district court would have subject matter jurisdiction, admitting that the Medicare scheme does not impliedly repeal the False Claims Act." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 17 (1st Cir. 2005); *see also United States ex rel. Body v. Blue Cross and Blue Shield of Alabama*, 156 F.3d 1098, 1110 (11th Cir. 1998) (finding that, "although a number of benefits determinations are at issue in this suit, and although treble damages under the FCA bear a direct relation to the amount of overpayment of benefits," relator was not required to exhaust the administrative procedures of the Medicare Act in order to pursue his *qui tam* claim against a government contractor).[2] The Medicare program has extensive administrative procedures, yet the First Circuit found no basis for concluding that the United States was obligated to exhaust any administrative remedies before suing the defendant in district court to recover overpayments.[3] The decision in *Lahey* is

---

[2] Although the Eleventh Circuit correctly found no exhaustion requirement in the *Body* case, it nevertheless dismissed the suit based upon a particular provision of the Medicare Act that it interpreted to afford fiscal intermediaries (but not their officers and agents) immunity from claims of fraud in the processing of payments to Medicare beneficiaries. *Body*, 156 F.3d at 1110-13. To our knowledge, this holding has been followed by no other court of appeals and by only one district court. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, Order, Case No. 2:99CV86DAK (D. Utah Mar. 24, 2005) (denying reconsideration of previous orders dismissing claims against Medicare contractor based upon claim of statutory immunity). The Government strongly disagrees with this position and has filed a brief as *amicus curiae* in the relator's appeal of the *Sikkenga* ruling. In any event, the statutory provisions at issue in *Body* and *Sikkenga* (42 U.S.C. §§ 1395(i) and 1395u(e)) are part of the Medicare Act, and have no application to the FEHBA. Further, Congress has clarified that these provisions were not intended to immunize Medicare contractors from liability for acts taken in reckless disregard of their contractual obligations or with intent to defraud the United States. Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173 § 911(d)(3), 117 Stat. 2066, 2382 (2003). Finally, the *Body* court acknowledged that "[f]iscal intermediaries would be liable for any money pilfered directly by the intermediary from government funds, such as government cash illegally siphoned into the intermediary's own accounts or charges to the government for services the intermediary did not perform. . . ." *Id.* at 1112.

[3] Even the lower court decision overruled by the First Circuit in *Lahey* had acknowledged that actions brought under the FCA are not subject to administrative exhaustion requirements.

fully applicable here, and Defendants have not pointed to any provision of the FEHBA that purports to impinge upon the original jurisdiction of the district courts to entertain FCA actions.

Defendants' error reflects a misunderstanding of the nature of a *qui tam* action under the FCA. A *qui tam* action differs from an ordinary claim for damages in that the relator sues "for the person and for the United States Government." 31 U.S.C. § 3730(b). Thus, Relator's FCA action here is **not** a claim for individual benefits under the FEHBA. Rather, Relator has brought the FCA action on behalf of, and in the name of, the United States, asserting that the United States has been damaged by Defendants' alleged conduct. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000), the Supreme Court held conclusively that the *qui tam* provisions of the FCA are a partial assignment of the United States' right to sue for FCA damages and that there is "no room for doubt that a *qui tam* relator under the FCA has Article III standing." *Id*. at 778. While there are limitations upon a relator's ability to pursue FCA claims[4], there is no basis for imposing an exhaustion requirement upon a relator where none exists for the United States bringing an FCA suit directly. Defendants rely on cases where individuals sought relief for themselves and were required to exhaust existing administrative remedies before suing in court. Such cases have no application in the FCA

---

*See United States v. University of Mass. Memorial Med. Center*, 296 F. Supp. 2d 20, 23 (D. Mass. 2003).

[4] Notably, *Stevens* held that relators may not pursue claims against State entities where the United States has declined to intervene. Additionally, the United States retains substantial ability to control the FCA action even where it has declined to intervene. *See, e.g.,* 31 U.S.C. § 3730(b)(1) (relator may not dismiss an FCA action without written consent of the Attorney General); 31 U.S.C. § 3730(c)(4) (court may stay discovery in the *qui tam* action if it would interfere with the Government's investigation or prosecution of another matter); 31 U.S.C. § 3730(c)(3) (even if Government earlier declined to intervene in the action, it may later be permitted to intervene "upon a showing of good cause."); 31 U.S.C. § 3730(c)(2)(A) (Government may dismiss a *qui tam* action over relator's objection).

setting, where the United States remains the real party in interest whether or not it has intervened in the *qui tam* action.

