UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JOHN M. GREABE, <br><br> Plaintiffs, <br><br> v. <br><br> BLUE CROSS BLUE SHIELD ASSOCIATION and ANTHEM BLUE CROSS BLUE SHIELD OF NEW HAMPSHIRE, <br><br> Defendants. | Civil Action No. 04-11355-MEL |

**DEFENDANTS' JOINT RESPONSE
TO THE UNITED STATES' STATEMENT OF INTEREST**

Defendants Blue Cross Blue Shield Association ("BCBSA") and Anthem Blue Cross Blue Shield of New Hampshire ("ANH") (collectively, "Defendants") respectfully respond to the United States' Statement of Interest on Defendants' Joint Motion to Dismiss (Doc. No. 39) (hereinafter, "Gov't Stmt.").

## FACTUAL AND REGULATORY BACKGROUND

The Government's filing focuses on the alleged non-exclusivity of the Federal Employees Health Benefits Act ("FEHBA") remedies for certain alleged wrongs. We therefore review at the start the wrongs that the relator John M. Greabe ("the Relator") alleges and the contractual and regulatory remedies available.

The Relator alleges that his son was wrongfully denied speech therapy benefits to which he was entitled under his FEHBA health plan.  The Relator claims that Defendants denied these benefits because the speech therapy was associated with a mental disorder.  The Relator asserts that after a substantial effort, he succeeded in obtaining the benefits at issue through the remedy provided by FEHBA – an appeal at OPM.  Although the Relator received the benefits in question, he alleges that, with respect to other FEHBA enrollees, Defendants systematically deny speech therapy benefits when associated with mental disorders.  The Relator claims that, as a result, the Federal Government has been defrauded, and therefore a False Claims Act ("FCA") violation has occurred.  Two of the Relator's FCA theories – that Defendants received excess premium payments from the Government amounting to false claims, and that Defendants caused false claims to be submitted under two other federal programs (Medicare and Tricare) – have been recanted by the Relator and dropped from his proposed Second Amended Complaint.

The Relator's newest (and only remaining) theory is that Defendants defrauded the Government by submitting claims for the "Service Charge" under the contract with OPM.  The Service Charge is the negotiated profit Defendants receive under the contract.  Proposed Second Am. Compl. ¶ 29; *see also id*. at Exh. A at III-5 (§ 3.7(a)).  The Relator asserts that these claims for the Service Charge were false because Defendants were improperly denying claims for speech therapy for enrollees with mental disorders.  Put differently, the Relator's argument is that the claims for the Service Charge were false because the Government was not receiving all of the services for which it had contracted.  Proposed Second Am. Compl. ¶ 94.  The Relator alleges that Defendants knew their claims for the Service Charge were

false because they knew that OPM "frequently" overturned Defendants' denials of speech therapy claims. *Id*. ¶ 87. The Relator does not, however, allege that OPM reverses all such denials that it reviews, or even a majority of them.

Aside from the Relator's allegations, the contract between the parties and the governing statute and regulations also provide facts important to this dispute.[1] First, the Government *must* consider certain factors in setting the Service Charge including "such elements as the accurate and timely processing of benefit claims and the volume and validity of disputed claims." 48 C.F.R. § 1615.404-70(a)(1). Accordingly, if Defendants did not accurately process claims or if disputed claims decisions were frequently overturned by OPM as the Relator alleges, OPM should have considered that in setting the Service Charge. In this regard, it is important to note that the Relator does *not* allege that Defendants ever deceived OPM about their claims processing practices, including the alleged systematic denial of certain speech therapy claims, or about any other facts relevant to the setting of the Service Charge. Indeed, the Relator does not allege that Defendants engaged in any fraud or deceit in connection with the negotiation of the Service Charge.

Second, the contract does not require Defendants to process claims with 100% accuracy. Given that Defendants process more than one hundred million claims each year using automated claims processing systems, the parties fully recognized that perfect claims processing accuracy was not possible. Thus, the contract provides that "[a]n average of 95 percent of FEHB claims must be processed accurately." Proposed Second Am. Compl. at

---

[1] The contract is part of the Relator's pleading in that it is referred to in, and attached to, the proposed Second Amended Complaint.

