"structural problems here" and that "clearly our standards for 'medical necessity' and OPM's are not the same." RELATOR inquired why, despite the OPM reversal, Anthem New Hampshire, the Association's agent, continued to deny these claims. LETIZI answered that employees of Anthem New Hampshire "could lose their jobs" if a different determination was made. This was because Anthem New Hampshire personnel were applying standards and criteria that came from the Association; because "our system is programmed in such a way as to spit out your claims"; and because, even after the successful appeal to OPM, "we had all sorts of trouble getting the system to take ... [the ultimately successful claims for the speech therapy sessions] ... for processing."

66. On July 2, 2001, RELATOR had two conversations with Anthem New Hampshire Service Benefit Plan liaison LISA TWOHIG. In the first conversation, TWOHIG expressed concern about how OPM might respond to yet another denial of speech therapy reimbursement for RELATOR's son. TWOHIG informed RELATOR that she would contact an official who worked for the Association to see if anything could be done.

67. TWOHIG called back that same day to say that she had spoken to BARBARA HOLLEY in the Director's Office of the Association. HOLLEY had authorized Anthem New Hampshire to pay the claims pertaining to the summer 2000 sessions. In the course of this conversation, TWOHIG informed RELATOR that Anthem New Hampshire's denials of RELATOR's speech therapy claims were required under "Guidelines" the Association issued to all of the Local Plans. TWOHIG also stated that issues involving speech and occupational therapy for children were a "national problem"

17

for the Association and were not "unique" to subscribers in New Hampshire. She stated that "most cases involving OPM reversals of Local Plan decisions are speech therapy cases." TWOHIG again mentioned her "concern about exposure to OPM." Finally, TWOHIG emphasized that the Anthem New Hampshire's decision to cover speech therapy for RELATOR's son was not indefinite and could change.

68. On July 24, 2001, while reviewing the documents accumulated in the course of his dealings with Anthem New Hampshire and the Association, RELATOR noticed that LAFLEUR's May 30, 2000 letter had stated that "[a] copy of the criteria used in … [denying RELATOR's Summer 2000 request for pre-certification] … may be obtained by calling 1-800-531-4450." RELATOR called the number and asked for the criteria. The service representative said that she would have to call him back.

69. Later in the day, RELATOR received a call from Anthem New Hampshire Senior Customer Service Representative KELLY FEENY, author of the October 26, 2000 decision denying RELATOR's initial appeal and the April 9, 2001 letter acknowledging OPM's reversal of the denial of the November/December 1999 claims. FEENY informed RELATOR that LAFLEUR's justification for the claim denial in his May 30, 2000 letter was "boilerplate language" that Anthem New Hampshire had been sending out in its letters denying coverage to customers who were not federal employees. FEENY stated that the denial decision was based upon guidelines, specifications, or and/or criteria dictated to Anthem New Hampshire by the Association. When RELATOR asked FEENY for a copy of the written guidelines applicable to his son's situation, she refused, saying that the Association's guidelines were for "internal use

18

only" and were regarded as "extremely private." FEENY also confirmed that denials by the Local Plans of claims for children's speech and occupational therapy were frequently reversed on appeal by OPM.

70. FEENY went on to state that the Association's national computer system, which is used by Local Plans when a claim is made by a beneficiary of the Service Benefit Plan, is programmed in such a way that all claims seeking coverage for speech therapy, occupational therapy, physical therapy and other "medical services" will be denied when they bear "mental disorder" diagnosis codes. Although FEENY would not disclose the specific diagnosis codes that had been submitted in connection with the claims of RELATOR's son, she informed RELATOR that the codes corresponded to a "mental disorder" diagnosis. RELATOR subsequently learned that the diagnosis codes used in his son's submissions were 315.4, 315.39 and 784-69. The meaning of these diagnosis codes is discussed infra.

71. FEENY explained that the ICD-9, discussed infra, classifies certain conditions, common in young children, as "mental disorders." FEENY asserted that the Association had programmed its computers to regard speech therapy, occupational therapy and physical therapy as "medical services" to be covered only when the claim forms contain corresponding "medical disease" diagnosis codes. In other words, she said, the Association's computer system will automatically reject all claims for "medical services" on claim forms containing a "mental disorder" diagnosis code, even when those services actually are "medically necessary" to treat the mental disorder.

72. FEENY agreed with RELATOR that, as a result of the Association's

19

computer system, the only way a plan beneficiary can obtain approval for a "medical service" prescribed for a condition bearing an ICD-9 "mental disorder" diagnosis code is to appeal the Association's agent's automatic denial to OPM. FEENY informed RELATOR that his son was particularly "lucky" because the Association had mandated that, in the case of claims involving "his son and his son alone," an Anthem New Hampshire employee would be assigned responsibility for keying into the computer system an "override" to the Association's preprogrammed "denial." When RELATOR suggested that this was good for his son but not so good for others with similar diagnoses, FEENY had no reply.