As a corollary to their exhaustion argument, Defendants also contend that FCA remedies are not available in a case involving the FEHB program. Defts' Joint Motion at 6, 10-11. Again, Defendants cite no authority for this incorrect proposition, and none exists. There is no legal reason why, in a properly framed FCA action, the United States and the Relator (if any) should be limited to remedies provided by OPM's regulations, as opposed to the statutory remedies set forth in the FCA. The OPM does not have authority to adjudicate FCA claims – that authority rests with the courts.

## II.     FEHB PLAN ADMINISTRATORS ARE NOT IMMUNE FROM PROSECUTION UNDER THE FCA.

Defendants suggest that, as plan administrators under the FEHB program, they cannot be sued under the FCA for a denial of benefits because of the FEHBA's detailed administrative scheme. Defts' Jt. Motion at 11. It is true that the FEHBA and OPM's regulations establish an administrative procedure for beneficiaries to challenge coverage determinations made by plan administrators. It is also true that plan administrators are legally required to defer to OPM's authority to make coverage determinations under the Service Benefit Plans. However, it does not follow from these facts that an FEHB plan administrator is immune from suit under the FCA. Like every other government contractor, these administrators are required to perform certain services for which the government compensates them. If, for example, an administrator's compensation were based upon the number of claims it processed, and the administrator knowingly inflated that number in an invoice submitted to the OPM for payment, the administrator could unquestionably be held liable for submitting false claims. That the particular

facts alleged in this case may not present a viable theory of recovery under the FCA does not mean that FEHB plan administrators can never be held liable under the FCA.

Pursuant to the provisions of the False Claims Act, "any person who – (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ... is liable to the United States Government ...." 31 U.S.C. §3729(a)(1). "Congress wrote expansively [in enacting the False Claims Act], meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County, Illinois v. United States*, 123 S.Ct. 1239, 1245-46 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). The "chief purpose" of the False Claims Act remedy is "to provide restitution to the government of money taken from it by fraud," and "to make sure that the government [is] made completely whole." *United States v. Bornstein*, 423 U.S. 303, 314 (1976) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943)). No exemption from FCA liability exists for FEHB plan administrators or any other contractors who attempt to defraud the United States.

Defendants rely heavily upon – and misconstrue – the decisions in *United States v. Southland Management Corp.*, 326 F.3d 669 (5th Cir. 2003) (*en banc*), and *United States ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844 (E.D. Va. 1995). The *en banc* ruling in *Southland Management* was based upon the specific terms of the Housing Assistance Program contract and the course of dealing between the property owner and the Department of Housing and Urban Development. The contract expressly allowed the owner to continue receiving payments from the Department for a set period of time while taking corrective action to ameliorate substandard conditions in the dwelling unit **after** receiving notification from the agency that the unit did not meet contractual habitability standards. The Court found that because the contract specifically

allowed the owner to receive payments, even while on notice that the dwelling was not in noncompliance with habitability requirements, the owner of the dwelling could not be held liable for false claims during the corrective action period. *Southland Management*, 326 F.2d at 676. Further, the Court stressed that during the corrective action period, the agency was well aware of the condition of the property when it made the decision to pay the claims, and thus the owner's certification of habitability had no impact upon the agency's decision to continue making payments. The Court's ruling in *Southland Management*, however, would not foreclose an FCA action where the owner had misrepresented the property's condition to the Government to avoid corrective action or had continued to seek payment after the Government had exercised its right to withhold payment for failure to bring the dwelling into compliance with contractual standards.

It is difficult, if not impossible, to see how *Southland Management* can have any application to the Relator's complaint in this case. Relator alleges that OPM was **unaware** of Defendants' alleged practice of denying certain benefits, and Defendants point to no "corrective action period" in the FEHB contract at issue.[5] While there is no indication that the practice

---

[5]In their Joint Opposition to Relator's Motion to File a Second Amended Complaint (filed April 21, 2006) at 15-16, Defendants claim that OPM's "knowledge"of the claims denials through its administrative procedures definitively precludes an FCA action. Plainly, the Relator must demonstrate that the allegedly improper benefit denials affected or could have affected the government's decision to pay Defendants' claims for administrative fees, and we express no view as to whether Relator has satisfied this requirement. However, Defendants go too far in claiming that OPM's "knowledge" of some benefit denials acquired through its administrative procedures necessarily meant that OPM condoned the denials.

The Court need not reach the "government knowledge" issue at all if it resolves the motion to dismiss on Rule 9(b) grounds. However, it must be noted that a number of appellate courts have held that government knowledge **may** – but does not necessarily – negate the *scienter* requirement of the FCA. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("The government's prior knowledge of an allegedly false claim can vitiate an FCA action."); *United States ex rel. Becker v. Westinghouse Savanna River Co.*, 305

alleged actually caused the Government to pay out money that it was not required to, there also is no basis for Defendants' attempt to analogize this case to *Southland Management*. If Defendants propose a reading of *Southland Management* that would, in every instance, foreclose potential FCA liability whenever regulatory and/or contractual remedies exist, then they are asking the Court to stretch the decision beyond recognition. The Court need not reach this argument at all if it finds the Relator's claims insufficient under Rule 9(b). But if the Court does reach the argument, it should refuse to accept Defendants' interpretation of *Southland Management*.