Exh. A at I-6 (§ 1.9(i)). Notably, the Relator does *not* allege that Defendants processed less than 95 percent of the claims under the contract accurately.

Third, the contract provides broad remedies to OPM in a variety of circumstances, including the ability to order the correction of any deficiencies in terms of claims processing accuracy. Proposed Second Am. Compl. at Exh. A at I-5 (§ 1.9(f)(1)); *see also id*. at I-8 and I-9 (§ 1.12). OPM's regulations also grant it a remedy if a carrier does not make "[t]imely and accurate adjudication of claims." 48 C.F.R. § 1609.7001(b)(4). In addition, OPM has the authority to penalize carriers for any "pattern of poor conduct," "fraudulent or unethical business or health care practices" or "lack of business integrity or honesty." *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 42 (D.D.C. 1996). The contract also specifies many other remedies that are available to OPM under various situations, including when there is "[a]ny fraud, embezzlement or misappropriation of FEHBA funds." Proposed Second. Am. Compl. at Exh. A at I-7 (§ 1.10(a)(12)).

Fourth, the contract and the regulations explicitly provide that OPM is to be the sole arbiter of any benefits disputes between FEHBA carriers and enrollees. Any review of a FEHBA carrier's benefit determination must be made by OPM in the first instance. 5 U.S.C. § 8902(j) (providing OPM the remedy to "require the carrier to agree to pay for or provide a health service or supply in an individual case if the Office finds that the employee . . . is entitled thereto under the terms of the contract"). No court actions are permitted at all unless and until OPM review is sought and completed. 5 C.F.R. § 890.107(d)(1). Judicial review of OPM's decisions are solely under the deferential "arbitrary and capricious" standard of the Administrative Procedure Act ("APA"). In such a lawsuit, the enrollee may recover his or

her claimed benefits, but is not entitled to any other remedies such as punitive damages, interest, or injunctive relief.  5 C.F.R. § 890.107(c).  OPM is charged with making all benefit determinations because the Government's money is at stake in each such benefit determination and because OPM has "expertise in this area" and has the "ability to take a broad, national view when it interprets plans which serves the function of ensuring consistent, nationwide application."  *Muratore v. United States OPM*, 222 F.3d 918, 923 (11th Cir. 2000); *see also Doe v. Devine*, 703 F.2d 1319, 1326-31 (D.C. Cir. 1983) (Ginsberg, J.).

**ARGUMENT**

I. **DEFENDANTS' POSITION IS NOT INCONSISTENT WITH THE UNITED STATES' POSITION**

As a threshold matter, Defendants agree with many of the statements made by the United States in its Statement of Interest.  Indeed, it is not clear that Defendants and the United States have fundamentally inconsistent views about any disputes material to this case.

Defendants agree with the United States that there is no broad immunity or protection from the FCA whenever an administrative remedy is available (under FEHBA or otherwise).  To be clear, Defendants do *not* assert that "FEHBP plans are allegedly exempt, as a matter of law, from FCA liability" (Gov't Stmt. at 2), that either the Relator or the United States was required to exhaust any administrative remedies before bringing this case (*id*. at 5-6), that the Court is deprived of jurisdiction over this FCA lawsuit (*id*. at 5), that FEHB administrators are "immune" from FCA liability (*id*. at 8), or that *United States v. Southland Management Corp.*, 326 F.3d 669 (5th Cir. 2003) stands for the proposition that contractual remedies foreclose FCA liability "in every instance" (Gov't Stmt. at 10-11).  To the contrary,

Defendants' position is far narrower, and does not take issue with any of the United States' broad statements about the proper scope of the FCA. Defendants' arguments are based entirely on the specific federal regulatory and contractual scheme at issue as it relates to the specific facts of this case. Defendants fully recognize that, in general, FCA claims can, when properly alleged, be pursued against FEHBA carriers. In Section II below, we provide Defendants' focused explanation as to how the FEHBA administrative scheme prevents the Relator from properly pleading an FCA violation under the facts as alleged.