73. Until early 2002, RELATOR's son received private speech therapy from a third therapist. Anthem New Hampshire provided reimbursement for these services pursuant to the Association's authorization to permit a system "override" applicable only to RELATOR's son.

74. On Tuesday, April 13, 2004, RELATOR left a message on an Anthem New Hampshire customer service line, requesting a copy of the guidelines that would be used to evaluate any claim for speech, occupational and physical therapy services for his daughter, who also has articulation issues but was not diagnosed with a particular condition.

75. On April 15, 2004, an Anthem New Hampshire customer representative named "Linda" returned RELATOR's call. LINDA would not provide RELATOR with her last name, stating that she was not allowed to do so by her office. Instead of responding to RELATOR's request for the guidelines, she described the benefits to which

the RELATOR is entitled under his Service Benefit Plan. RELATOR told LINDA that he knew the Plan's coverage provisions and, after describing the history of his attempts to secure coverage for his son's speech therapy sessions, asked for a copy of the internal guidelines that Anthem New Hampshire had refused to provide to him in 2001. LINDA replied that the internal guidelines are "even more confidential now." When RELATOR described the computer system problem he had uncovered in connection with his son's claims, she told him that the Association's computer system is still programmed to reject claims for speech, occupational and physical therapy when prescribed to treat a "mental disorder." LINDA stated that "the same thing will probably happen again." She also confirmed that RELATOR likely will need to go to OPM to get any potential coverage for his daughter because "nothing has changed" and because speech, occupational and physical therapies are still "problem areas with mental disorder diagnoses."

## V. <u>ALLEGATIONS OF FRAUD</u>

### A. General Allegations

76. The Centers for Medicare and Medicaid Services (CMS), and the National Center for Health Statistics (NCI), two departments within the Department of Health and Human Services (DHHS), have devised the <u>International Classification of Diseases, Ninth Revision - Clinical Modification</u> ("ICD-9-CM") to identify diagnosis codes for to be used in submissions for reimbursement, i.e., "claims," by health service providers.

77. Section 315 (Specific Delays in Development) of Chapter 5 of the ICD-9-CM deals specifically with learning delays.

78. The ICD-9-CM, Section 315.4 (Coordination Disorder) classifies as "mental

21

disorders" certain coordination disorders, such as "Clumsiness Syndrome," "Dyspraxia Syndrome" and "Specific Motor Development Disorder."

79. The ICD-9-CM, Section 315.39, classifies as a "mental disorder" a disorder known as "Developmental and Articulation Disorder."

80. The ICD-9-CM, Chapter 16 (Symptoms, Signs and Ill-Defined Conditions), Section 784-69 (Symptoms Involving Head And Neck), classifies as a "symptom, sign, or ill-defined condition" a condition known as "Apraxia," along with three others.

81. These disorders and conditions, common in young children, cause speech and fine motor functioning problems. Speech, occupational and physical therapies are medically necessary treatments for these disorders and conditions.

82. As set forth above, the Association has determined, and actually has programmed its computers, to shunt aside, and not to adjudicate, claims for speech, occupational, and physical therapy when the claim forms by which reimbursement coverage is sought contain corresponding "mental disorder" diagnosis codes.

83. The result is that the Association causes its Local Plans not to pay claims for reimbursement for medically necessary speech, occupational and physical therapy which are submitted on claim forms containing "mental disorder" diagnosis codes from the ICD-9-CM -- at least in situations where claimants are not unusually persistent.

84. OPM contracts with the Association for the adjudicative and other administrative services required in the administration of the Service Benefit Plan. The OPM, as a party in interest, has the final "right of review" of the denial by the carrier [the

Association] ... of a claim for reimbursement (Title 5, Part 890 C.F.R. Sec. 105 - Filing Claims for Payment or Service).

85. The C.F.R. also provides that OPM is the party in federal court to be sued by a subscriber if it denies coverage, not the Association or Local Plan.

86. Among the contract's service benefits is limited reimbursement for "... other outpatient services [for] ... speech, occupational and physical therapy."

87. The Association and Anthem New Hampshire act with actual knowledge of their fraudulent denial of claims for reimbursement for speech, occupational and physical therapy in cases where the therapy is medically necessary for conditions classified in the ICD-9-CM as "mental disorders," as such denials are frequently reversed by OPM.

88. The Association and its agents have caused the Government to receive less than that for which it has bargained. Contract CS 1039 requires the Association and its agents to adjudicate and reimburse claims for all medically necessary speech, occupational, and physical therapy. In practice, however, the Association and its agents adjudicate and reimburse only claims for medically necessary speech, occupational, and physical therapy prescribed in connection with "medical disease" diagnosis codes.

89. The Association and its agents have discriminated against beneficiaries of the Service Benefit Plan who suffer from mental disorders for which speech, occupational, or physical therapy are medically necessary treatments.