Equally unhelpful to Defendants' position is the decision in *United States ex rel. Windsor v. Dyncorp., Inc.*, 895 F. Supp. 844 (E.D. Va. 1995). *Dyncorp* involved a government contract that required the contractor to comply with the wage and reporting requirements of the Davis-Bacon Act, 40 U.S.C. § 276a. The relator alleged that the defendant had violated the FCA by

---

F.3d 284, 289 (4th Cir. 2002) (same), *cert. denied*, 538 U.S. 1012 (2003); *accord United States ex rel. Costner v. United States*, 317 F.3d 883, 887-88 (8th Cir.), *cert. denied*, 540 U.S. 875 (2003); *Shaw v. AAA Engr'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) (holding that after 1986 amendments to the FCA, "government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action."). Indeed, as recognized in *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991): "The requisite intent is the knowing presentation of what is known to be false. That the relevant government officials know of the falsity is not in itself a defense." *Accord United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1156 (2d Cir.), *cert. denied*, 508 U.S. 973 (1993).

While it is true that government knowledge of a falsehood can be relevant to a defendant's knowledge of that falsehood, it is the rare case that such government knowledge will entitle the defendant to judgment as a matter of law. The case law establishes that only where the government has directed the contractor's action, as in *Becker*, or where the government and the contractor have "completely cooperated and shared information" in the process of solving a problem together, *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995), should the court find that the defendant lacked the requisite *scienter* as a matter of law. There is no evidence, or even an allegation, that either of these circumstances exists in this case.

submitting to the government claims for payment despite having misclassified certain workers, and thereby having paid them lower wages than they were entitled to receive under the Davis-Bacon Act. The district court declined to impose FCA liability because the Department of Labor had not determined whether the challenged classifications were proper or improper under the Davis-Bacon Act. However, the district court observed:

> To be sure, where a contractor intentionally misrepresents to the government how much a worker was actually paid, or overstates the number of hours he or she actually worked, the contractor has made a false statement to the government. So, too, has the contractor that purposefully doctors its records to misclassify an employee as a "General Laborer", when in fact it knows that the employee performed work of a more highly paid "Semi-Skilled Laborer." Similarly, a statement by a contractor that it is paying its workers Davis-Bacon Act wages, when it knows it is not, is false.

*Dyncorp*, 895 F. Supp. at 850. The court went on to conclude that such false statements could form the basis for an FCA action by causing the government to pay out more money than it otherwise would. *Id.* at 851 & note 10. Thus, the *Dyncorp* decision is properly read not as a ruling that administrative remedies must be exhausted before an FCA claim may be filed, but rather as a finding that, in that particular case, the relator's complaint failed to demonstrate the requisite *scienter* for an FCA claim because there was no indication that the defendant had "knowingly" misclassified workers or doctored wage records. *See also United States ex rel. Plumbers and Steamfitters Local Union No. 342 v. Dan Caputo Co.*, 152 F.3d 1060 (9th Cir. 1998) (holding that deferral to Department of Labor is proper "only with respect to the resolution of how particular types of work should be classified [under the Davis-Bacon Act] but not with respect to whether the Contractors misclassified their employees").

In sum, there is no legal basis for concluding that FEHB plan administrators – any more than any other government contractors – cannot be held liable under the FCA for seeking and/or obtaining payments from the government through the use of false claims or documents.

## Conclusion

Relator here does not purport to seek FEHB program benefits for himself: he has already obtained the benefits he sought through the administrative procedures established by OPM. Rather, Relator claims that **the United States** has been defrauded by Defendants' alleged misconduct. Whatever the merits of Relator's FCA claim, about which we express no view, there is plainly no jurisdictional bar to him bringing it directly in the district court. Further, there is no legal basis for the contention that FEHB plan administrators enjoy a general exemption from liability under the FCA if it is shown that they have submitted, or caused to be submitted, false or fraudulent claims for payment to the United States government.

    Respectfully submitted,

    PETER D. KEISLER
    Assistant Attorney General

    MICHAEL J. SULLIVAN
    United States Attorney

By:   /s/ Patricia M. Connolly
    PATRICIA M. CONNOLLY
    Assistant U.S. Attorney
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    (617) 748-3278

    /s/ Tracy L. Hilmer
    MICHAEL F. HERTZ
    JOYCE R. BRANDA

TRACY L. HILMER
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0474