Next, there is no disagreement about the broad powers granted to OPM by Congress in administering the FEHBA program. The Government does not dispute that OPM alone was granted the authority to adjudicate benefits disputes between enrollees and FEHBA carriers, that OPM has broad police powers over FEHBA carriers, or that the FEHBA contractual and administrative scheme provides various remedial provisions potentially applicable in situations such as that alleged by the Relator. Nor does the Government dispute that in order for the Relator to prevail in this case, this Court would have to interpret the FEHBA plan at issue in order to determine whether particular benefits are covered by the plan – a determination normally reserved exclusively for OPM. The relevance of OPM's administrative powers to this case is also discussed in Section II below.

Finally, the Government does not claim that the Relator has made out valid FCA claims under Rules 12(b)(6) and 9(b) but instead recognizes "[t]hat the particular facts alleged in this case may not present a viable theory of recovery under the FCA." Gov't Stmt. at 8-9; *see also id*. at 10-11 ("there is no indication that the practice alleged actually caused

the Government to pay out money that it was not required to"). This issue is further discussed in Section III.

## II. THE EXCLUSIVE REMEDIES PROVIDED UNDER FEHBA PREVENT THE RELATOR'S PROPOSED SECOND AMENDED COMPLAINT FROM MAKING OUT A VALID FCA ALLEGATION

As Defendants have previously argued, there are two separate aspects of FEHBA that preclude the Relator's FCA lawsuit. *See, e.g.,* Doc. No. 31 at 3. First, it is precluded by the exclusive authority granted to OPM to adjudicate FEHBA benefit disputes. Second, it is precluded by OPM's broad authority to police FEHBA carriers.

### A. OPM's Exclusive Authority Over Benefit Disputes Prevents The Relator's Proposed Second Amended Complaint From Stating A Valid FCA Allegation

Even though the Relator is not literally suing for denied health benefits under FEHBA, resolution of this case requires a determination about whether a FEHBA carrier properly denied enrollees' claims under the FEHBA plan. The Relator's entire proposed Second Amended Complaint is dependent on the contention that the FEHBA plan should be interpreted as requiring Defendants to approve at least some claims for speech therapy submitted by patients with mental disorders. As demonstrated in Section III below, even if that contention is taken as true, the Relator fails to make out a valid FCA allegation. The question here, however, is whether the Relator should be permitted to base his complaint on the assumption that OPM would agree with his interpretation of what benefits are covered by the FEHBA plan. Because Congress specifically granted OPM the exclusive authority to interpret FEHBA plans and to make all FEHBA benefits determinations, the answer is no.

In support of that conclusion, Defendants cited *United States ex rel. Windsor v.*

*DynCorp, Inc.*, 895 F. Supp. 844 (E.D. Va. 1995), in which the court barred a relator from going forward with an FCA action in an analogous situation.  In that case, the relator's complaint was based on the assumption that the defendant had misclassified an employee for Davis-Bacon Act purposes, but the court granted summary judgment in the defendant's favor because Congress had granted the Department of Labor, and not the courts, the exclusive authority to resolve all Davis-Bacon Act employee classification disputes.  *Id*. at 851-52.  Similarly, resolution of this case would require the interpretation of a FEHBA plan to determine, among other things, whether it covers speech therapy associated with mental disorders and whether such therapy is "medically necessary" as that term is used in the plan.  Because this task has been specifically delegated to OPM, "responsibility for resolving [this] dispute[] rests not with the courts, but with" OPM.  *DynCorp, Inc.*, 895 F. Supp. at 851.

The Government contends that DynCorp "is properly read not as a ruling that administrative remedies must be exhausted before an FCA claim may be filed."  Gov't Stmt. at 12.  Defendants agree.  The Government also notes that *DynCorp* does not entirely exclude the possibility of an FCA action:

> To be sure, where a Contractor intentionally misrepresents to the government how much a worker was actually paid, or overstates the number of hours he or she actually worked, the contractor has made a false statement to the government.  So, too, has the contractor that purposefully doctors its records to misclassify an employee as a "General Laborer", when in fact it knows that the employee performed work of a more highly paid "Semi-Skilled Laborer."  Similarly, a statement by a contractor that it is paying its workers Davis-Bacon Act wages, when it knows that it is not, is false.

Gov't Stmt. at 12 (quoting *DynCorp*, 895 F. Supp. at 850).  Again, Defendants agree and recognize that there are many situations analogous to those cited in the above-quoted language where a FEHBA carrier might violate the FCA.  Analogous examples might be

-8-

when a carrier improperly denies certain benefits but then lies to OPM about it so that OPM is defrauded into negotiating a higher Service Charge, or when a carrier embezzles FEHBA funds outright while falsely claiming to OPM that the funds were used for allowable administrative expenses. Here, however, the Relator has not alleged any fraud along these lines.

The Government also argues that the *DynCorp* decision was premised on "a finding that, in that particular case, the relator's complaint failed to demonstrate the requisite *scienter* for an FCA claim." Gov't Stmt. at 12. The Government is mistaken. The fundamental premise of *DynCorp* was that an FCA suit could not lie because "it is impossible to determine whether DynCorp submitted a false claim to the government without first determining whether DynCorp actually misclassified an employee in a given instance. And, the responsibility for resolving such disputes rests not with the courts, but with the Department of Labor." 895 F. Supp. at 851.

It is for this narrow proposition that Defendants cited *DynCorp*. In other words, the Relator is not entitled to assume that any speech therapy claims associated with mental disorders are covered by a FEHBA plan unless and until OPM has made such a determination. However, there is no allegation that OPM has determined that claims for speech therapy associated with mental disorders are covered under the FEHBA plan and should be paid. Because Congress specifically granted OPM the exclusive authority to adjudicate all benefits determinations, the Relator should not be permitted to plead an FCA case premised on the assumption that OPM would agree with his interpretation of the FEHBA plan. It is for OPM acting pursuant to FEHBA – not for courts or juries acting

pursuant to the FCA – to determine what benefits a FEHBA plan allows.

    **B.    OPM's Exclusive Authority to Police FEHBA Carriers Prevents The Relator's Proposed Second Amended Complaint From Stating A Valid FCA Allegation**

Defendants also argue that the Relator's FCA action cannot stand in light of another feature of the FEHBA scheme: OPM's police powers and specific contractual remedies to deal with situations such as the one alleged by the Relator. Again, Defendants do not suggest that the existence of contractual or administrative remedies bars FCA liability in general. Instead, Defendants argument is limited to the particular federal program at issue and to the specific facts as alleged by the Relator.

In support of its argument, Defendants rely on *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37 (D.D.C. 1996) and *United States v. Southland Management Corp.*, 326 F.3d 669 (5th Cir. 2003). The *Bridges* court discussed OPM's broad police powers over the FEHBA program and held that no action could lie under RICO because "the broad enforcement and oversight powers of the OPM established in the statute indicate that the exclusive remedy for an action cognizable under the FEHBA lies under the FEHBA, not under another federal statute." 935 F. Supp. at 41. Unlike the Relator, the Government does not dispute that OPM has broad powers to police FEHBA carriers. Moreover, the Government does not dispute the basic holding of *Bridges* and does not even cite the case in its Statement of Interest.

The Government does, on the other hand, take issue with Defendants' reliance on *Southland Management*. Gov't Stmt. at 9-11. However, the Government seems to have mistakenly believed that Defendants "propose a reading of *Southland Management* that

would, in every instance, foreclose potential FCA liability whenever regulatory and/or contractual remedies exist." Gov't Stmt. at 11. Defendants agree with the United States that *Southland Management* should not be read that broadly.

Instead, Defendants' point in citing *Southland Management* is that when (1) a federal statutory scheme sets out specific standards, (2) a federal agency is given specific regulatory or contractual remedies to enforce those standards, (3) the agency is charged with enforcing those standards in order to properly balance important competing interests served by the federal statutory scheme, and (4) a relator's FCA complaint interferes with the agency's responsibilities by seeking to impose different standards than those used by the agency, then the regulatory or contractual remedy should apply to the exclusion of the FCA. *See also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (finding state law claims preempted because they would "skew" the "somewhat delicate balance of statutory objectives").

There can be no debate that these conditions are met in this case. FEHBA spells out a detailed enforcement scheme under which OPM is exclusively responsible for balancing the various stakeholders' interests. *See, e.g., Doe v. Devine*, 703 F.2d 1319, 1326-31 (D.C. Cir. 1983) (discussing the competing interests that OPM must balance, including the Government's interest in cost containment as well as the interests of subscribers and insurers). The contract in question specifically spells out the standards that carriers must meet (*e.g.*, 95 percent claims processing accuracy) and, in the very same contract section, gives OPM the power to enforce those standards (*e.g.*, the right to order the carrier to correct any claims processing deficiencies). Proposed Second Am. Compl. at Exh. A at I-6

(§ 1.9(i)). And lastly, the Relator's allegations seek to impose different standards on FEHBA carriers (*e.g.*, a 100% claims processing accuracy rate). Under these particular facts and this particular statutory scheme, an FCA action should not lie because it "would exert an extraneous pull on the scheme established by Congress." *Buckman*, 531 U.S. at 353.

*Southland Management* is also instructive here in a simpler sense. As in that case, given the remedial provisions at issue here, there simply cannot, as a factual matter, be any fraud under the facts alleged by the Relator. We discussed many of these remedies in our prior filings and will not repeat them here. *See* Doc. No. 25 at 4-6; Doc. No. 31 at 11-13. One aspect of the contract does merit further discussion, however. As stated above, the contract does not require Defendants to process claims with 100 percent accuracy. Instead, the contract provides for only a 95 percent accuracy rate. That does not mean that if the carrier is processing more than 95% of the claims correctly, OPM is powerless to correct the purported claims processing deficiency alleged by the Relator (or any other deficiencies for that matter). Section 1.9(i) of the contract explicitly gives OPM the authority to order the carrier to correct any claims processing deficiencies. Proposed Second Am. Compl. at Exh. A at I-6 (§ 1.9(i)). In addition, OPM has the authority to penalize carriers for any "pattern of poor conduct," "fraudulent or unethical business or health care practices" or "lack of business integrity or honesty." *Bridges*, 935 F. Supp. at 42.

However, the 95% standard does mean that Defendants' claims for the Service Charge cannot be false or fraudulent under the Relator's theory that OPM did not receive everything to which it was entitled under the contract. If 95% of the claims were processed accurately, OPM will have received the contractually required claims processing

performance. These facts are similar to those in *Southland Management*, where the contract stated that, despite less than perfect performance of their obligations, defendants were entitled to continue receiving payment, at least during a corrective action period. 326 F.3d at 675-76.

The Government makes a brief attempt to distinguish *Southland Management* on the facts by claiming that "Relator alleges that OPM was **unaware** of Defendants' alleged practice of denying benefits, and Defendants point to no 'corrective action period' in the FEHB contract at issue." Gov't Stmt. at 10 (emphasis in original). The Government is incorrect on these points. First, nowhere does the Relator allege that OPM was unaware of Defendants' alleged practice of denying benefits. If anything, the Relator alleges the opposite when he claims that OPM frequently reversed these denials. Second, and more importantly, whether OPM was aware of this alleged practice is irrelevant. It is the Relator's burden properly to plead a fraud under the FCA by setting forth sufficient factual allegations supporting his assertion that OPM was fraudulently denied some benefit or right to which it was entitled under the contract. Given that the contract provided for only 95 percent claims processing accuracy, OPM cannot have been defrauded unless the Relator alleges that Defendants' actual performance was worse than that, or alternatively that OPM ordered Defendants to correct a deficiency and that Defendants failed to comply. But again, these allegations are missing. Third, while the Government is literally correct that there is no set "corrective action period" in the FEHBA contract, it cannot be disputed that the contract expressly permits Defendants to process claims with less than 100 percent accuracy. There is

no corrective action period because Defendants are not required to correct anything in order to continue receiving all of their payments under the contract.

For these reasons, the logic of *Southland Management* fully applies here. We repeat, however, that Defendants do not mean to suggest that this logic would always apply where there is an available administrative remedy or even that it would always apply to FCA suits brought against FEHBA carriers. Nor do Defendants contend that a FEHBA carrier may process claims however it likes without any oversight. Instead, Defendants merely argue that the express terms of the FEHBA contract mean that the claims processing deficiency alleged by the Relator cannot make Defendants' claims for the Service Charge false where there is no allegation that Defendants' claims processing was inaccurate more than five percent of the time or that Defendants failed to comply with an OPM order to correct the claims processing deficiency.

### III.  THE RELATOR'S PROPOSED SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER RULES 12(b)(6) AND 9(b)

As stated above, the Relator should not be entitled in this FCA action to assume how OPM wants Defendants to process speech therapy claims. However, as the Government correctly points out, this Court need not decide that question if it finds that the Relator has failed properly to plead an FCA violation under Rules 12(b)(6) and 9(b). In other words, even assuming the Relator is correct that Defendants improperly processed speech therapy claims, his allegation still fails under the FCA. As the Government points out, "the particular facts alleged in this case may not present a viable theory of recovery under the FCA." Gov't Stmt. at 8-9.

To make out a valid FCA claim, the Relator must properly plead that Defendants "1) present[ed] or cause[ed] to be presented to the United States government, a claim for approval or payment, where 2) that claim is false or fraudulent, and 3) the action was undertaken 'knowingly,' in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that information." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004). In addition, the Relator must properly plead facts sufficient to show that the false claim was material to the Government's decision to pay. *See* Doc. No. 25 at 22. While the Relator's proposed Second Amended Complaint does allege that Defendants presented claims (for the Service Charge) to the Government, he fails adequately to plead any of the other required elements of an FCA violation.

The Relator has not properly pleaded that Defendants' claims for the Service Charge were false because he has not pleaded that Defendants' actions have improperly increased the amount of the Service Charge over and above what Defendants were rightfully entitled to receive. As stated above, the Government *must* consider certain factors in setting the Service Charge including "such elements as the accurate and timely processing of benefit claims and the volume and validity of disputed claims." 48 C.F.R. § 1615.404-70(a)(1). Therefore, even assuming that Defendants had improperly processed claims as the Relator alleged, OPM should have taken that into account when setting the amount of the Service Charge. It conceivably might still have been possible for the Relator to plead an FCA violation by alleging that Defendants somehow lied to or deceived OPM in connection with the

negotiation of the Service Charge.  But, the Relator makes no such allegation, and there is no basis for such an allegation.

Another reason the Relator has failed properly to allege that Defendants' claims for the Service Charge were false is that the contract explicitly states that Defendants are only required to process claims with a 95 percent accuracy rate.  Thus, even assuming the Relator is correct that Defendants have improperly processed certain speech therapy claims, Defendants are still entitled to the full Service Charge.[2]  It might have been possible for the Relator to have avoided this deficiency by alleging that Defendants claims processing accuracy was less than 95 percent or that Defendants failed to comply with an order from OPM to correct a deficiency.  Again, he makes no such allegation, and there is no basis for it.[3]

For similar reasons, Defendants cannot be said to have "knowingly" submitted any false claims.  For example, even had the Relator alleged that Defendants failed to process 95 percent of the claims accurately, his allegation would still fail because he does not allege that

---

[2] If Defendants had improperly processed certain speech therapy claims, OPM would have the right to order them to correct that deficiency through FEHBA's remedial mechanisms.

[3] The alleged fact that OPM frequently reversed Defendants' denials of speech therapy claims provides yet another reason why Defendants' claims cannot be false.  *See* Proposed Second Am. Compl. ¶¶ 87, 96.  The Government acknowledges, as it must, that OPM had knowledge of some speech therapy claims denials by Defendants, but argues that this fact does not "necessarily mean[] that OPM condoned the denials."  Gov't Stmt. at 10 n.5.  Defendants agree.  The point is not that OPM *condoned* Defendants' actions, but rather that if OPM knew about Defendants' claims denials, it is hard to say that Defendants' claims could be false (even aside from Defendants' other arguments negating the falsity element).  *See, e.g., United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  The Government also asserts that some courts have held that government knowledge might, but does not necessarily, vitiate an FCA action.  Gov't Stmt. at 10 n.5.  Even assuming the Government's view of the law, OPM's knowledge in this case is just one of the many reasons Defendants' claims cannot be false.

Defendants knew their performance fell below the 95 percent threshold. In that regard, he alleges only that OPM frequently reversed Defendants' decisions on speech therapy claims, without quantifying how often that happens or what percent of the time. In addition, there is no indicia that Defendants thought they were doing anything wrong when they submitted claims for the Service Charge. And, as explained in Defendants' prior filing (Doc. No. 31 at 18), there is no possible motive for Defendants to have improperly denied speech therapy claims.

Likewise, even had the Relator properly pleaded the falsity and knowledge elements, the Relator's proposed Second Amended Complaint would still fail because is does not plead any facts from which it can be reasonably inferred that Defendants' allegedly improper claims processing practices were material to OPM decision to pay out any money. That is particularly true in light of the facts that OPM was required to consider Defendants claims processing accuracy in setting the amount of the Service Charge, that Defendants were not required to process 100% of the claims accurately, and that there is no allegation that the speech therapy claims in question make up any significant portion of the total claims Defendants processed under the contract.

The Relator's newly amended Complaint fails properly to allege that any of Defendants' claims for the Service Charge were false, that Defendants knew they were false, or that Defendants' actions were material to OPM's decision to pay. Each one of these deficiencies on its own means that the Complaint does not suffice under Rules 12(b)(6) and 9(b) to make out a claim of fraud under the FCA.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Relator's Motion to File Second Amended Complaint and should grant Defendants' Motion to Dismiss.

Dated: June 6, 2006

Respectfully submitted,

/s/     Adam P. Feinberg
Anthony F. Shelley
ashelley@milchev.com
Adam P. Feinberg
afeinberg@milchev.com
Miller & Chevalier Chartered
655 15th Street, NW
Suite 900
Washington, DC  20005
Telephone:  (202) 626-6800
Fax:  (202) 628-0858

Nicholas J. Nesgos, BBO No. 553177
nnesgos@pbl.com
Jennifer Finger, BBO No. 641830
jfinger@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-8004
Telephone:  (617) 973-6100
Fax:  (617) 367-2315

*Counsel for Defendant Blue Cross Blue Shield Association*

/s/     Michael J. Tuteur
Michael J. Tuteur, BBO No. 543780
mtuteur@foley.com
Lawrence M. Kraus, BBO No. 564561
lkraus@foley.com
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199
Telephone:  617-342-4000
Fax:  617-342-4001

*Counsel for Defendant Anthem Blue Cross Blue Shield of New Hampshire*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing DEFENDANTS' JOINT RESPONSE TO THE UNITED STATES' STATEMENT OF INTEREST to be served electronically on the following on this 6th day of June, 2006:

Richard B. McNamara, Esquire
Stephanie A. Bray, Esquire
Wiggin & Nourie, P.A.
670 No. Commercial Street
Suite 305, P.O. Box 808
Manchester, New Hampshire  03105

Patricia M. Connolly, Esquire
Assistant United States Attorney
1 Courthouse Way
Suite 9200
Boston, Massachusetts  02210

Michael F. Hertz, Esquire
Joyce R. Branda, Esquire
Tracy L. Hilmer, Esquire
U.S. Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC  20044

        /s/      Adam P. Feinberg
        Adam P. Feinberg