90. On information and belief, the Association and its agents fraudulently deny these claims for speech, occupational and physical therapy not merely to defraud the federal government and its beneficiaries, but also to defraud all holders of Blue Cross and

Blue Shield policies nationwide. The fraud against the federal government is part of a larger effort to defraud all Association policyholders. In fact, on information and belief, the scheme is motivated by the profits it generates for the Association and its agents in connection with their private plans.

## B. Legal Theories and False Claims Allegations

### 1. Violation of 31 U.S.C. § 3729(a)(1)

91. The Association has been engaged in an ongoing violation of 31 U.S.C. § 3729(a)(1) of the FCA, which proscribes the knowing presentation to the United States Government of a false or fraudulent claim for payment or approval.

92. The Service Benefits Plan is "experience rated," so the Association and its agents are entitled to withdraw from a special reserve in the letter of credit account it manages in administering the Plan a portion of its negotiated annual service charge on the last day of each month. See Exhibit A at §§ 1.1, 3.3(a), and 3.7.

93. Since at least January 31, 2000 (when RELATOR's first batch of claims for reimbursement for medically necessary speech therapy were not adjudicated (or, alternatively, were not adjudicated accurately and in good faith)), and on the last day of each month since January 2000, the Association, in conspiracy with Anthem and others, has submitted at least 73 consecutive monthly "claims" for its negotiated service charge, see id. at § 4.4 (stating that a "claim includes, in the case of the carrier, a charge against the contract") for approval or payment. See id. at §§ 1.1, 3.3(a) & 3.7.

94. Each such claim is false or fraudulent in violation of FCA § 3729(a)(1) for at least two reasons. First, the claims are factually false or fraudulent because OPM pays

24

the Association its service charge in consideration for "all the services set forth in [Contract CS 1039]." See id. at ii. And yet, as set forth above, the Association and its agents do not provide OPM with all the services for which it has contracted, which include adjudicating and paying claims for medically necessary speech, occupational, and physical therapy sought in connection with diagnosed mental disorders. Second, the claims are legally false or fraudulent because, in accordance with the annual "truing up" process required by § 3.2 of Contract CS 1039, the Association and its agents have in each contract year since 2000 certified the satisfaction of material conditions to payment of their service charge: (1) that only income, rebates, allowances, refunds, and other credits owed in accordance with the contract terms have been included in the accounting statement, see id. at § 3.2(c)(3); and (2) that the letter of credit account was managed in accordance with the federal acquisition regulations found at 48 C.F.R. chapter 16, which are part of the contract, see Contract CS 1039 at § 1.4(a), and require, inter alia, "compliance with the terms of the . . . contract," 48 C.F.R. subpart 1609.7001(b)(3) (2005), and the "accurate adjudication of claims" presented to the Association and its agents under the contract, 48 C.F.R. subpart 1609.7001(b)(4) (2005). See Exhibit C (2000-2004 Annual Accounting Statements, signed and certified by Chief Executive Officer Scott P. Serota, Financial Officer Ralph D. Rambach, Executive Director of Finance Michelle Helfand, and Senior Vice President Kathryn Sullivan, and dated, respectively, May 4, 2001, August 21, 2002, April 22, 2003, April 29, 2004, and April 29, 2005). (N.B. The Association has not yet submitted the 2005 Annual Accounting Statement).

95. As set forth above, the Association and its agents are neither materially complying with the terms of the contract nor accurately adjudicating the claims which are the subject of this lawsuit

96. The Association's presentation of these false claims for approval has been "knowing" or, at the very least, deliberately ignorant or recklessly in disregard of the truth. As set forth above, the Association's agents are well aware that OPM regards speech, occupational, and physical therapy to be medically necessary treatments for certain mental disorders. And yet, knowing that its non-adjudications and denials are frequently reversed by OPM, the Association and its agents knowingly maintain the non-compliant (with Contract CS 1039) computer system and adjudicative process in connection with claims of this sort, making exceptions only for persistent enrollees who do not accede to their initial decisions.

## 2. Violation of 31 U.S.C. § 3729(a)(3)

97. The Association and Anthem New Hampshire (and others) have been engaged in an ongoing violation of 31 U.S.C. § 3729(a)(3) by conspiring to defraud the government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit. The Association and Anthem New Hampshire have engaged in a number of overt acts to further the conspiracy, including the setting up and maintenance of a non-compliant (with Contract CS 1039) adjudicative system and the repeated failure to adjudicate, or to adjudicate accurately and fairly, claims for reimbursement for medically necessary speech, occupational, and physical therapy submitted in connection with mental disorder diagnoses.

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1)

### (Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)

98.  RELATOR realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 97.

99.  The Association, through its agents, has knowingly presented, or cause to be presented, to officers, employees or agents of the United States Government false or fraudulent claims for payment or approval.

100. By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by the Association or its agents.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(3)

### (Conspiring to Defraud the Government Through False or Fraudulent Claims)

101. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 100.

102. The Association, Anthem New Hampshire, and others have conspired to defraud the government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit.